**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ALAN KONIG,

        Plaintiff,

  v.

LAWRENCE J. DAL CERRO, ET AL.,

        Defendants.

_____/

No. C-04-2210  MJJ

**ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

### INTRODUCTION

Before the Court is Defendants' motion for partial summary judgment in this § 1983 lawsuit. Plaintiff Alan Konig ("Plaintiff") opposes the Motion. After careful consideration of the parties' briefs and after oral argument on the motion, the Court **GRANTS** Defendants' motion for partial summary judgment for the following reasons.

### FACTUAL BACKGROUND[1]

Plaintiff Konig was employed by the State Bar of California as Deputy Trial Counsel within the Office of the Chief Trial Counsel ("OCTC") in San Francisco from May 17, 1999, until October 27, 2004. The Chief Trial Counsel has exclusive jurisdiction over the State Bar's prosecutorial decisions. Defendant Robert Hawley is the Deputy Executive Director of the OCTC. The Deputy Chief Trial Counsel, Defendant Russell Weiner, supervises several Assistant Chief Trial Counsel,

---

[1] The facts described herein are taken from the parties' briefs. Wherever the parties appear to dispute a particular fact, each party's interpretation of what occurred is identified as such.

**United States District Court**
For the Northern District of California

who are each in charge of a unit comprised of Senior Trial Counsel, Deputy Trial Counsel, paralegals, and investigators.  Defendant Lawrence J. Dal Cerro, who serves as Assistant Chief Trial Counsel, and Defendant Allen Blumenthal, Senior Trial Counsel, both supervised Plaintiff.

As Deputy Trial Counsel, Plaintiff was charged with litigating matters in the State Bar Court and State Superior Court related to attorney admission, licensing, regulation, and discipline. Through performance evaluations and otherwise, Plaintiff was regularly recognized for his outstanding work.  In the Manager's Comments section of his 2000-2001 performance review, however, it was noted that Konig was "very aggressive" and that "he experienced some difficulty dealing with opposing counsel."  (Declaration of Robert Hawley ("Hawley Decl."), Ex. C.)  Konig was advised to "consider adopting a less aggressive posture" and that he "may find that a less confrontational style would benefit the orderly processing of his cases, create an atmosphere more conducive to settlement and enhance his dealings with both the Court and opposing counsel."  (*Id.*)

A.      **Plaintiff's 2002-2003 Interaction With, and Complaints About, State Bar Court Judges**

In San Francisco, there are only two State Bar Court judges:  Judge Patricia McElroy and Judge Joanne Remke.  Beginning in 2002, Plaintiff became increasingly concerned about improper rulings and orders from the State Bar Court judges.  He believed that both judges lacked judicial decorum and often acted contrary to the Code of Judicial Ethics.  He began to vocalize his concerns to his superiors at the OCTC in September 2002.  Plaintiff claimed that various State Bar Court rulings violated the State Bar's state and federal constitutional rights, violated witnesses' state and federal constitutional rights, and disregarded binding precedent.  For example, in a September 5, 2002, email to Defendant Dal Cerro, Plaintiff complained that Judge McElroy had engaged in extensive *ex parte* communications with opposing counsel when she granted requests for extensions of time without first consulting Konig.  (Declaration of Lawrence J. Dal Cerro ("Dal Cerro Decl."), Ex. A.)  On September 17, 2002, Plaintiff drafted a memorandum to the file in the *Wells* matter threatening to suspend an Early Neutral Evaluation Conference ("ENEC") when Judge McElroy questioned the factual basis of Plaintiff's Notice of Disciplinary Charges ("NDC") and suggested that the State Bar agree to reduced discipline.  (*Id.*, Ex. B.)  On another occasion, Plaintiff found fault with a State Bar Court decision rendered in his own office's favor.  He complained that Judge

McElroy's decision disbarring an attorney was "so fraught with factual errors and erroneous legal conclusions" that he was embarrassed to show it to the complaining witnesses and he "wondered" if McElroy had read the evidence or his brief. (*Id.*, Ex. C.) He urged his supervisors to seek review of the favorable decision. In May 2003, Plaintiff complained in an email that he had "reached [his] breaking point" with Judge Remke as well, when she denied his motion to continue a trial. Plaintiff claims that he urged Defendant Dal Cerro to take action in response to the conduct of the State Bar Court, and informed Dal Cerro that if he did not do so, Plaintiff himself would report the State Bar Court's actions to the California Commission on Judicial Performance ("CJP"). (*Id.*, Ex. D.) Defendants took no action.

Defendants contend that due to the "small, 'repeat player' nature of this bar and bench, it is critical that all State Bar prosecutors in San Francisco have a professional working relationship with both of these judges." (Motion at 2:13–15.) According to Defendants, Plaintiff began displaying disrespect for both judges in 2002. Specifically, he repeatedly refused to comply with judicially-set time limits for witness examinations and complained to the judges about such limits being imposed. He accused Judge Remke of bias against him for denying a motion to compel discovery and, during a trial in 2003 (the *Bajaj* trial), was apparently so disrespectful in court that Judge Remke warned him that he would be required to bring his supervisor to court if he continued.[2] A month later, during the *Wells* trial, also before Judge Remke, Plaintiff again refused to comply with the time limit set for conducting a witness examination and behaved contemptuously. When Judge Remke instructed Plaintiff to summon Dal Cerro to the courtroom, Plaintiff refused, claiming that she did not have the power to make such an order of the State Bar. Judge Remke then summoned Dal Cerro herself.

**B.      Plaintiff's Conduct At, and Complaints, About the OCTC**

---

[2] After the trial, which the State Bar lost, Defendant Blumenthal was assigned, over Konig's objection, to review the *Bajaj* trial record. In April 2004, Blumenthal recommended that the Bar withdraw its request for review. He concluded that there was an insufficient legal basis for appeal and that Konig's handling of the matter was "disturbing" and unprofessional. He was particularly concerned that Konig had treated Judge Remke so disrespectfully, that he had engaged in inappropriate communications with a witness, and that he had delayed propounding discovery in the case until very late in the discovery period, significantly impairing the case. (Declaration of Allen Blumenthal ("Blumenthal Decl."), Ex. K.)

United States District Court
For the Northern District of California

On September 11, 2003, the day after he attended an ENEC in the *Kay/Dalton* matter with supervisor Donald Steedman (not a defendant here), Plaintiff delivered an eight-page memorandum to Defendant Dal Cerro entitled, "State of Office Working Environment." (*Id.*, Ex. G.) In that memo, Plaintiff complained about low morale at the office and about feeling betrayed by his superiors. Specifically, Plaintiff complained that Dal Cerro had "backstabbed" Plaintiff by coming to court at Judge Remke's insistence and by allowing Judge Remke to "dress me down." He also complained that Steedman had "undercut" him at the September 10 *Kay/Dalton* ENEC by agreeing to the other side's request for an extension of time when Plaintiff did not want to so agree. In the memorandum, Plaintiff accused Judge Remke of bias and misconduct for: (1) referring to an Immigration Judge as "Mr. Abrams" instead of "Judge Abrams;" (2) "improperly" allowing a witness to be questioned about his medical condition; (3) disallowing a line of re-direct examination she found irrelevant and ruling on an objection without allowing Plaintiff what he felt was sufficient time to respond to the objection; and (4) disallowing Plaintiff from asking another witness about unrelated discipline. (Dal Cerro Decl., Ex. G.) Plaintiff said he was tired, angry, frustrated, and no longer passionate about his job. "I refuse to conduct another ENEC or settlement conference under the current policy," Plaintiff wrote. (*Id.*) He threatened to resign the "next time [he] fe[lt] betrayed by this office." (*Id.*) Soon thereafter, Plaintiff wrote a letter to Judge Anello, the complaining witness in *Kay/Dalton*, in which he disclosed that there had been an internal disagreement over whether and when to file charges. (*Id.*, Ex. J.) He informed Anello that "supervising attorneys" often do not have complete knowledge of the cases when they attend ENECs and suggested that Steedman made the wrong decision in agreeing to the respondent's request for additional time. (*Id.*) According to Defendants, the letter improperly disclosed the Bar's work product and mocked Steedman's authority.

On September 23, 2003, Dal Cerro and Steedman met with Plaintiff and a union representative. According to Defendants, Dal Cerro attempted to counsel Plaintiff about his anger and his need to be less confrontational and accusatory. According to Plaintiff, at that meeting, Dal Cerro made several false allegations against Plaintiff related to his work and his insubordinate conduct. On October 31, 2003, Dal Cerro delivered a written response to Plaintiff's memorandum

that he and Defendant Hawley had prepared.  The response informed Plaintiff that the OCTC is not a democracy and that Plaintiff is not a free agent.  (*Id.*, Ex. H.)  According to Plaintiff, the response contained numerous vague and unwarranted allegations of misconduct against Plaintiff and included a "veiled threat that [Konig] either accept the way things are done and stop raising issues of wrongdoing and malfeasance or [he] would no longer have a job."  (Jan. 18, 2005, Declaration of Alan Konig ("Konig Decl. - Jan."), ¶ 15.)  Plaintiff responded with another memorandum in November complaining that the concerns he had raised in the September memo had gone addressed . (Dal Cerro Decl., Ex. I.)

Defendants contend that during this same time, they became so concerned about the theories and facts Plaintiff had included in his draft NDC in the *Kay/Dalton* matter that Steedman instructed Konig's assistant not to file the NDC.  Steedman also instructed Konig to cease communicating with the complaining witness because Plaintiff was creating "all types of pratfalls to [Anello] being a successful witness in the proceeding by involving him" in the charging decisions.  (Dal Cerro Decl., Ex. K.)  Konig objected saying, "[C]utting me out of this case after I committed significant and substantial time and energy has created a feeling within me that words cannot adequately describe." On October 24, Plaintiff asked, in writing, that the case be reassigned because he could not "operate in a cloud of secrecy knowing that conversations about this matter have occurred that I am not privy to."  (*Id.*, Ex. M.)  The case was reassigned to Defendant Blumenthal.  On November 10, Plaintiff sent an email to Dal Cerro complaining about the reassignment and asking for an explanation.  (*Id.*, Ex. N.)

On November 3, 2003, Plaintiff filed a formal complaint with the CJP about Judge Remke's lack of judicial decorum, unprompted character attacks on Konig, and general misconduct. (Declaration of Emilia Mayorga ("Mayorga Decl."), Ex. I.)  Defendants claim not to have known about this complaint.  Plaintiff, however, alleges that Defendants were aware of the CJP complaint because he had hinted at it in conversations with Dal Cerro and Blumenthal.  In November and December of 2003, Plaintiff made similar complaints to the California State Personnel Board,[3] the California Senate and Assembly Judiciary Committees, and the State Bar Board of Governors'

---

[3] The State Personnel Board rejected Konig's complaint.

United States District Court

For the Northern District of California

1  Regulation, Admissions, and Discipline Oversight Committee ("RAD").[4]  According to Plaintiff, the

2  day before he submitted his complaint to RAD, Defendant Hawley emailed John Van de Kamp,

3  RAD's Chair, to discuss Konig's forthcoming complaint.  Plaintiff claims that Hawley defended his

4  and Dal Cerro's actions and made prejudicial statements about Plaintiff.  According to Plaintiff,

5  Hawley suggested to RAD how Plaintiff's complaint should be dealt with and hired an investigator,

6  who was purported to be independent but who was not, to look into Plaintiff's claims.  (*See* footnote

7  4, *supra*.)  According to Plaintiff, Defendant Hawley also wrote to the legislative committees to

8  which Konig had complained, and represented that Mr. Van de Kamp was directing an appropriate

9  investigation into Konig's complaints.

10       On November 14, 2003, Plaintiff met with Steedman to discuss the *Mendez* NDC.  Steedman

11  gave Konig handwritten comments including edits and the deletion of three of 15 counts.  On

12  November 17, 2003, Plaintiff filed the *Mendez* NDC without having incorporated Steedman's

13  changes.  When asked about it, Plaintiff said that Steedman had not specifically instructed him not to

14  file the NDC without making the changes.  On November 20, 2003, Dal Cerro and Steedman met

15  with Plaintiff and union representative Rob Henderson to discuss Plaintiff's conduct.  Dal Cerro and

16  Steedman presented Plaintiff with a Disciplinary Notice (Written Warning).  (*Id.*, Ex. Q.)  The

17  Written Warning explained that Konig had insubordinately failed to make changes to the draft NDC

18  in *Mendez* as had been requested by his supervisor and that he then denied being instructed to make

19  those changes.  The Warning required, among other things, that Plaintiff file an amended NDC by

20  November 24, 2003.  Plaintiff was also warned that if he "continue[d] to fail to follow the direction

21  of [his] supervisors or otherwise engage[d] in acts of insubordination, disobedience, or disrespect,

22  _____

23       [4] After investigating Konig's claims, the investigator hired to look into Plaintiff's complaint,
     concluded that Konig's actions, and not the actions of his supervisors, were the cause of the "workplace
24   conflicts which form the basis of his complaints."  (Declaration of Charlotte Addington, Ex. A at
     56–58.)
25
         Plaintiff contends, however, that Defendant Hawley was actually in control of the investigation,
26   and not RAD.  He says that Hawley hand-picked Ms. Addington, with whom Hawley used to work and
     maintained a friendship, as the independent investigator.  (Konig Decl. - Jan., ¶ 51.)  To support his
27   allegation, Plaintiff claims that Hawley telephoned Addington on December 8 and 10.  Ms. Addington's
     notes from the December 10, 2003 call state, "Bob [is] contact" and "Konig will question my role." (*Id.*,
28   ¶ 53.) On December 11, Hawley wrote to Van de Kamp informing him that Charlotte Addington would
     conduct an "independent investigation."

6

**United States District Court**
For the Northern District of California

1  [he would] be subject to additional discipline, up to and including termination." (*Id.*) Plaintiff

2  objected to the Written Warning and refused to sign it. Plaintiff never filed an amended NDC in the

3  *Mendez* matter and was ultimately issued a second Written Warning for continuing to exhibit

4  "insubordinate and willfully disobedient behavior." (Dal Cerro Decl., Ex. V.)[5]

5        Also on November 20, 2003, Defendant Dal Cerro provided Plaintiff with a written review of

6  Plaintiff's performance for the July 2002 through July 2003 time period (the "Performance

7  Review"). On the whole, the Performance Review was positive, giving Plaintiff an overall rating of

8  "Meets Requirements."[6] However, in the Manager's Comments section, the Review suggested

9  several areas in which Mr. Konig might improve. Specifically, it reported that Mr. Konig had had

10 "several antagonistic encounters with various individuals, including his supervisors, a State Bar

11 Court judge, and several opposing counsel." (Dal Cerro Decl., Ex. S.) The original draft of the

12 Performance Review had been prepared by Steedman on August 4, 2003. That draft contained the

13 same ratings but was more critical of Plaintiff than the final version. (*Id.*, Ex. F.)

14       On December 4, Plaintiff submitted a grievance concerning the first Written Warning and the

15 Performance Evaluation. On January 6, Plaintiff, two union representatives, Dal Cerro, Steedman,

16 and Iola Lee-LaMark from Human Resources conducted Step I and Step II grievance proceedings.[7]

17 On January 9, Konig's grievance was rejected. Instead of requesting a Step III hearing (after which,

18 if the issues were not resolved, he could proceed to arbitration), Plaintiff abandoned his grievance.

19 Plaintiff did not file a grievance regarding his second Written Warning.

20       In early January, the OCTC in San Francisco reorganized into two teams. According to

---

22  [5] Mendez was ultimately found guilty on three counts and was sentenced to a one-year stayed suspension and one year of probation instead of the 30 days actual suspension and two years probation requested by the OCTC. On March 23, Blumenthal informed Plaintiff by email that the OCTC had decided not to appeal the discipline meted out in the *Mendez* matter. He said, "Alan: I have to go to a meeting, but I wanted you to know that the office has decided not to appeal the *Mendez* matter. We appreciate your efforts in this case." (Blumenthal Decl., Ex. J.) Konig responded, "Please cease the patronization." Blumenthal replied that he was not being patronizing and Konig sent several emails complaining that management had made the decision not to appeal with no input from him. (*Id.*)

27  [6] In several areas, Plaintiff was rated "Exceeds Requirements." In all other areas, Plaintiff was rated "Meets Expectations." In no areas was he rated "Needs Improvement."

28  [7] The parties had agreed to consolidate the first two phases of the grievance process into one proceeding.

United States District Court

For the Northern District of California

1    Defendants, the reorganization was designed to promote the filing of more NDCs and reduce case

2    backlog.  On each team, two Deputy Trial Counsel were to be responsible for notice drafting and

3    pre-filing settlement, and three Deputy Trial Counsel were to be responsible for handling trials.

4    Plaintiff was reassigned to the notice-drafting team.  According to Defendants, Plaintiff was

5    reassigned to "temporarily get [him] out of contested courtroom proceedings, where he had been

6    clashing with both State Bar Court judges and . . . to utilize his skills to help reduce case backlog."

7    (Motion at 9:26–10:1.)  Plaintiff wanted to keep his trial matters and objected to his reassignment.

8          Defendants contend that Plaintiff's performance fell short of expectations and his

9    insubordination escalated in the months after his reassignment.  For example, Konig refused to

10   follow the OCTC's charging guidelines set forth in the Uniform Charging Standards manual.  The

11   policy required that charges not be filed unless the Deputy Trial Counsel has sufficient evidence to

12   meet the clear and convincing burden of proof at trial.  Konig sent an email to all Deputy Trial

13   Counsel in the OCTC claiming that the policy was invalid.  When he was told he was "required to

14   comply," he refused and sent an email to Defendants Blumenthal, Dal Cerro, and Weiner, asserting

15   that he "cannot legally or ethically follow the 'guidelines.'" (Blumenthal Decl., Ex. O.)  He was

16   again instructed to follow the charging standard.  He admitted in deposition that he had had no

17   training on the issue and did not discuss the policy with anyone before declaring it "illegal."

18   (Mayorga Decl., Ex. A (Konig Deposition) at 60:8–16, 64:2–23.)

19         Defendants also contend that in several matters, Plaintiff continued to insubordinately resist

20   instruction from his superiors and to be confrontational with the State Bar Court judges.  For

21   example, in the *Medeiros* matter, Blumenthal asked Plaintiff to have a draft NDC in the matter done

22   by March 22.  Konig agreed ("no prob") and Blumenthal reminded Konig of the deadline on

23   March 12 and on March 16.  In response to the second reminder, Konig replied that he had not yet

24   been able to complete the draft but would have it done by the end of the week.  Blumenthal

25   confirmed that he needed the draft by the originally set due date.  In response, Konig sent a thirteen-

26   paragraph email to Blumenthal accusing management of harassing and criticizing him.  Among

27   other things, he said, "If I could spend less time distrusting management and supervisors, their

28   motives, and their actions, then I could probably have had the brief done by now."  (Blumenthal

8

<div style="float:left">**United States District Court**<br>For the Northern District of California</div>

1  Decl., Ex. G.)  Konig then forwarded the inter-office email exchange to a friend outside the State

2  Bar.  Defendants contend that this breached Konig's duties of confidentiality.

3      Similarly, in the *Lowenstein* matter, Konig provided a draft ENEC statement and NDC to

4  Blumenthal on April 1.  Blumenthal gave Konig written comments and questions.  Konig rejected

5  Blumenthal's edits and accused management of harassing him, retaliating against him, and engaging

6  in unethical and unlawful conduct.  (*Id.*, Ex. P.)  Dal Cerro then got involved and told Konig his

7  continuing to be insubordinate for no reason violated his obligation to do as he is told as long as he

8  works for the State Bar.  (*Id.*)  Konig responded with more accusations that his supervisors were

9  engaging in misconduct.  Dal Cerro then removed Plaintiff from the *Lowenstein* matter.

10      Another example of Plaintiff's insubordination, as described by Defendants, was his conduct

11  in the *Beasley* case.  Plaintiff sought to have attorney Beasley disbarred for mistakenly faxing a

12  proof of compliance form to the probation department instead of to the State Bar Court.  At a

13  settlement conference on the matter with Judge McElroy, the Judge commented that Konig was

14  "unreasonable," had "no judgment," and "never [comes] into these things with an open mind."

15  Afterwards, Judge McElroy apologized to Konig for her comments and Konig himself reported that

16  he responded to the apology as follows:

17

18      I told her that it was unnecessary to engage in a personal attack on my character
        especially in front of a respondent because now the respondent sees that and grabs
19      onto it and uses it in the future to undermine anything I could do in the future.  I
        told her I did not think it proper for a judge who is to be neutral and unbiased to
20      engage in a personal attack against a party or its attorney whether that be the State
        bar or the respondent.  There are ways to express your dissatisfaction but it is not
21      through a manner in which a judge loses the appearance of impartiality and allows
        her personal feelings to affect her role as an unbiased and neutral arbitrator.

22  (Dal Cerro Decl., Ex. CC.)  On May 18, 2004, Defendant Blumenthal instructed Plaintiff to make

23  three specific changes to the draft NDC in the *Beasley* case.  (Blumenthal Decl., Ex. C.)  Konig

24  disagreed with the changes and Blumenthal repeated his instruction.  Konig refused to comply and

25  again questioned his superiors' judgment and ethics.  (*Id.*)

26  **C.      Performance Improvement Plan and Notice of Disciplinary Action**

27      On May 19, 2004, Defendant Dal Cerro presented Plaintiff with a Performance Improvement

28  Plan ("PIP") due to "his failure to satisfactorily fulfill the requirements of [his] position."  The PIP,

9

to be effective May 24, 2004, through November 24, 2004, stated that it was intended to "serve as a non-disciplinary corrective action program designed to monitor, evaluate and improve [his] performance." The PIP listed past deficiencies in Konig's work and provided specific direction for him to meet with his new team leader, Defendant Blumenthal, on a weekly basis for management oversight. In response, Plaintiff filed a 25-page memorandum challenging the basis of the PIP and contending that it was retaliatory and designed to harass.

On June 14, 2004, Mike Nisperos, Chief Trial Counsel, stated in an email that he intended to terminate Konig's employment when the investigation was complete. (Konig Decl. - Jan., Ex. 45.)

On July 27, 2004, in advance of the next PIP meeting, Blumenthal asked Konig to bring a draft of the pre-trial statement in the *Stevens* matter to the meeting and to be prepared to discuss his trial strategies. At the July 30 PIP meeting, Konig informed Blumenthal that he had not finished taking Stevens' deposition and that the pre-trial statement was not done. When asked about his trial approach, Konig said he did not know what that meant and refused to respond. Blumenthal instructed Konig to provide a list of witnesses and exhibits, the pre-trial statement, and a short summary of his planned trial approach by August 11, and to be prepared to discuss the matter at the next PIP meeting on August 13. On August 12, Blumenthal had not yet received the requested documents. He emailed Konig about it and Konig responded, "It is highly unlikely that I can complete a draft pretrial statement by tomorrow morning." (Blumenthal Decl., Ex. W.) On August 18, Dal Cerro held a short PIP meeting with Konig to discuss the *Stevens* matter. Despite an August 25 filing deadline, Konig had not yet finished the pre-trial statement for his supervisors' review. Dal Cerro gave him until August 20 to finalize the statement. Konig did not meet that internal deadline.

On August 24, 2004, Dal Cerro presented Plaintiff with a Notice of Disciplinary Action for his failure to comply with the terms of the PIP. Specifically, the Notice identified Konig's failure to provide drafts of the *Stevens* pre-trial statement as requested. The Notice also informed Plaintiff that he was being removed from the *Stevens* case and from all other court appearances and that he should focus his efforts on improving the productivity of his notice drafting. The Notice explained that as a result of Plaintiff's insubordination, a three-day suspension would be imposed, and that the Notice

served as a final warning that any further misbehavior could result in termination.  The Notice explained, however, that the suspension would be stayed until a later date when the OCTC was less busy and Plaintiff could be spared.

The next day, Plaintiff took a voluntary leave of absence and remained on leave until he resigned, by email, on October 27, 2004.  The three-day suspension was never imposed.

**D.    Plaintiff's Complaint**

Plaintiff asserts a cause of action against Defendants Dal Cerro, Weiner, Blumenthal, and Hawley under 42 U.S.C. § 1983.  Plaintiff alleges that Defendants retaliated against him for exercising his First Amendment right to free speech.[8]  Specifically, Plaintiff alleges that after he began complaining about the improper conduct of the State Bar Court, Defendants engaged in a continuous and pervasive campaign of retaliation and harassment directed at Plaintiff.  This harassment included:  (1) the thwarting of Plaintiff's filing and service of the *Kay/Dalton* NDC on October 21, 2003, without Plaintiff ever having been told that there was any problem with his handling of the case, and the eventual reassignment of the case without explanation; (2) the October 31, 2003, Dal Cerro/Hawley memorandum which, according to Plaintiff, contained vague allegations of misconduct that were unwarranted; and (3) throughout the ensuing year, constant unwarranted criticism; harassment; removal from cases without justification; punitive reassignment; false performance evaluations; false written reprimands; a baseless performance improvement plan; continuous badgering; acts that undermined and sabotaged Plaintiff's work and ability to perform; disparate treatment; unwarranted suspension; and interference with his attempts to report the retaliatory acts to the appropriate government bodies.  Plaintiff also claims that he was constructively discharged on October 27, 2004, and that that discharge was Defendants' final act of retaliation.

—

Defendants now move for partial summary judgment on Plaintiff's First Amendment claim.

---

[8] Plaintiff's Complaint also included a second cause of action alleging a denial of due process in violation of his Fourteenth Amendment rights.  However, in its April 6, 2005 Order, the Court granted partial summary judgment in Defendant's favor on Plaintiff's due process claim.  The First Amendment claim, addressed by Defendants' present motion, is the only remaining claim.

1    ///

2

3                              **LEGAL STANDARD**

4          The summary judgment procedure is a method for promptly disposing of actions.  *See* FED.

5    R. CIV. P. 56.  The judgment sought will be granted if "there is no genuine issue as to any material

6    fact and [ ] the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  "[A]

7    moving party without the ultimate burden of persuasion at trial [ ] may carry its initial burden of

8    production by either of two methods.  The moving party may produce evidence negating an essential

9    element of the nonmoving party's case, or, after suitable discovery, the moving party may show that

10   the nonmoving party does not have enough evidence of an essential element of its claim or defense

11   to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz*

12   *Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the movant meets its burden, the nonmoving

13   party must come forward with specific facts demonstrating a genuine factual issue for trial.

14   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

15         If the nonmoving party fails to make a showing sufficient to establish the existence of an

16   element essential to that party's case, and on which that party will bear the burden of proof at trial,

17   "the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S.

18   317, 323 (1986).  In opposing summary judgment, the nonmoving party may not rest on his

19   pleadings.  He "must produce at least some 'significant probative evidence tending to support the

20   complaint.'"  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.

21   1987) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

22         The Court does not make credibility determinations with respect to evidence offered, and is

23   required to draw all inferences in the light most favorable to the non-moving party.  *See T.W. Elec.*

24   *Serv., Inc.*, 809 F.2d at 630-31 (citing *Matsushita*, 475 U.S. at 587 ).  Summary judgment is

25   therefore not appropriate "where contradictory inferences may reasonably be drawn from undisputed

26   evidentiary facts . . . ."  *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 (9th

27   Cir. 1980).

28                              **ANALYSIS**

United States District Court
For the Northern District of California

Defendants contend that Plaintiff has presented no evidence creating a triable issue of fact on his claim that they unlawfully retaliated against Plaintiff for his exercise of protected speech. Defendants argue that even if the Court disagrees, they are entitled to qualified immunity because Plaintiff's rights were not violated, his alleged rights were not clearly established, and a reasonable supervisor in each Defendant's position would have believed his respective conduct was lawful. The Court examines these arguments separately.

**I.      Standard Governing Plaintiff's First Amendment Claim[9]**

"In order to state a claim against a government employer for violation of the First Amendment, an employee must show (1) that he or she engaged in protected speech; (2) that the employer took 'adverse employment action;' and (3) that his or her speech was a 'substantial or motivating' factor for the adverse employment action." *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2002). Under the balancing test established by *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), the court must weigh the employer's legitimate interest in promoting workplace efficiency and avoiding workplace disruption against the employee's interest in exercising his First Amendment rights, or that, under the mixed motive analysis established by *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977), the employer would have taken the same adverse actions in the absence of the employee's protected conduct. *See Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 675-76 (1996). The *Pickering* balancing test can be employed even at the first step of determining whether the speech at issue is protected.

Here, Defendants contend that Plaintiff, a public employee, did not engage in speech that is protected by the Constitution. Defendants argue that even if the speech at issue is protected, their treatment of Plaintiff, about which he now complains, was motivated not by retaliation for engaging in the protected speech, but by Defendants' interest in preventing further insubordination and disruption in the OCTC, which outweighed Plaintiff's First Amendment interests. They also contend that they would have taken the very same actions whether or not he had engaged in the allegedly protected conduct. The Court first examines whether the speech at issue was protected.

---

[9] The Court agrees with Defendants that *Connick v. Meyers*, 461 U.S. 138 (1983), and its progeny, and not cases dealing with disclosures of criminal wrongdoing such as *Hufford v. McEnaney*, 249 F.3d 1142 (9th Cir. 2001), dictate the outcome of Plaintiff's retaliation claim.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    **A.      Plaintiff Engaged in Protected Speech.**

2          Plaintiff contends that the following communications were constitutionally protected:

3    (1) statements of intent to seek redress from CJP; (2) the September 11, 2003, memorandum; (3)

4    Plaintiff's complaint to the CJP; (4) the November 18, 2003, memorandum; (5) Plaintiff's statement

5    of intent to seek redress from RAD and the Legislature; (6) Plaintiff's reports to RAD and the

6    Legislature; (7) Plaintiff's report to the State Personnel Board; and (8) Plaintiff's refusals to comply

7    with supervisor directives that he believed would have resulted in ethical and legal violations.

8          "An employee's speech is protected under the First Amendment if it addresses 'a matter of

9    legitimate public concern.'" *Coszalter*, 320 F.3d at 973 (quoting *Pickering*, 391 U.S. at 571); *see*

10   *also Connick v. Myers*, 461 U.S. 138, 149–50 (1983).  "[S]peech that concerns 'issues about which

11   information is needed or appropriate to enable the members of society' to make informed decisions

12   about the operation of their government merits the highest degree of first amendment protection."

13   *Coszalter*, 320 F.3d at 973 (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)).

14   "On the other hand, speech that deals with 'individual personnel disputes and grievances' and that

15   would be of 'no relevance to the public's evaluation of the performance of governmental agencies'

16   is generally not of 'public concern.'"  *Id.*; *see also Weeks v. Bayer*, 246 F.3d 1231, 1235 (9th Cir.

17   2001) (the First Amendment "does not safeguard 'purely private interest,' 'individual disputes,' or

18   'the minutiae of workplace grievances.'")  "The determination of whether an employee's speech

19   deals with an issue of public concern is to be made with reference to 'the content, form, and context'

20   of the speech."  *Coszalter*, 320 F.3d at 973–74 (citing *Allen v. Scribner*, 812 F.2d 426, 430 (9th Cir.

21   1987)).

22         Here, Defendants argue that the speech at issue consists of workplace gripes and is not

23   protected by the First Amendment.  The Court does not entirely agree.  Defendants are right that the

24   record is replete with Plaintiff's personal complaints, mostly by email, in which he complains about

25   Defendants' micro-management, disrespect, and lack of support of him.  This type of personal

26   workplace grousing does not raise matters of public concern.  *See, e.g., Connick*, 461 U.S. at 148

27   (morale in the district attorney's office was not an issue of public concern).  However, Plaintiff did,

28   on several occasions, engage in speech that touched on matters of public concern.  Plaintiff's

14

communications in which he expressed concerns, either internally or to the CJP, the state Legislature, the Board of Governors' RAD committee, or the State Personnel Board, about judicial misconduct at the State Bar Court, were protected by the First Amendment.  The appropriate functioning of the judicial forum in which attorneys are tried for wrongdoing is of vital concern to the public.[10]  Whether or not Plaintiff's concerns were well-founded is irrelevant.  Thus, the Court finds that the following communications, occurring between approximately May 2003 and November 2003, were protected by the First Amendment:  (1) statements of intent to seek redress from CJP; (2) Plaintiff's complaint to the CJP; (3) Plaintiff's statement of intent to seek redress from RAD and the California Legislature; (4) Plaintiff's reports to RAD and the Legislature; (5) Plaintiff's report to the State Personnel Board.

More complex questions, however, are presented by Plaintiff's September 11, 2003, and November 18, 2003, internal memoranda, and his repeated refusals, between January 2004 and August 2004, to comply with his supervisors' directives because he believed that to do so would have resulted in ethical and legal violations.  The Court examines each of these separately.

### 1.    The September 11, 2003 Memorandum

Defendants' position is that Plaintiff's September 11, 2003, memorandum is a workplace gripe about the lack of support and morale at the OCTC that does not constitute speech that is protected by the First Amendment.  Plaintiff contends, to the contrary, that because the memo addresses, at least in part, concerns about the State Bar Court judges' conduct, fairness, and propriety – matters of public concern, the entire memorandum constitutes protected speech.  The Court agrees with Plaintiff here.

At the outset, the Court notes that Defendants are right that Plaintiff's speech should be considered not "in a vacuum, but in conjunction with the manner, time, and place of the public employee's expression and the context in which the dispute arose."  *Poole v. VanRheen*, 297 F.3d 899, 908 (9th Cir. 2002).  Here, there is no doubt that Plaintiff's September memorandum was written primarily to express his great personal anguish about what he perceived was his supervisors'

---

[10] Whether or not Defendants knew about the CJP complaint and took adverse employment action against Plaintiff in retaliation is a separate question and is discussed *infra*.

increasing lack of respect for and trust in him professionally.  He felt undermined and patronized, and was dispirited.  This sense that he was being treated unfairly is interwoven throughout the memo and constitutes its overarching theme.  Defendants argue, therefore, that the memorandum, as expression of workplace grousing, is not protected speech.

However, "[i]f some part of the communication addresses an issue of public concern, the First Amendment's protections are triggered even though other aspects of the communication do not qualify as a public concern."  *Hyland v. Wonder*, 972 F.2d 1129, 1137 (9th Cir. 1992).  At issue in *Hyland* was whether a memorandum written by a Juvenile Hall employee (against whom adverse action was taken) and distributed to judges constituted protected speech.  The memorandum accused the current director of Juvenile Hall of incompetence, described a precipitous decline in staff morale, accountability, and leadership, and cited problems with the living conditions at Juvenile Hall and the treatment of the children detained there.  *Id*.  The court, citing its earlier holding in *Roth v. Veteran's Administration*, 856 F.2d 1401, 1405 (9th Cir. 1988), held that speech regarding "'the misuse of public funds, wastefulness, and inefficiency in managing and operating government entities' qualifies as a matter of public concern."  *Id*.  The *Hyland* plaintiff's memorandum alleged the "inept, inefficient, and potentially harmful administration of a government entity."  *Id*. at 1139.  Thus, the court found, the memorandum spoke to a matter of public concern.  The court rejected the defendant's argument that the speech concerned only an internal personnel dispute, finding that the "context in which the memorandum was drafted and circulated suggested" otherwise.  *Id*. at 1138 (citations omitted).

Plaintiff contends that his September 2003 memorandum is analogous to the memo at issue in *Hyland*.  The Court disagrees.  Here, the thrust of Plaintiff's memorandum, unlike the memo at issue in *Hyland*, was Plaintiff's own personal dissatisfaction with his supervisors and their lack of support for him, as exemplified by the following excerpts:

> I am still speechless when I look back at these hearings and still appalled at the lack of support and lack of backing I received from this office while enduring the erroneous rulings, inappropriate comments, unlawful orders, disregard of due process, and outright bias of Judge Remke.

(*Id*. at 1.)

I cannot believe this office refuses to support its trial counsel and defend their

United States District Court

For the Northern District of California

> integrity when inappropriately attacked by a judge without basis.  I cannot understand why so much deference is given to a judge here merely because there is a fear of conflict between this office and a judge despite the judge's behavior and actions lacking in judicial temperament [sic] and the judge's rulings disregarding and contradicting Supreme Court authority and Review Department authority.

(*Id*. at 1–2).

> In no other organization that I have worked [sic] have I ever seen senior attorneys or management refuse to back their trial attorneys when inappropriately disparaged or attacked by the judiciary.

(*Id*. at 2.)  However, this difference between Plaintiff's memo and the *Hyland* memo is not dispositive.  Plaintiff's memo touched on matters of public concern by incorporating accusations that one of the State Bar Court judges was bias and had engaged in repeated misconduct and by asserting that Plaintiff "truly and sincerely now question[s] the mission of [the OCTC] and its commitment to its obligation to protect the public, the administration of justice, and former clients." (Dal Cerro Decl., Ex. G at 3.)  Judicial misconduct and the proper administration of a government agency are issues of public concern.  In the memorandum, those issues are inextricably intertwined with Plaintiff's expression of workplace dissatisfaction.  Accordingly, while the Court disagrees with Plaintiff that the memo is comparable to the *Hyland* memo, the Court finds that the portions of the September 11, 2003, memorandum that raise matters of public concern trigger the First Amendment's protection and render the entire memorandum protected speech.

Defendants contend that even if the Court finds that the memorandum is protected speech by virtue of those aspects of the memo that touch on matters of public concern, Konig's speech, in the September 2003 memorandum, so severely damages office harmony and working relationships that the Government's interest in promoting a congenial workplace outweighs Plaintiff's First Amendment rights under *Pickering* and the memo should not be deemed protected speech.  The Court disagrees.  To so find would require a finding that the memorandum disrupted coworker relationships, impaired discipline or control by superiors, eroded close working relationships, interfered with performance of duties, or obstructed the routine operation of the office.  On this record, the Court cannot find as a matter of law that Plaintiff's memo was so insubordinate or disruptive to the management of the OCTC that it falls outside the protection of the First Amendment.  Plaintiff's September 11, 2003, memorandum is protected speech.

### 2.      The November 18, 2003 Memorandum

Plaintiff's November 18, 2003, memorandum, a defensive reply to Dal Cerro's October 2003 response to the September memorandum, incorporates the September memo.  Specifically, Plaintiff criticizes Defendants' failure to address the issues set forth in his September 11 memorandum, which he attached thereto.  As discussed above, some of the issues raised in the September memo were of public concern, rendering that memo protected speech.  Thus, the November memo must also be deemed protected speech.

### 3.      Plaintiff's Refusals to Comply With Directives That He Believed Would Have Resulted in Ethical and Legal Violations

Plaintiff contends that his recurring refusals to follow his supervisors' instructions constituted protected speech because he believed if he complied with their directives, he, himself, would be violating the law and the code of ethics.  Plaintiff cites a California Supreme Court case – *General Dynamics Corp. v. Superior Court*, 7 Cal. 4th 1164 (1994) – to support his argument.  In that case, an in-house attorney alleged that he was terminated in retaliation for spearheading an investigation into company-wide drug use, protesting the company's failure to investigate the criminal bugging of the office of the chief of security, and advising the company that its salary policy might violate federal labor law.  The court held that a terminated in-house attorney can sue his former employer for retaliating against him for raising legitimate legal and ethical concerns. However, the court was explicit that the "contested ethical requirement must be clearly established by the ethics code or statutory provision" and "disagreements over policy are not actionable."  *Id*. at 1189–91.  In the case at bar, Plaintiff has provided no evidence that his refusal to follow instructions by, *inter alia*, dropping certain charges from NDCs or making routine edits to his drafts would have violated clearly established ethics provisions or law.  Accordingly, the Court finds that Plaintiff has not demonstrated that this speech was protected.

—

In sum, the Court finds that Plaintiff's stated intention to seek redress from the CJP, RAD, and the California Legislature beginning in May 2003, his complaints to those bodies and to the State Personnel Board in November and December 2003, and his internal complaints, in September

1   and November 2003, about judicial misconduct and the poor administration of the OCTC,

2   constituted protected speech.

3   ///

### B.   Adverse Employment Actions

5         An adverse employment action is an action that is "reasonably likely to deter" the employee

6   from engaging in protected speech.  *Coszalter*, 320 F.3d at 976.  "To constitute an adverse

7   employment action, a government act of retaliation need not be severe and it need not be of a certain

8   kind.  Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the

9   imposition of a burden."  *Id.* at 975.  "In some cases, the would-be retaliatory action is so

10  insignificant that it does not deter the exercise of First Amendment rights, and thus does not

11  constitute an adverse employment action within the meaning of the First Amendment retaliation

12  cases."  *Id.*; *see also Nunez v. City of Los Angeles*, 147 F.3d 867 (9th Cir. 1987) ("bad-mouthing" an

13  employee who engaged in protected speech is not an adverse employment action).  In *Coszalter*, the

14  Ninth Circuit held that a whole host of employer conduct, including assigning an employee to new

15  duties, conducting an unwarranted disciplinary investigation, ongoing verbal harassment and

16  humiliation, suspending the employee from work, threatening disciplinary action, withholding

17  customary public recognition, and special reviews of work quality, when taken together, amounted

18  to "a severe and sustained campaign of employer retaliation that was 'reasonably likely to deter'

19  plaintiffs from engaging in speech protected under the First Amendment."  320 F.3d at 976–77.[11]

20        Here, Plaintiff alleges that Defendants took the following adverse actions against him:  (1)

21  harassing and humiliating Plaintiff both verbally and in writing; (2) micro-managing Plaintiff's

22  work; (3) sabotaging Plaintiff's work; (4) bad-mouthing Plaintiff; (5) withholding positive

23  comments about Plaintiff's work; (6) issuing false written reprimands in November and December

24  2003; (7) conducting biased grievance proceedings; (8) retaining a biased investigator to look into

25  Plaintiff's RAD complaint; (9) reassigning Plaintiff in December 2003/January 2004 to new job

26  ────────────────

27        [11] The court in *Coszalter* addresses whether the defendant's conduct amounted to adverse actions
     and whether those actions were motivated by the plaintiff's protected speech together.  This Court will
     address these issues separately.  Defendants' adverse employment action only constitutes retaliation if
28   Plaintiff can demonstrate that it was if motivated by Plaintiff's protected speech.  The causation issue
     is addressed in the next section.

United States District Court
For the Northern District of California

1   responsibilities; (10) conducting unwarranted disciplinary investigations; (11) failing to fully

2   investigate allegations against him by speaking with witnesses who would refute the allegations;

3   (12) threatening disciplinary action; (13) removing Plaintiff from matters on which he was working;

4   (14) imposing the PIP in the summer of 2004; (15) imposing the three-day suspension in August

5   2004; (16) constructively terminating Plaintiff's employment.[12]  Plaintiff contends that Defendants'

6   treatment of him was, like the actions at issue in *Coszalter*, a severe and sustained campaign of

7   conduct that was reasonably likely to deter him from engaging in any further protected speech.  The

8   Court addresses, under the *Coszalter* standard, whether each Defendant's actions against Plaintiff

9   amounted to an adverse action.[13]

10                     **1.      Defendant Dal Cerro**

11          According to Plaintiff, the following actions taken by Defendant Dal Cerro constitute

12   adverse employment actions:

•   On September 23, 2003, Defendant Dal Cerro and Donald Steedman (not a defendant here)
    met with Plaintiff and a union representative.  At that meeting, Dal Cerro allegedly made
    several false allegations against Plaintiff related to his work and his conduct.

•   On October 31, 2003, Dal Cerro delivered a memorandum that he and Defendant Hawley
    had prepared in response to Plaintiff's September 11, 2003, memorandum.  According to
    Plaintiff, the response contained numerous vague and unwarranted allegations of misconduct
    against Plaintiff and included a "veiled threat that [Konig] either accept the way things are
    done and stop raising issues of wrongdoing and malfeasance or [he] would no longer have a
    job."

•   In November 2003, Defendant Dal Cerro reassigned the *Kay/Dalton* matter to Blumenthal.

•   On November 20, 2003, Dal Cerro and Steedman presented Plaintiff with a Written Warning,
    explaining that Konig had insubordinately failed to make changes to a draft NDC which had
    been requested by his supervisor and that he then denied being instructed to make those
    changes.  The Warning admonished Plaintiff that if he "continue[d] to fail to follow the
    direction of [his] supervisors or otherwise engage[d] in acts of insubordination, disobedience,
    or disrespect, [he would] be subject to additional discipline, up to and including
    termination."

_____

[12] This list is gleaned from Plaintiff's less comprehensible list on pages 12 and 13 of his
opposition.

[13] The Court notes that Plaintiff does not separately analyze each Defendant's actions against
him.  However, to survive summary judgment on his claims against each Defendant, he must present
evidence that each Defendant took an adverse action against him in retaliation for protected speech.  *See
Hansen v. Black*, 885 F.2d 642, 645–46 (9th Cir. 1989) (no vicarious liability under § 1983).
Accordingly, the Court separates out by Defendant, as best it can, the conduct Plaintiff alleges amounted
to adverse action against him.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

- Also on November 20, 2003, Defendant Dal Cerro provided Plaintiff with his Performance Review for the July 2002 through July 2003 time period. On the whole, the Performance Review was positive, giving Plaintiff an overall rating of "Meets Requirements." However, in the Manager's Comments section, the Review suggested several areas in which Plaintiff might improve. Specifically, it reported that Konig had had "several antagonistic encounters with various individuals, including his supervisors, a State Bar Court judge, and several opposing counsel."

- In December 2003, Dal Cerro issued Plaintiff a second Written Warning for continuing to exhibit "insubordinate and willfully disobedient behavior."

- In April 2004, following a battle between Plaintiff and Defendant Blumenthal over Blumenthal's edits and suggestions for Plaintiff's draft NDC in the *Lowenstein* matter, Dal Cerro got involved and told Konig that continuing to be insubordinate for no reason violated Plaintiff's obligation to do as he is told as long as he works for the State Bar. Ultimately, Dal Cerro removed Plaintiff from the *Lowenstein* matter.

- On May 19, 2004, Defendant Dal Cerro presented Plaintiff with a PIP due to Plaintiff's "failure to satisfactorily fulfill the requirements of [his] position." The PIP stated that it was intended to "serve as a non-disciplinary corrective action program designed to monitor, evaluate and improve [Plaintiff's] performance." The PIP listed past deficiencies in Konig's work and provided specific direction for him to meet with his new team leader, Defendant Blumenthal, on a weekly basis for management oversight.

- On August 18, 2004, Dal Cerro held a short PIP meeting with Konig to discuss Plaintiff's ability to meet deadlines in the *Stevens* matter.

- On August 24, 2004, Dal Cerro presented Plaintiff with a Notice of Disciplinary Action for his failure to comply with the terms of the PIP. Specifically, the Notice identified Konig's failure to provide drafts of the *Stevens* pre-trial statement as requested. The Notice also informed Plaintiff that he was being removed from the *Stevens* case and from all other court appearances and that he should focus his efforts on improving the productivity of his notice drafting. The Notice explained that as a result of Plaintiff's insubordination, a three-day suspension would be imposed, and that the Notice served as a final warning that any further misbehavior could result in termination. The Notice explained that the suspension would be stayed until a later date when the OCTC was less busy and Plaintiff could be spared.

Under *Coszalter*, the Court finds that Defendant Dal Cerro's reassignment of Plaintiff's cases and issuance of two Written Warnings, a PIP, and a Notice of Disciplinary Action constitute adverse employment actions. If undertaken in response to Plaintiff's protected speech,[14] these actions were reasonably likely to deter Plaintiff from engaging in further protected speech. To avoid summary judgment, however, Plaintiff must demonstrate that his protected conduct was a substantial or motivating factor for Defendant Dal Cerro's adverse actions. That question is addressed in section 3(c), *infra*.

---

[14] Again, the Court addresses Defendants' motivation for taking adverse action in the next section.

21

**United States District Court**
For the Northern District of California

### 2.    Defendant Blumenthal

Plaintiff claims that the following actions taken by Defendant Blumenthal constitute adverse employment actions:

- On March 23, 2004, Blumenthal informed Plaintiff by email that the OCTC had decided not to appeal the discipline meted out in the *Mendez* matter.  He said, "Alan: I have to go to a meeting, but I wanted you to know that the office has decided not to appeal the *Mendez* matter.  We appreciate your efforts in this case."  Konig interpreted the email as patronizing and alleges that it was an adverse action against him to make the decision not to appeal with no input from him.

- In the *Medeiros* matter, Blumenthal asked Plaintiff to have a draft NDC done by March 22, 2004.  Blumenthal then reminded Konig of the deadline on March 12 and again on March 16.  Plaintiff alleges that Blumenthal was unduly harassing, criticizing, and micro-managing him.

- In the *Lowenstein* matter, Konig provided a draft ENEC statement and NDC to Blumenthal on April 1, 2004.  Blumenthal gave Konig written comments and questions which Konig alleges amounted to harassment and retaliation.

- On May 18, 2004, Defendant Blumenthal instructed Plaintiff to make three specific changes to the draft NDC in the *Beasley* matter. Plaintiff contends that this was more micro-management and harassment.

- On July 27, 2004, in advance of the next PIP meeting (scheduled for July 30), Blumenthal asked Konig to bring a draft of his pre-trial statement in the *Stevens* matter to the meeting and to be prepared to discuss his trial strategies.  At the July 30 PIP meeting, Konig informed Blumenthal that he had not finished taking Stevens' deposition and that the pre-trial statement was not done.  When asked about his trial approach, Konig said he did not know what that meant and refused to respond.  Blumenthal then instructed Konig to provide a list of witnesses and exhibits, the pre-trial statement, and a short summary of his planned trial approach by August 11, and to be prepared to discuss the matter at the next PIP meeting on August 13.  On August 12, Blumenthal had not yet received the documents.  He emailed Konig about it.  Konig alleges that Blumenthal's conduct around the *Stevens* matter amounted to micro-management and harassment.

Defendant Blumenthal's attempts to supervise Plaintiff by checking in with him about trial strategy and deadlines, and by providing edits and suggestions to drafts may amount to adverse actions.   Plaintiff, generally asserts that Defendant Blumenthal's attempts to supervise Plaintiff by checking in with him about trial strategy and deadlines, and by providing edits and suggestions to constitute adverse actions.  Defendant argues that Plaintiff has failed to demonstrate how Blumenthal's supervisory behavior was reasonably likely to deter Plaintiff from speaking out about judicial misconduct at the State Bar Court.  The court finds on this record that it is a close question as to whether Plaintiff has presented sufficient evidence to establish a genuine factual dispute

United States District Court

For the Northern District of California

1   regarding whether Blumenthal's conduct constitutes an adverse action.  Assuming, without finding,

2   that Plaintiff has established that Blumenthal's conduct constitutes an adverse action, to avoid

3   summary judgment Plaintiff must establish that Blumenthal's actions were undertaken in retaliation

4   for Plaintiff's protected speech.  This issue is addressed in section 3(c), *infra*.

5                    **3.      Defendant Hawley**

6          Plaintiff alleges that Defendant Hawley manipulated the internal investigation into Plaintiff's

7   RAD complaint in November and December 2003 and that that manipulation constituted an adverse

8   action against him.  Plaintiff alleges that one day before Konig sent his complaint to RAD – the

9   committee that oversees the OCTC, Hawley emailed John Van de Kamp, RAD's Chair, to discuss

10  Konig's forthcoming complaint.  According to Plaintiff, Defendant Hawley suggested to RAD how

11  Plaintiff's complaint should be dealt with and hired an investigator – Charlotte Addington – who

12  was purported to be independent but who Plaintiff alleges was not independent, to look into

13  Plaintiff's claims.  Plaintiff also claims that Hawley made prejudicial statements about Plaintiff in

14  the email to Van de Kamp.  Plaintiff also alleges that Defendant Hawley wrote to the legislative

15  committees to which Konig had complained, and represented that Mr. Van de Kamp was directing

16  an appropriate investigation into Konig's complaints.  Plaintiff asserts that this, too, amounted to an

17  adverse action.  Finally, Plaintiff claims that the October 2003 memorandum prepared by

18  Defendants Dal Cerro and Hawley in response to Plaintiff's September 2003 memo contained

19  numerous vague and unwarranted allegations of misconduct against Plaintiff and included a "veiled

20  threat that [Konig] either accept the way things are done and stop raising issues of wrongdoing and

21  malfeasance or [he] would no longer have a job," amounting to adverse action.

22         With respect to the RAD investigation, the Court finds that Plaintiff has not presented any

23  evidence that Defendant Hawley's role in that investigation was improper or that he manipulated the

24  investigation in the OCTC's favor such that it could constitute an adverse employment action.  It

25  may be true that where an employee complains about his organization to its supervisory board and

26  the board's investigation of the complaint is rigged by the employee's manager to result in a positive

27  outcome for the organization, the manager's manipulative conduct may be reasonably likely to deter

28  the employee from complaining again.  The employee presumably would not bother to file a

1   complaint because he would know that the complaint would not be taken seriously.  But Plaintiff has

2   not shown this to be the case here.  Here, Plaintiff has not presented any evidence to support a

3   finding that Defendant Hawley's email to Van de Kamp suggests that he was manipulating the

4   investigative process.  The email, attached to Plaintiff's April 5, 2005, Declaration as Exhibit 16,

5   only alerts Van de Kamp that Konig's complaint will be filed soon, presents the OCTC's side of the

6   story and its current battle with Konig over his refusal to follow his superiors' directives, and

7   suggests that he will contact Charlotte Addington, an investigator with whom he had worked in the

8   past, to investigate the complaint.  There is no suggestion, in that email, that Defendant Hawley

9   intended to manipulate the findings in his (or the OCTC's) favor.  Similarly, Plaintiff presents no

10  evidence that Ms. Addington was in any way instructed by Hawley to manipulate the investigation

11  in the OCTC's favor.  Her notes, upon which Plaintiff heavily relies here, say only that Konig is

12  likely to question her role.  This, alone, does not suggest that her role was questionable or, more to

13  the point, that Hawley was rigging the investigation.  Accordingly, the Court finds, after a very

14  careful examination of the record, here, that Plaintiff has not created a triable issue of fact with

15  respect to whether Hawley's role in the RAD investigation was an adverse action.

16         With respect to Hawley's alleged letters to CJP, to the California State Personnel Board, and

17  to the California Senate and Assembly Judiciary Committees, to whom Plaintiff had submitted

18  written complaints, Plaintiff provides no evidence that Hawley actually wrote letters to CJP or to the

19  legislative committees.  Plaintiff does provide evidence, and Defendants admit, that Hawley wrote a

20  letter to the State Personnel Board, informing the Board, correctly, that it did not have jurisdiction

21  over the State Bar (and the Board agreed and did not pursue Plaintiff's complaint).  The Court finds

22  that this act does not constitute an adverse action against Plaintiff.

23         Finally, with respect to the memorandum prepared by Defendants Hawley and Dal Cerro in

24  response to Plaintiff's September memo, the Court finds that that there was no adverse action.

25  Plaintiff has presented no evidence that the responsive memo was disciplinary in nature nor has he

26  presented any evidence demonstrating that the memo, which specifically addressed Plaintiff's

27  insubordination, would be reasonably likely to deter him from engaging in protected speech.

28  Accordingly, under *Coszalter*, the Court finds that the memorandum written by Hawley and Dal

1   Cerro does not, alone, constitute an adverse action.

2   **4.      Defendant Weiner**

3        Plaintiff makes no specific allegations of adverse employment actions taken against him by

4   Defendant Weiner.  Instead, Weiner is mentioned in passing as one of the supervisors who directed

5   Plaintiff to conform his practice to the guidelines set by the OCTC.  Plaintiff refused to do so on the

6   ground that the guidelines were unethical; however, he points to no evidence that would support a

7   finding that this instruction amounted to an adverse action reasonably likely to deter Plaintiff from

8   engaging in protected speech.

9   **5.      Generalized Allegations of Adverse Action – No Identified Actor**

10       Plaintiff alleges that the decision, in January 2004, to reassign him to the team designated to

11  draft notices (and away from the trial team), constituted an adverse action taken against him by

12  Defendants.  Plaintiff does not name a specific actor.  The evidence in the record demonstrates that

13  the entire office was reorganized such that some counsel were assigned to notice drafting and others

14  were assigned to trial work, and that the reassignment was not unique to Plaintiff.  However, the

15  decision to assign Plaintiff to notice drafting and to take him off of his cases was, even if not unique

16  to Plaintiff and even if justified by Defendants (a question that the Court will examine in the next

17  section), an adverse action against Plaintiff that might be likely to deter him from further engaging

18  in protected speech.

19                                              —

20       In sum, the Court finds that the following actions taken against Plaintiff were adverse:

21  Defendant Dal Cerro's issuance of Written Warnings, the PIP, and the Notice of Disciplinary

22  Action, as well as the removal of Plaintiff from various matters on which he was working (e.g.

23  *Kay/Dalton*, *Lowenstein*, *Stevens*); Defendant Blumenthal's alleged micro-management of Plaintiff

24  from January 2004 through August 2004; Plaintiff's reassignment to notice drafting in January 2004;

25  and the decision, in August 2004, to discipline Plaintiff by suspending him.  Because Plaintiff has

26  not presented any evidence that Defendant Weiner took an adverse action against Plaintiff, the Court

27  **GRANTS** Defendants' motion for summary judgment as to the claims against Defendant Weiner.

28

**C.      Plaintiff Has Not Demonstrated that His Protected Speech Was a Substantial or**

**United States District Court**
For the Northern District of California

**Motivating Factor For Defendants' Adverse Employment Actions.**

Plaintiff argues that Defendants[15] took adverse action against him in retaliation for engaging in protected speech. Defendants contend, to the contrary, that each action Plaintiff contends was retaliatory was actually disciplinary in nature and was prompted, in each instance, by Plaintiff's insubordination and refusal to be supervised, not by his protected speech. Defendants also contend that even assuming Plaintiff has shown that his protected speech was a substantial or motivating factor for the adverse actions taken against him, the same decisions would have been reached in the absence of any protected conduct. The Court agrees with Defendants.[16]

A plaintiff can show that retaliation was a substantial or motivating factor behind a defendant's adverse employment actions in three different ways. *Coszalter*, 320 F.3d at 977 (citing *Keyser v. Sacramento City Unified Sch. District*, 265 F.3d 741 (9th Cir. 2000)). First, a plaintiff can point to evidence demonstrating that the proximity in time between the protected action and the allegedly retaliatory employment decision could prompt a jury logically to infer that the plaintiff was terminated in retaliation for his speech. Second, a plaintiff can point to evidence that his employer expressed opposition to his speech, either to the plaintiff or to others. Third, a plaintiff can point to evidence that his employer's proffered explanations for the adverse employment action were false and pre-textual. *Id*. Here, Plaintiff argues that he has submitted evidence demonstrating that he has made a *prima facie* case for retaliation and that he has shown that Defendants' proffered justifications for their adverse employment actions are actually a pretext for a retaliatory motive.

**1.    Expressed Opposition**

Plaintiff contends that various communications from Defendants constituted expressed opposition to his attempts to engage in protected speech such that he has established a *prima facie*

---

[15] Having dismissed Defendant Weiner, the term "Defendants" as used in the remainder of this Order refers only to Defendants Dal Cerro, Blumenthal, and Hawley.

[16] In his opposition, Plaintiff does not analyze the question of motive separately for each Defendant and instead makes very generalized contentions about retaliatory motive. For example, Plaintiff appears to argue, as will be discussed *infra*, that the log of Plaintiff's conduct maintained by Defendant Blumenthal demonstrates that *all* Defendants' adverse conduct against Plaintiff was motivated by retaliation. He does not specifically tether the log to *Blumenthal's* actions. While the Court found it useful, in section I(B) above, to break out by Defendant the various actions Plaintiff alleged constituted adverse employment actions, the Court declines to follow that pattern here.

United States District Court
For the Northern District of California

case of retaliation.  Specifically, Plaintiff suggests that Defendant Dal Cerro's advice to Plaintiff not

to file a complaint with CJP because CJP "won't do anything" anyway and Dal Cerro's personal

notes suggesting that Plaintiff should not make reports of judicial misconduct to outside agencies

without first discussing it with his supervisors amounts to opposition that supports a finding that the

actions Dal Cerro took were motivated by retaliation.  Plaintiff fails, however, to cite to any

competent evidence in the record establishing that Dal Cerro made the dissuasive comment or wrote

the note.[17]  Assuming evidence of this conduct were before the Court, Dal Cerro's comments might

suffice to support Plaintiff's *prima facie* case, as to Defendant Dal Cerro, of retaliation here.  With

no evidentiary support, however, Plaintiff has not shown that Dal Cerro expressed opposition to his

protected speech.

Plaintiff's second example of "expressed opposition" fairs no better than the first.  He

contends that the first Written Warning he received, just 17 days after he submitted his complaint to

the CJP, contained the following directive regarding "corrective action to be taken:"

> You will seek and receive the approval of your team leader (or his designee) as to
> final form and content of each of your pleadings before they are filed, and other
> written documents related to your cases and other assigned tasks directed to
> individuals outside of the Office of the Chief Trial Counsel before they are sent.

(Dal Cerro Decl., Ex. Q.)  Plaintiff contends that the "plain language of this directive, without any

attempt to distinguish between purely private speech and that done as an employee of the office, . . .

---

[17] In neither his Opposition nor in the supplemental brief he filed providing citations to the record (that were utterly lacking in his original Opposition) does Plaintiff cite to anything in the record that supports the portion of his opposition claiming that during the spring and summer of 2003, "when Plaintiff stated his intent to notify the CJP of judicial misconduct within the State Bar, Defendant Dal Cerro repeatedly attempted to dissuade or discourage Plaintiff from doing so by stating to him words to the effect of 'you don't want to do that,' and that the CJP 'won't do anything' anyway."  (*See* Opposition at 18:2–5; Plaintiff's Response to Evidence Interposed by Defendants.)  Plaintiff also fails to provide evidentiary support for his contention that, "In Defendant Dal Cerro's notes from his meetings with Plaintiff on September 23 and 24, he has made specific references to Plaintiff making reports of internal misconduct to outside agencies and notes to the effect that Plaintiff was not to make such reports without first obtaining the approval of his supervisors."  (*See* Opposition at 18:6–9; Plaintiff's Response to Evidence Interposed by Defendants at 3:24–25.)  Plaintiff did provide citations to the record to support that statement (in his supplemental brief), but neither citation actually supports Plaintiff's claims.  First, Plaintiff cites to a portion of his own declaration, which says nothing about Dal Cerro's alleged notes suggesting that Plaintiff discuss possible CJP complaints with supervisors before making them (*see* Plaintiff's April 5, 2005, Declaration at 14–15).  Second, he cites to Exhibit 16 to his April 5, 2005, Declaration, which is an email from Defendant Robert Hawley to RAD that says nothing about Dal Cerro's notes regarding Plaintiff's CJP complaints.  The Court has located nothing else in this very full record to support Plaintiff's factual claims here.

United States District Court

For the Northern District of California

makes the intent of the directive clear.  Plaintiff will cease the outside reports." (Opposition at

18:20–23.)  The Court is at a loss as to how Plaintiff or his counsel could reasonably read the

language of the Written Warning to suggest that Plaintiff stop filing complaints about judicial

misconduct with outside agencies.  The directive clearly states that it applies only to "pleadings,"

"other written documents *related to your cases*," and "other *assigned* tasks."  (Dal Cerro Decl., Ex.

Q (emphasis added).)  Even a liberal reading of the language would not accommodate the meaning

Plaintiff assigns.

### 2.   Temporal Proximity

Plaintiff also contends that the temporal proximity between the protected speech in which he

engaged and the adverse actions Defendants took supports, under *Coszalter*, an inference that his

speech was a substantial or motivating factor for their actions.  It is true that many of Defendants'

actions took place not long after Plaintiff engaged in protected speech.  For example, Plaintiff filed

his CJP complaint in early November and was issued a Written Warning a few weeks later.

Defendants argue, however, that the temporal proximity of their actions to the protected conduct

does not alone demonstrate retaliatory motive.[18]

Defendant's argument is somewhat persuasive in that Plaintiff has failed to link the  discrete

acts of harassment committed by each defendant to an instance of protected speech so that the Court

could determine whether the record supports an inference than an employment decision was

retaliatory. *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003). However, the record does

evince that several instances of asserted retaliatory conduct took place not long after Plaintiff

engaged in protected speech.  For example, Plaintiff filed his CJP complaint in early November and

was issued a Written Warning a few weeks later.  As such, the Court proceeds as if the proximity of

the adverse consequences identified herein were sufficient to establish that Defendants acted with

the requisite motivation.  *Id.*

___

[18] Defendants also contend that they did not all know about all of the complaints Plaintiff had
filed; thus, their subsequent actions could not have been taken in retaliation for Plaintiff's complaints
of judicial misconduct.  While that may be true (and the record suggests that it is), the Court is not
persuaded that this absolves Defendants here.  If each Defendant was aware that Plaintiff had raised
issues regarding judicial decorum with outside agencies, it is irrelevant that each did not know of every
instance of protected communication.  That each knew he had engaged at all in protected speech
provides a basis for retaliation.

### 3.    The Government's Proffered Justification and Pretext

Under Ninth Circuit law, Defendant can escape liability by showing that it would have taken the complained of action even in the absence of the protected speech. *Keyser v. Sacramento City Unified School Dist.*, 265 F.3d 741, 750 (9th Cir. 2000). Assuming, without deciding, that Plaintiff has established a *prima facie* case of retaliation here by demonstrating temporal proximity, the Court now examines the justifications for the adverse employment actions proffered by Defendants and whether Plaintiff has presented any evidence to support a finding that the neutral justifications are actually pretext for retaliation.

Defendants contend that each disciplinary action taken against Plaintiff was actually meted out in response to Plaintiff's acts of insubordination, and not in retaliation for Plaintiff's engaging in protected speech. For example, Defendant Dal Cerro's reaction to the September 11, 2003, memo was to call a meeting with Plaintiff, twelve days afterwards, to counsel him on improving his honey-to-vinegar ratio at the office. Defendants contend that Dal Cerro merely responded, at that meeting, and in writing a month later, to Plaintiff's invectives about his supervisors' failure to support him properly. Other examples are: (1) Dal Cerro's decision to remove Plaintiff from the *Kay/Dalton* matter after Plaintiff had written a letter to the complaining witness in the case (Judge Anello) and disclosed that there had been an internal disagreement at the OCTC over whether and when to file charges and suggesting that Plaintiff's supervisor (Steedman) had made an incorrect decision by granting the respondent an extension of time; (2) Dal Cerro's issuance of a Written Warning after Plaintiff filed the *Mendez* NDC without making the changes his supervisor (Steedman) had instructed him to make; (3) Dal Cerro's issuance of the second Written Warning after Plaintiff failed to comply with the first Written Warning (which required him to file an amended NDC in the *Mendez* matter); (4) the decision to reassign Plaintiff to notice drafting and away from court appearances, where he, of late, had repeatedly treated both State Bar Court judges contemptuously; (5) Dal Cerro's decision to remove Plaintiff from the *Lowenstein* case after he refused to incorporate Blumenthal's changes; (6) Blumenthal's micro-management of Plaintiff's work after discovering that Plaintiff had failed to timely propound discovery in the *Bajaj* matter, had failed to comply with internally set deadlines, and was refusing to follow his supervisors' directives; (7) Dal Cerro's

United States District Court

For the Northern District of California

29

United States District Court

For the Northern District of California

1   decision to implement a PIP so that Plaintiff could be coached back on track; (8) Dal Cerro's

2   decision to remove Plaintiff from the *Stevens* case after he failed to comply with his supervisor's

3   directives regarding drafts and deadlines; and (9) Dal Cerro's issuance of the Notice of Disciplinary

4   Action, informing Plaintiff that he would be suspended for three days (to be implemented at a later

5   date) for insubordination.[19]

6          Plaintiff suggests that Defendants' proffered explanations for the adverse employment

7   actions taken against him are false and pretextual.  To support this argument, Plaintiff cites very

8   generally to the entire factual record and then more specifically, to a log maintained by Defendant

9   Blumenthal which documented Plaintiff's activities, to Mike Nisperos' June 14, 2004, email stating

10  his intent to terminate Plaintiff once the investigation into his RAD complaint was complete, and to

11  Defendant Hawley's failure to conduct an impartial investigation into Plaintiff's complaints of false

12  allegations and retaliation.  (*See* Opposition at 20:5–24.)  The Court finds that the record does not

13  support Plaintiff's contention that Defendants' actions were motivated by retaliation.  Plaintiff has

14  not presented evidence that demonstrates that Defendants' proffered justifications are pretext for

15  retaliation.

16         With respect to Defendant Blumenthal's log, attached to Konig's April 5, 2005, Declaration

17  as Exhibit 17, Blumenthal's first entry was not until March 2004, and the contents of the log

18  evidence only an attempt to document Plaintiff's insubordinate behavior.  Plaintiff has presented no

19  evidence indicating that the log was maintained in retaliation for Plaintiff's complaints to the CJP or

20  for engaging in other protected speech or how the log supports a finding that any of Blumenthal's

21  contemporaneous adverse actions (e.g. micro-managing Plaintiff's work) were actually motivated by

22  retaliation.  Furthermore, Plaintiff has not shown how Defendant Blumenthal's log could support a

23  ─────────────────

24         [19] In his opposition, Plaintiff does not analyze, Defendant by Defendant, whether the evidence
    supports a finding that each Defendant's adverse action was motivated by retaliation.  Instead, he makes
25  only very generalized arguments that various actions taken by some Defendants supports a finding that
    all engaged in unlawful retaliation.  For example, as is discussed *infra*, Plaintiff generally asserts that
26  the fact that Blumenthal maintained a log of Plaintiff's insubordinate conduct evidences a retaliatory
    motive on the part of all Defendants.  However, as noted in footnote 13, *supra*, to survive summary
27  judgment on his claims against each Defendant, Plaintiff must present evidence that each Defendant's
    adverse action was motivated by retaliation for protected speech.  *See Hansen*, 885 F.2d at 645–46 (no
28  vicarious liability under § 1983).  Defendants, for their part, also do not engage in separate analyses of
    motive as to each Defendant.  Thus, rather than analyze this question in a manner wholly different from
    that employed by the parties, the Court addresses pretext in the same manner.

1  finding that Defendants Dal Cerro's or Hawley's adverse actions were motivated by retaliation.

2  Accordingly, the Court finds that Blumenthal's log does not support a finding of pretext here.

3      With respect to Defendant Hawley's involvement in the investigation of the RAD complaint

4  the Court has already found that Plaintiff has not presented any evidence that Defendant Hawley

5  took any adverse action against him.[20]  (*See* discussion *supra*.)  Plaintiff must present evidence of an

6  adverse action to survive summary judgment on his retaliation claim and with respect to Defendant

7  Hawley, he has failed to do so.  Additionally, to the extent that Plaintiff claims that the other

8  Defendants' adverse actions against him were actually motivated by retaliation cannot find support

9  in Defendant Hawley's conduct.  Thus, the Court finds that Hawley's role in the RAD investigation

10  does not support a finding of pretext here.

11      With respect to Nisperos' email statement that he intended to fire Plaintiff regardless of the

12  outcome of the RAD investigation, the Court disagrees with Plaintiff that the email is evidence of

13  retaliatory motive.  Mr. Nisperos' expressed desired to terminate Plaintiff regardless of what the

14  investigation uncovered does not provide evidence that Plaintiff would be fired *because he filed the*

15  *complaint that prompted that investigation*.  Moreover, Nisperos is not a defendant here.  Plaintiff

16  has not explained how Defendants are liable for the alleged conduct and motivation of a different

17  employee at the OCTC.

18      Defendants contend that they disciplined Plaintiff, changed his work assignments, imposed a

19  PIP, and suspended him in response to his insubordination, not in retaliation for his speech.  As

20  supervisors to Plaintiff at the OCTC, Defendants had a strong interest in promoting the efficiency of

21  the public services their office performs through its employees and in managing its employees

22  appropriately, particularly where employee conduct hinders the efficient operation of the office.  *See*

23  *Connick*, 461 U.S. at 150.  The PIP explained to Konig as follows:

24

25      You have had a recurring history of performance problems related to
       insubordination, lack of professional detachment, and disrespect of judicial

26      officers and other persons of authority.  Additionally, you have taken positions in
       drafting legal documents and presenting matters at trial that are ill-advised and

27      unlikely to result in positive outcomes.  Finally you have not diligently performed

28  _____
       [20] The Court has already found that Defendant Hawley's role in the RAD investigation does not,
    on its own, amount to an adverse action.

**United States District Court**
For the Northern District of California

1  the duties and responsibilities of your legal advisor/notice drafting assignment."

2  (Dal Cerro Decl., Ex. HH.)  The evidentiary record before the Court does not support a finding that

3  the reasons offered by Defendants for taking the actions they did were pretext for retaliation.  (*See,*

4  *e.g.,* Blumenthal Decl., Exs. C, D, G, K, N, O, P; Dal Cerro Decl., Exs. J, DD.)  Plaintiff offers only

5  generalities to support his pretext argument, claiming that because he was treated poorly around the

6  time he submitted complaints about judicial misconduct, the events must be connected.  In light of

7  the totality of the record, as discussed above, the Court finds plaintiff has failed to marshal

8  significant and probative evidence sufficient to avoid summary judgment.  *T. W. Elec. Serv., Inc. v.*

9  *Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987).

10  The Court finds, based on the totality of the evidence, that Plaintiff has not raised a triable

11  issue of fact with respect to the motive behind Defendants' actions against Plaintiff.  Plaintiff has

12  provided no evidence to suggest that Defendants' contention that taking such adverse actions as

13  issuing warning letters for insubordinate behavior, which followed closely on the heels of the filing

14  of his CJP complaint, were actually taken in retaliation against Plaintiff for engaging in protected

15  speech.  In short, Plaintiff has not shown pretext here.

16  —

17  Plaintiff has failed to demonstrate that there is a genuine issue of material fact regarding

18  whether any adverse employment action Defendants took was motivated by Plaintiff's protected

19  speech.  "When evidence to refute the defendant's legitimate explanation is totally lacking, summary

20  judgment is appropriate even though plaintiff may have established a minimal prima facie case of

21  unlawful discrimination or retaliation."  *Hashimoto v. Dalton*, 118 F.3d 671, 680–81 (9th Cir. 1997)

22  (citation omitted).

23  **II.      Qualified Immunity**

24  Defendants argue that even assuming, *arguendo*, that Plaintiff had presented a genuine issue

25  of material fact with respect to his First Amendment claim, Defendants are entitled to qualified

26  immunity.  Because the Court has found that Plaintiff has not demonstrated a triable issue of fact on

27  his First Amendment claim, the Court need not reach Defendants' qualified immunity argument.

28  ///

1   ///

2   ///

3   ///

4   ///

5                               **CONCLUSION**

6          "In some cases, the totality of the facts may form such a clear picture that a district court

7   would be justified in granting summary judgment, either for or against a plaintiff, on the issue of

8   retaliatory motive."  *Coszalter*, 320 F.3d at 978.  Having carefully examined the very full record in

9   this case, the Court finds that this is one of those cases and accordingly **GRANTS** Defendants'

10  motion for partial summary judgment on Plaintiff's first cause of action as to each Defendant.

11         This Order terminates docket entry no. 24.  The Clerk of Court shall close the file.

12         **IT IS SO ORDERED.**

13
     Dated: October    7, 2005
14                                                   _____
15                                                   MARTIN J. JENKINS
                                                     UNITED STATES DISTRICT JUDGE
16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California