JAMES M. WAGSTAFFE (95535)
MICHAEL VON LOEWENFELDT (178665)
EMILIA MAYORGA (203688)
**KERR & WAGSTAFFE LLP**
100 Spear St., Suite 1800
San Francisco, CA 94105–1528
Tel: (415) 371-8500
Fax: (415) 371-0500

LAWRENCE C. YEE (84208)
HEATHER A. IRWIN (203203)
**OFFICE OF GENERAL COUNSEL**
**THE STATE BAR OF CALIFORNIA**
180 Howard Street
San Francisco, CA 94105-1639
Tel: (415) 538-2000
Fax: (415) 538-2321

Attorneys for Defendants
LAWRENCE J. DAL CERRO; RUSSELL WEINER;
ALLEN BLUMENTHAL; and ROBERT HAWLEY

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

ALAN KONIG,

      Plaintiff,

  v.

LAWRENCE J. DAL CERRO; RUSSELL
WEINER; ALLEN BLUMENTHAL; and
ROBERT HAWLEY,

      Defendants.

Case No. C 04-02210 MJJ

**DECLARATION OF EMILIA**
**MAYORGA IN SUPPORT OF**
**DEFENDANTS' MOTION FOR**
**PARTIAL SUMMARY JUDGMENT ON**
**PLAINTIFF'S FIRST AMENDMENT**
**CLAIM**

DATE:  April 26, 2005
TIME:  9:30 a.m.
DEPT:  11

Hon. Martin J. Jenkins

**<u>REDACTED</u>**

**RE-FILED PURSUANT TO**

**MARCH 3, 2009 ORDER**

C 04-02210 MJJ

1    I, Emilia Mayorga, hereby declare:

2        1.    I am an attorney licensed to practice before all courts in the State of California,

3    and am an associate in the law firm of Kerr & Wagstaffe LLP, attorneys of record for defendants

4    in this action. I have personal knowledge of the facts stated herein, and, if called as a witness,

5    could and would competently testify to them under oath.

6        2.    On October 28, 2004 and November 4, 2004, defendants took the deposition of

7    plaintiff Alan Konig ("Konig") in this matter. I attended that deposition. Attached hereto as

8    Exhibit A are true and correct copies of pages 60, 64, 79, 151, 190, 191, 214, 225, 226, 227,

9    237, 238, 239, 263, 264, 265, 410, 411, 417, 419, 449, 503, 523, 524, 531, and 533.

10       3.    Attached hereto as Exhibit B is a true and correct copy of an email from Alan

11   Konig to Robin Haffner and Robert Henderson. This document was marked as Exhibit 8 in

12   Konig's deposition, and was authenticated by Konig at page 263 line 16 through page 264 line

13   4.

14       4.    Attached hereto as Exhibit C is a true and correct copy of an email exchange

15   between Konig and Brian Ebbesen. This document was marked as Exhibit 45 in Konig's

16   deposition, and was authenticated by Konig at page 523 line 19 through page 524 line 3.

17       5.    Attached hereto as Exhibit D is a true and correct copy of Konig's November 26,

18   2003 "Complaint of Unlawful and Improper Conduct Including Retaliatory Actions Within the

19   Office of the Chief Trial Counsel of the State Bar of California" to the Regulations, Admissions,

20   and Discipline Oversight Committee ("RAD") of the Board of Governors of the State Bar. This

21   documents was marked as Exhibit 32 in Konig's deposition, and was authenticated by Konig at

22   page 449 lines 14-22.

23       6.    Attached hereto as Exhibit E is a true and correct copy of Konig's "Addendum to

24   November 26, 2003 Complaint of Unlawful and Improper Conduct" to RAD. This document

25   was marked as Exhibit 38 in Konig's deposition, and was authenticated by Konig at page 503

26   lines 8 through 23.

27       7.    Attached hereto as Exhibit F is a true and correct copy of Konig's "Second

28   Addendum to November 26, 2003 Conduct of Unlawful and Improper Conduct" to RAD. This

1   document was marked as Exhibit 50 in Konig's deposition, and was authenticated by Konig at

2   page 533 lines 11 through 17.

3         8.     Attached hereto as Exhibit G is a true and correct copy of Konig's December 8,

4   2003 complaint to the State Personnel Board ("SPB"). This document was marked as Exhibit 9

5   in Konig's deposition, and was authenticated by Konig at page 264 lines 10 through 17.

6         9.     Attached hereto as Exhibit H is a true and correct copy of the SPB's December

7   16, 2003 response to Konig's December 8, 2003 complaint. This document was marked as

8   Exhibit 11 in Konig's deposition, and was authenticated at page 265 lines 8 through 15.

9         10.     Attached hereto as Exhibit I is a true and correct copy of a November 3, 2003

10   complaint to the Commission on Judicial Performance, which Konig produced to this office in

11   response to a discovery request, and which Konig has designated as "Attorneys Eyes Only."

12         11.     Proceedings at the State Bar Court are recorded electronically in a format that can

13   be replayed using a computer program called FTR (For the Record), which shows the time and

14   date as the record is being played. Attached hereto as Exhibit J is a CD formatted for a

15   Windows based computer containing the official audio recording from June 25, 2003 in the

16   *Wells* trial.

17         I declare under penalty of perjury under the laws of the United States that the foregoing is

18   true and correct. Executed on March 7, 2005, at San Francisco, California.

19

20                   *Emilia Mayorga*

21                   Emilia Mayorga

22

23

24

25

26

27

28

**EXHIBIT A**

**CERTIFIED COPY**

CONFIDENTIAL – ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT OF CALIFORNIA

NORTHERN DISTRICT OF CALIFORNIA

ALAN KONIG,                        )
                                   )
                Plaintiff,         )
                                   )
        vs.                        )
                                   )
                                   ) No. C04-2210 MJJ
THE STATE BAR OF CALIFORNIA,       )
et al.,                            )
                                   )
                Defendants.        )
_____   )

CONFIDENTIAL – ATTORNEYS' EYES ONLY

DEPOSITION OF ALAN KONIG

OCTOBER 28, 2004

CASSANDRA RUSSELL
CSR # 11934
183656



| Los Angeles | Orange County | San Francisco | San Diego | Inland Empire | Palm Springs | San Fernando Valley | San Jose |
|---|---|---|---|---|---|---|---|
| (310) 207.8000 | (949) 955.0400 | (415) 433.5777 | (858) 455.5444 | (909) 686.0606 | (760) 322.2240 | (818) 702.0202 | (408) 885.0550 |

CERTIFIED COPY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALAN KONIG,                          )
                                     )
                  Plaintiff,         )
                                     )
           vs.                       ) No. C 04-02210 MJJ
                                     )
THE STATE BAR OF CALIFORNIA,         )
Etc., et al.,                        )
                                     )
                  Defendants.        )
_____     )

VOLUME II

DEPOSITION OF ALAN KONIG

November 4, 2004

ANDREA ANGWIN
CSR No. 6988
186557



CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.  It varied depending upon what period of time        10:28 AM

2   you're talking about and also what activity or what        10:28 AM

3   calendar you were working on.                               10:28 AM

4       Q.  Was Ms. Delay your supervisor at any time?          10:28 AM

5       A.  De Loe.                                             10:28 AM

6       Q.  De Loe.  Excuse me.                                 10:29 AM

7       A.  She was.                                            10:29 AM

8       Q.  Did you ever receive any training at the            10:29 AM

9   D.A.'s Office with respect to the standard of proof        10:29 AM

10  for filing a criminal complaint?                           10:29 AM

11      A.  Not that I can remember.                            10:29 AM

12      Q.  The office had a policy, did it not, as to          10:29 AM

13  what standard of proof is required in the office with      10:29 AM

14  respect to the quantum of evidence they thought would      10:29 AM

15  be necessary in order to initiate a complaint, right?      10:29 AM

16      A.  I don't know.                                       10:29 AM

17      Q.  Well, that standard was, was it not, that the       10:29 AM

18  office believed there had to be sufficient evidence        10:29 AM

19  beyond a reasonable doubt even to charge; isn't that       10:29 AM

20  right?                                                     10:29 AM

21      A.  Not that I'm aware of, no.                          10:29 AM

22      Q.  Was it a lower standard that you can               10:29 AM

23  remember?                                                  10:29 AM

24      A.  As far as I understood it was probable cause.      10:29 AM

25      Q.  You were never told it was a higher standard,      10:29 AM

Page 60

ALAN KONIG - CONFIDENTIAL

BARKLEY
Court Reporters

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.  No. | 10:46 AM |
| 2 | Q.  Are you aware that other district attorney's | 10:46 AM |
| 3 | offices in the State of California do have such a | 10:46 AM |
| 4 | policy, that is they insist there be sufficient | 10:46 AM |
| 5 | evidence to convict even at the time the complaint is | 10:46 AM |
| 6 | charged? | 10:46 AM |
| 7 | A.  I don't know what the policies of any | 10:46 AM |
| 8 | district attorney's office is aside from the one I | 10:46 AM |
| 9 | worked in. | 10:46 AM |
| 10 | Q.  You are a member -- you were a member of the | 10:46 AM |
| 11 | California District Attorneys' Association, weren't | 10:46 AM |
| 12 | you? | 10:46 AM |
| 13 | A.  Yes. | 10:46 AM |
| 14 | Q.  Are you still a member? | 10:46 AM |
| 15 | A.  No. | 10:46 AM |
| 16 | Q.  What time were you a member? | 10:46 AM |
| 17 | A.  When I worked at the Sonoma County District | 10:46 AM |
| 18 | Attorney's Office. | 10:46 AM |
| 19 | Q.  Did you ever go to any meetings? | 10:46 AM |
| 20 | A.  No. | 10:47 AM |
| 21 | Q.  Did you ever go to any continuing legal | 10:47 AM |
| 22 | education courses for prosecutors? | 10:47 AM |
| 23 | A.  I don't remember. | 10:47 AM |
| 24 | Q.  Have you ever gone to a continuing education | 10:47 AM |
| 25 | course at any time in your career in which the subject | 10:47 AM |

Page 64

ALAN KONIG - CONFIDENTIAL

BARKLEY
Court Reporters

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | with the client, that you could waive that if you | 11:05 AM |
| 2 | disclosed it to someone who is not within the | 11:05 AM |
| 3 | privilege, right? | 11:05 AM |
| 4 | A.  That's a very convoluted question, actually, | 11:05 AM |
| 5 | because there are ways to disclose attorney-client | 11:05 AM |
| 6 | communications to a third party that doesn't waive the | 11:05 AM |
| 7 | attorney-client privilege. | 11:05 AM |
| 8 | Q.  All right.  But there were confidential | 11:05 AM |
| 9 | aspects about your job as a DTC, correct? | 11:05 AM |
| 10 | A.  Sure. | 11:05 AM |
| 11 | Q.  You had a certain discretion with respect to | 11:05 AM |
| 12 | charging, did you not? | 11:05 AM |
| 13 | A.  I'm sorry? | 11:05 AM |
| 14 | Q.  You were given certain discretion, were you | 11:05 AM |
| 15 | not, as a DTC with respect to what you charged and how | 11:05 AM |
| 16 | you charged it, right? | 11:05 AM |
| 17 | A.  I would say I was given absolute discretion. | 11:05 AM |
| 18 | Q.  In that sense you were -- you were | 11:06 AM |
| 19 | affected -- there would be policies implemented by the | 11:06 AM |
| 20 | State Bar and you were implementing those policies | 11:06 AM |
| 21 | within that discretion, right? | 11:06 AM |
| 22 | A.  If you can refer me to a specific policy, I | 11:06 AM |
| 23 | might be able to answer that.  I don't know what you | 11:06 AM |
| 24 | mean by "policies." | 11:06 AM |
| 25 | Q.  When this -- when you're -- there were | 11:06 AM |

Page 79

ALAN KONIG - CONFIDENTIAL

BARKLEY
Court Reporters

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   backstabbed?                                          01:44 PM

2       A.  He completely failed to provide any support   01:44 PM

3   to me.                                                01:44 PM

4       Q.  Because he went to court and he said, Judge,  01:44 PM

5   we'll take this seriously and we won't do it again,   01:44 PM

6   that was the backstab, right?                         01:44 PM

7       A.  No.  He agreed with the judge and agreed with 01:44 PM

8   the judge's accusations without knowing any of the    01:44 PM

9   facts.                                                01:44 PM

10      Q.  How did Mr. Dal Cerro allow Judge Remke to     01:44 PM

11  dress you down, as you write in your memorandum?       01:44 PM

12      A.  Because he sat there and he did nothing.       01:44 PM

13      Q.  Do you recall Mr. Dal Cerro telling you at     01:44 PM

14  this time that the case was the chief's case and that  01:44 PM

15  he was there as the chief's deputy if the Court wants  01:44 PM

16  the chief or him to be a delegate in that regard?  Do  01:44 PM

17  you recall words to that effect?                       01:45 PM

18      A.  No.                                            01:45 PM

19      Q.  Are you saying that those words weren't        01:45 PM

20  spoken, or you don't recall?                           01:45 PM

21      A.  I certainly don't remember them.               01:45 PM

22      Q.  How did the rest of the trial go?              01:45 PM

23      A.  I honestly don't remember.  I think that was   01:45 PM

24  towards the end of the trial.  I just don't remember.  01:45 PM

25      Q.  Looking at the bottom of 1127, the top of      01:45 PM

Page 151

ALAN KONIG - CONFIDENTIAL

BARKLEY

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | specifically at that time? | 02:32 PM |
| 2 | A.  I don't. | 02:32 PM |
| 3 | Q.  Do you have a recollection of having spoken | 02:32 PM |
| 4 | to Mr. Steedman at any time specifically where the | 02:32 PM |
| 5 | subject of the 9/11 memorandum came up? | 02:32 PM |
| 6 | A.  Not that I can remember, no. | 02:32 PM |
| 7 | Q.  How about Mr. Blumenthal?  You said he acted | 02:32 PM |
| 8 | negatively toward you in response to the 9/11 | 02:32 PM |
| 9 | memorandum.  What did he do? | 02:32 PM |
| 10 | A.  He took part in the meetings that were | 02:32 PM |
| 11 | supposed to have been to discuss some of my matters. | 02:32 PM |
| 12 | Q.  Well, in what meetings were those? | 02:32 PM |
| 13 | A.  What do you mean? | 02:32 PM |
| 14 | Q.  You're talking about September 23rd and 24th | 02:32 PM |
| 15 | meetings? | 02:32 PM |
| 16 | A.  No, no, the meetings subsequent to September | 02:32 PM |
| 17 | 23rd and 24th during the month of October.  It may | 02:32 PM |
| 18 | have been the beginning of November as well. | 02:32 PM |
| 19 | Q.  In those meetings the subject of the | 02:32 PM |
| 20 | September 11th memorandum came up in your | 02:33 PM |
| 21 | communications with Mr. Blumenthal? | 02:33 PM |
| 22 | A.  No, I don't believe it did. | 02:33 PM |
| 23 | Q.  When is the last time you recall | 02:33 PM |
| 24 | Mr. Blumenthal, if ever, mentioning the September 11th | 02:33 PM |
| 25 | memorandum to you? | 02:33 PM |

Page 190

ALAN KONIG - CONFIDENTIAL

BARKLEY

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.  I don't remember him mentioning it to me at        02:33 PM

2  all.                                                      02:33 PM

3    Q.  At any time?                                        02:33 PM

4    A.  Not that I remember, no.                            02:33 PM

5    Q.  I'm going to show you what I'll mark as             02:33 PM

6  Defendants' Exhibit 4.                                    02:33 PM

7              (Defendants' Exhibit 4 marked for             02:34 PM

8              identification by the Court Reporter.)        02:33 PM

9  BY MR. WAGSTAFFE:                                         02:34 PM

10   Q.  Mr. Konig, we've marked as Defendants'              02:34 PM

11  Exhibit 4 an Email chain.  At the top it refers to how   02:34 PM

12  it was generated by my office.  It has my firm's name    02:34 PM

13  there.                                                   02:34 PM

14       The top says, Alan Konig -- from Alan Konig         02:34 PM

15  to Jeff Dal Cerro and Andrea Wachter.  It's Bates        02:34 PM

16  7738.                                                    02:34 PM

17       I want you to look at the Email two-thirds          02:34 PM

18  the way down the page.  It's from you to Ms. Wachter,    02:34 PM

19  dated May 7th, 2003.                                     02:34 PM

20   A.  Okay.                                               02:34 PM

21   Q.  The first line says (Reading):                      02:34 PM

22              I think I've reached my breaking point       02:34 PM

23              with Judge Remke.                            02:34 PM

24       As of May 7th, 2003, had you reached your           02:34 PM

25  breaking point with Judge Remke?                         02:34 PM

Page 191

ALAN KONIG - CONFIDENTIAL

BARKLEY
Court Reporters

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Defendants' 6.                                               03:23 PM

2            (Defendants' Exhibit 6 marked for                  03:23 PM

3            identification by the Court Reporter.)             03:23 PM

4   BY MR. WAGSTAFFE:                                           03:23 PM

5       Q.   Before I identify it, was there anything else      03:23 PM

6   about the meeting of the 24th, Mr. Konig, that you can      03:23 PM

7   remember?                                                   03:23 PM

8       A.   Well, again, I made the same request:  That I      03:23 PM

9   be provided with the allegations and the accusations        03:23 PM

10  in writing and also the facts that support them or the      03:23 PM

11  bases for them in writing.                                  03:24 PM

12      Q.   Did Mr. -- was Mr. Steedman there?                 03:24 PM

13      A.   I believe so, but I'm not certain.                 03:24 PM

14      Q.   Did he say anything?                               03:24 PM

15      A.   I don't remember him saying anything, if he        03:24 PM

16  was there.                                                  03:24 PM

17      Q.   Did you say anything to him?                       03:24 PM

18      A.   To Mr. Steedman?                                   03:24 PM

19      Q.   Yes.                                               03:24 PM

20      A.   I don't remember saying anything to him.           03:24 PM

21      Q.   Do you recall ever being in a meeting in           03:24 PM

22  which you accused Mr. Steedman of being a liar?            03:24 PM

23      A.   Oh, yeah.                                          03:24 PM

24      Q.   Do you ever recall telling him you thought he      03:24 PM

25  was acting criminally?                                      03:24 PM

Page 214

ALAN KONIG - CONFIDENTIAL

BARKLEY
Court Reporters

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.  You didn't tell anyone you were going to do | 03:38 PM |
| 2 | it, right? | 03:38 PM |
| 3 | A.  Not at that meeting, no. | 03:38 PM |
| 4 | Q.  All right.  Now, you did, in fact, file a | 03:38 PM |
| 5 | complaint with the CJP, correct? | 03:38 PM |
| 6 | A.  Yes. | 03:39 PM |
| 7 | MR. ROGERS:  If we're going to talk about it, | 03:39 PM |
| 8 | I want this portion of the deposition to be attorneys' | 03:39 PM |
| 9 | eyes only, and if there's anybody here who's connected | 03:39 PM |
| 10 | with the State Bar, I request that they not be | 03:39 PM |
| 11 | present. | 03:39 PM |
| 12 | MR. WAGSTAFFE:  Well, that's if I talk about | 03:39 PM |
| 13 | the contents.  Do you agree also with the timing | 03:39 PM |
| 14 | issues? | 03:39 PM |
| 15 | MR. ROGERS:  It's only content. | 03:39 PM |
| 16 | MR. WAGSTAFFE:  If I get there, you stop me | 03:39 PM |
| 17 | before the answer comes and we'll ask Mr. Dal Cerro to | 03:39 PM |
| 18 | leave and have our stenographer swear under oath. | 03:39 PM |
| 19 | Q.  What date did you file it? | 03:39 PM |
| 20 | A.  I mailed it November 3rd, I believe. | 03:39 PM |
| 21 | Q.  Did you tell anybody at the CJP that you were | 03:39 PM |
| 22 | going to do it before you did it? | 03:39 PM |
| 23 | A.  The CJP? | 03:39 PM |
| 24 | Q.  Yes. | 03:39 PM |
| 25 | A.  No. | 03:39 PM |

Page 225

ALAN KONIG - CONFIDENTIAL

BARKLEY
Court Reporters

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.  Did you tell anybody at the State Bar that          03:40 PM

2    you were going to file the CJP complaint before you     03:40 PM

3    did it?                                                  03:40 PM

4    A.  Yes.                                                 03:40 PM

5    Q.  Who did you tell?                                    03:40 PM

6    A.  Lynne Thingvold.                                     03:40 PM

7    Q.  What did you tell her?                               03:40 PM

8    A.  That I was filing a complaint with the CJP.          03:40 PM

9    Q.  Just if you can answer the question, because         03:40 PM

10   I don't want to get into the content.  Did you tell      03:40 PM

11   her what the content was of the complaint you were       03:40 PM

12   filing with the CJP?                                     03:40 PM

13   A.  Not in specific terms, no.  I might have in          03:40 PM

14   general terms.                                           03:40 PM

15   Q.  Did you tell Ms. Thingvold to keep that              03:40 PM

16   information you communicated confidential?               03:40 PM

17   A.  I don't believe I did, no.                           03:40 PM

18   Q.  Did you tell anyone else other than                  03:40 PM

19   Ms. Thingvold at the State Bar or otherwise that you     03:40 PM

20   were filing a CJP complaint against Judge Remke?         03:40 PM

21   A.  I believe she's the only one.                        03:41 PM

22   Q.  What did Mr. Thingvold say to you when you           03:41 PM

23   told her this?                                           03:41 PM

24   A.  I actually don't remember what she said.  I          03:41 PM

25   think she just reacted with something to the effect      03:41 PM

ALAN KONIG - CONFIDENTIAL

BARKLEY
Court Reporters

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   of, oh, really or something.  It wasn't anything        03:41 PM

 2   detailed, I know that.                                  03:41 PM

 3       Q.  To your knowledge did -- other than the         03:41 PM

 4   filing of this lawsuit, to your knowledge, did anybody  03:41 PM

 5   at the OCTC become aware of your filing the CJP         03:41 PM

 6   complaint after you filed it?                           03:41 PM

 7       A.  Yes.                                            03:41 PM

 8       Q.  Who became aware, to your knowledge?            03:41 PM

 9       A.  A couple -- more than a couple -- several of    03:41 PM

10   the attorneys in the office.                            03:41 PM

11       Q.  Who were they?                                  03:41 PM

12       A.  Maria Thorpasa; Tammy Albertson Murray;         03:42 PM

13   Wonder, W-O-N-D-E-R, Leang.  I think every -- I think   03:42 PM

14   all of the attorneys in the office know now.  But you   03:42 PM

15   want me to limit it to --                               03:42 PM

16       Q.  I really want you to answer my question.        03:42 PM

17   When I get to that I will ask you.                      03:42 PM

18           My question is, who do you know became aware    03:42 PM

19   of the filing of the CJP complaint.                     03:42 PM

20           As I said before, you filed your complaint in   03:42 PM

21   this action and participated in a newspaper article.    03:42 PM

22       A.  Well, initially I know those three had          03:43 PM

23   knowledge of it within a few days to a week of the      03:43 PM

24   filing.  And then just through talk within the office   03:43 PM

25   and rumor, I think all of the attorneys knew.           03:43 PM
```

Page 227

ALAN KONIG - CONFIDENTIAL

BARKLEY
Court Reporters

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.  Isn't it a fact that once you learned from          03:54 PM

2    these three individuals they were aware of the CJP      03:54 PM

3    complaint, you were the one who raised the subject      03:54 PM

4    affirmatively in disclosure to Mr. Dal Cerro that you   03:54 PM

5    had filed a CJP complaint?                              03:54 PM

6    A.  No.  You're misread reading that.                   03:54 PM

7    Q.  When the complaint says, "plaintiff was             03:54 PM

8    required to confirm," what did you mean by the phase,   03:54 PM

9    "was required to confirm that he had filed a complaint  03:54 PM

10   with the CJP"?                                          03:54 PM

11   A.  When people in the office asked me about it         03:54 PM

12   and the fact that I had done it, I truthfully told      03:54 PM

13   them that I had.                                        03:54 PM

14   Q.  That would be the three people you've been          03:54 PM

15   able to identify here, correct?                         03:54 PM

16   A.  Yes.                                                03:54 PM

17   Q.  You identified that to them truthfully within      03:54 PM

18   approximately one week of your having filed the         03:54 PM

19   complaint, correct?                                     03:54 PM

20   A.  Yes.                                                03:54 PM

21   Q.  Between that date in mid-November of 2003 and       03:55 PM

22   March 2004, over four months, you never had a           03:55 PM

23   discussion with anybody at OCTC who are defendants in   03:55 PM

24   this action about that subject, did you?                03:55 PM

25   A.  Not a verbal discussion.  It was in written        03:55 PM

Page 237

ALAN KONIG - CONFIDENTIAL

BARKLEY
Court Reporters

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   memorandum.                                              03:55 PM

2       Q.  They never had it with you, did they?  Never     03:55 PM

3   discussed it with you, complained about it, did they?    03:55 PM

4       A.  No verbal discussions, no.                       03:55 PM

5       Q.  No one has ever had any communication with       03:55 PM

6   you, have they, in which they complained to you after    03:55 PM

7   the fact that you filed a CJP complaint -- that is       03:55 PM

8   someone who is a defendant in this action -- right?      03:55 PM

9       A.  Not specifically with -- no specific             03:55 PM

10  reference to the CJP, no.                                03:55 PM

11      Q.  Mr. Nisperos never mentioned it to you, did      03:55 PM

12  he?                                                      03:55 PM

13      A.  Mr. Nisperos hasn't had a single conversation    03:55 PM

14  with me about anything from the very beginning.          03:55 PM

15      Q.  I have a question; I want you to answer it.      03:55 PM

16  You can provide more information, but the answer to my   03:55 PM

17  question is that Mr. Nisperos never mentioned it to      03:55 PM

18  you, did he?                                             03:55 PM

19      A.  No.                                              03:56 PM

20      Q.  Mr. Weiner never mentioned it to you?  That      03:56 PM

21  is, he never mentioned he had any concerns, complaints   03:56 PM

22  or awareness that you had filed a complaint with the     03:56 PM

23  CJP; isn't that right?                                   03:56 PM

24      A.  No.                                              03:56 PM

25      Q.  Is that correct?                                 03:56 PM

Page 238

ALAN KONIG - CONFIDENTIAL

BARKLEY
Court Reporters

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      A.  Sorry.  That's right.                    03:56 PM

2      Q.  Very good.  Mr. Blumenthal never communicated   03:56 PM

3   to you in any way that he was upset or even aware of   03:56 PM

4   the filing of a CJP complaint by you, correct?   03:56 PM

5      A.  That's correct.                           03:56 PM

6      Q.  Mr. Dal Cerro -- strike that.            03:56 PM

7           Mr. Holly never communicated to you that he   03:56 PM

8   was upset or even aware of your filing a CJP   03:56 PM

9   complaint, correct?                               03:56 PM

10     A.  That's correct.                           03:56 PM

11     Q.  Mr. Dal Cerro never communicated to you at   03:56 PM

12   any time after November 3 of 2003 that he was upset or   03:56 PM

13   otherwise aware of the CJP complaint you had filed;   03:56 PM

14   isn't that right?                                 03:56 PM

15     A.  I think that's correct, yes.             03:56 PM

16     Q.  Let's go back to our exhibits.           03:57 PM

17          We have marked previously as Exhibit 6 --   03:57 PM

18          THE REPORTER:  6.                        03:57 PM

19          MR. WAGSTAFFE:  Let's mark as Exhibit 7 --   03:57 PM

20          (Defendants' Exhibit 7 marked for        03:57 PM

21          identification by the Court Reporter.)   03:57 PM

22   BY MR. WAGSTAFFE:                                03:57 PM

23     Q.  Mr. Konig, I put before you is Defendants'   03:57 PM

24   Exhibit 7, which is a document dated October 31, 2003   03:58 PM

25   from Mr. Dal Cerro to you.  I'll note that it appears   03:58 PM
```

Page 239

ALAN KONIG - CONFIDENTIAL

BARKLEY
Court Reporters

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   No.   If I believed at the time that I filed          04:25 PM

2    that I had probable cause and something happened            04:25 PM

3    either prior to or during the trial that was beyond my      04:25 PM

4    control that prevented me from actually obtaining           04:25 PM

5    culpability, that's something that I can't take into        04:25 PM

6    consideration.                                              04:26 PM

7           THE REPORTER:   Counsel, can we take a break?        04:26 PM

8           MR. WAGSTAFFE:   Yes.  Thank you.                    04:26 PM

9           VIDEOGRAPHER:   Going off the record.   The          04:26 PM

10   time is 4:26 p.m..                                          04:26 PM

11           (Recess.)                                           04:26 PM

12           VIDEOGRAPHER:   Going back on the record.           04:40 PM

13   This marks the beginning of Tape 5 of Volume 1 in the       04:40 PM

14   deposition of Alan Konig.   The time is 4:40 p.m..          04:40 PM

15   BY MR. WAGSTAFFE:                                           04:40 PM

16      Q.   Mr. Konig, I'd like to show you what we'll          04:40 PM

17   mark as Defendants' 8.                                      04:40 PM

18           (Defendants' Exhibit 8 marked for                   04:41 PM

19           identification by the Court Reporter.)              04:40 PM

20   BY MR. WAGSTAFFE:                                           04:41 PM

21      Q.   Mr. Konig, I'm showing you what has been            04:41 PM

22   Bates stamped as Defendants' 9413 and 9414.  I want to      04:41 PM

23   direct your attention to the text of the Email that's       04:41 PM

24   near the bottom of the first page from you to Robin         04:41 PM

25   Haffner and Robert Henderson; subject:  Decision on         04:41 PM

Page 263

ALAN KONIG - CONFIDENTIAL

BARKLEY
Court Reporters

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Grievance. | 04:41 PM |
| 2 | Is that a true-and-correct copy of your | 04:41 PM |
| 3 | Email? | 04:41 PM |
| 4 | A. It appears to be, yes. | 04:42 PM |
| 5 | Q. Thank you. | 04:42 PM |
| 6 | Let's mark Defendants' Exhibit 9. | 04:42 PM |
| 7 | (Defendants' Exhibit 9 marked for | 04:42 PM |
| 8 | identification by the Court Reporter.) | 04:42 PM |
| 9 | BY MR. WAGSTAFFE: | 04:42 PM |
| 10 | Q. Mr. Konig, I've given you what has been | 04:42 PM |
| 11 | produced, I believe, by you, Bates stamps 1274 through | 04:42 PM |
| 12 | 1300. The top of the first page is a letter from you | 04:42 PM |
| 13 | dated December 8, 2003 to the State Personnel Board. | 04:42 PM |
| 14 | Is that a true-and-correct copy of your | 04:42 PM |
| 15 | letter to the State Personnel Board plus the | 04:42 PM |
| 16 | attachment? | 04:42 PM |
| 17 | A. It appears to be, yes. | 04:42 PM |
| 18 | Q. Mr. Konig, I am now preparing what we'll mark | 04:43 PM |
| 19 | as Defendants' 10. | 04:43 PM |
| 20 | (Defendants' Exhibit 10 marked for | 04:43 PM |
| 21 | identification by the Court Reporter.) | 04:43 PM |
| 22 | BY MR. WAGSTAFFE: | 04:43 PM |
| 23 | Q. Defendants' 10, also I believe produced by | 04:43 PM |
| 24 | you, Mr. Konig, is Bates stamped 1301 through 1303, a | 04:43 PM |
| 25 | letter dated December 17th, 2003 from you to the State | 04:43 PM |

Page 264

ALAN KONIG - CONFIDENTIAL

BARKLEY
Court Reporters

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Personnel Board re an addendum to the complaint.          04:43 PM

2         Is that a true-and-correct copy of the letter       04:43 PM

3   and the attachment?                                       04:43 PM

4      A.  It appears to be, yes.                             04:43 PM

5             (Defendants' Exhibit 11 marked for              04:44 PM

6             identification by the Court Reporter.)          04:43 PM

7   BY MR. WAGSTAFFE:                                         04:44 PM

8      Q.  Mr. Konig, I'm showing you what we're marking      04:44 PM

9   as Defendants' No. 11, Bates stamped from your           04:44 PM

10  production 1304 a letter dated December 16th, 2003        04:44 PM

11  from Karen J. Brandt to you.  She's from the             04:44 PM

12  California State Personnel Board.                         04:44 PM

13        Does that appear to be a true-and-correct           04:44 PM

14  copy of the letter you received?                         04:44 PM

15     A.  It does.                                           04:44 PM

16     Q.  Continuing with the excitement.                   04:44 PM

17             (Defendants' Exhibit 12 marked for             04:44 PM

18             identification by the Court Reporter.)         04:44 PM

19  BY MR. WAGSTAFFE:                                         04:44 PM

20     Q.  Mr. Konig, I placed before you what we'll          04:44 PM

21  mark as Defendants' Exhibit 12 from your Bates stamp     04:44 PM

22  batch 1305, 1306.  It appears to be a two-page letter    04:44 PM

23  from you to Ms. Brandt, dated December 22, 2003.         04:44 PM

24        Is that a true-and-correct copy of the letter       04:45 PM

25  you sent to Ms. Brandt on that date?                     04:45 PM

Page 265

ALAN KONIG - CONFIDENTIAL

```
 1        Q    Go to the next paragraph where you write,

 2   "Throughout my 4.5 years with the State Bar, I have

 3   never once submitted a written document to

 4   Ms. Wachter for her approval prior to being able to

 5   file or send the document."

 6             Do you see that?

 7        A    Yes.

 8        Q    Is that a truthful statement?

 9        A    At the time I wrote that, yes.

10        Q    During the course of grievance process, did
```
51:30
```
11   you at any time refer to Mr. Steedman as a liar?

12        A    Yes.

13        Q    Okay.  And what did you say in regard to

14   calling him a liar?

15        A    Well, the entire basis for the warning

16   letter was false.  He made up a statement that he

17   never said.

18        Q    And are there any other bases for why you

19   called him a liar?

20        A    He also made up an alleged what he called
```
52:00
```
21   "counseling" of me, although I'm not certain because

22   he never gave a case that it occurred in.  And so,

23   yes, I told him he was lying about that.

24        Q    To his face you call him a liar, didn't

25   you?
```

BARKLEY
Court Reporters

1    A    That's right.

2    Q    And in front of other people; right?

3    A    That's right.

4    Q    And you said he had never told you or given

5 you any counseling with respect to interactions with

6 lawyers and judges; is that right?

52:30    7    A    I don't believe that's the correct

8 summation of what he said, no.

9    Q    Well, you give me the correct summation.

10   What is it?

11   A    He at the-- I don't remember if that's the

12 first meeting we had for the grievance or the second

13 meeting that we had, but at one of the meetings --

14 it was the lengthy one that we had -- he said that

15 in some unknown case he had counseled me about

16 interactions with opposing Counsel. And when I

53:00    17 asked him-- Well, first, I told him that that's not

18 true, that never occurred. And then I asked him if

19 he had documented that anywhere in any writing of

20 some sort or even in the file and he indicated "No."

21 I said, "That's because you are lying. It never

22 happened."

23   Q    Turn to Page 2892, which is Page 8 of the

24 memorandum. The third paragraph says, "As with the

53:30    25 allegations related to the supervisor and the judge,

411

ALAN KONIG, VOLUME II

1    them.

2         Q    And did you believe you were rude in

3    calling Mr. Steedman a liar?

4         A    Did I believe I was rude?

5         Q    Yes.

6         A    I believe I was honest.

7         Q    All right.  And not rude?

8         A    Well, "liar" by its very nature is probably

9    a rude term.

10        Q    And you decided to abandon the grievance

11   process, did you?

12        A    I did.

13        Q    And why did you do that?

14        A    For all of the reasons I just previously

15   stated.

16        Q    Well, one of the reasons was it was

17   meaningless; right?

18        A    Yes.

19        Q    And one of the reasons was because it had

20   become a drain on your time and you resources;

21   right?

22        A    To say the least.

23        Q    And you thought that the grievance process

24   was incestuous; right?

25        A    Yes.

ALAN KONIG, VOLUME II

```
 1         NOVEMBER 4, 2004; SAN FRANCISCO, CALIFORNIA

 2                        12:48 P.M.

 3

 4            THE VIDEOGRAPHER:  Going back on the

 5     record.  This marks the beginning of Tape 3 in

 6     Volume 2 in the deposition of Alan Konig.  The time

 7     is 12:48 P.M.

 8

 9                        EXAMINATION

10            BY MR. WAGSTAFFE:   Q   Mr. Konig, we had--

11     Oh, I see.

12            Mr. Konig, at the time you made the

13     decision to not go forward with the grievance, had

14     you made a decision at that time that you would

15     pursue your rights through litigation?

16       A    No.

17       Q    Had you made a decision at the time that

18     you decided to not go forward with the grievance

19     that you would pursue your matter through the FEHA?

20       A    I know it was an option.  I don't know if I

21     made any conclusion about it, though.

22       Q    Without looking at anything, had you

23     consulted a lawyer?

24            I don't want to know what you did, but had

25     you consulted a lawyer as of January 13th, 2004?
```

48:30   (line 11)

49:00   (line 18)

22:30    1    Mr. Steedman's office, but I can't tell you whether

         2    they had already discussed the Bijaj matter.  I know

         3    that I was prevented from coming into the office.

         4         Q    And you learned, did you not, that the

         5    decision had been made to seek review; right?

         6         A    I eventually learned that, yes.

         7         Q    The decision to seek review rests with

         8    Mr. Nisperos, does it not?

         9         A    I don't know.

        10         Q    Do you understand, do you, that as many as

        11    one-third of the times where a recommendation of

        12    review exists, a review is not taken anyway?

23:00   13         A    I don't know that.

        14         Q    I want to show you Exhibit 32, sir.  A

        15    November 26th, 2003, memorandum from you to office

        16    of Human Resources, Bates-stamped 1100 to 1116.

        17              Did you prepare this memorandum?

        18         A    Yeah.  Except for the smudges on the pages

23:30   19    isn't mine.

        20         Q    Okay.

        21         A    Actually, this is the complaint to the

        22    Board of Governors and Legislature.

        23         Q    Okay.  And what were you attempting to

        24    achieve in making this communication?

        25         A    How much time do you have?  I mean--  There

                                   449

                        ALAN KONIG, VOLUME II

BARKLEY
Court Reporters

1    actions were taken specifically in retaliation for

2    each particular complaint or each particular

3    protected communication.  It's just a pattern of

4    activity throughout the year-long period.  So I

35:30    5    can't pinpoint and say, you know, "In this

6    particular instance he did this because of this."

7    It's just impossible for me to do that.

8        Q    Okay.  Let's mark as Defendant's Exhibit

9    38-- That's 38.  You have the book.  I'm trying to

10   save myself.  Exhibit 38 is Bate-stamped 1735 to

11   1747, a memorandum dated February 26, 2004, from

36:00   12   Mr. Konig to Mr. Van de Kamp.

13            What were you trying to achieve with this

14   communication?

15       A    To supplement of my initial complaint to

16   the Board of Governors and the Legislature.

17   Although at this point, given Mr. Van de Kamp's

18   representation to the Legislature that he would

19   oversee an appropriate investigation and

20   Ms. Lee-LaMark statement to me at the

36:30   21   November 19th grievance that the Legislature had

22   deferred their investigation to RAD, I didn't supply

23   this to the Legislature, just to Mr. Van de Kamp.

24       Q    Did you give a copy to anybody else?

25       A    I don't believe that this was ever provided

503

ALAN KONIG, VOLUME II

1   A    Right.

2   Q    Go to the next exhibit.  By the way, did

3   anybody take any actions against you -- negative

4   actions against you -- in response to the e-mails

5   that are set forth in the exhibit we were just

6   looking at?

7   A    Yes.

8   Q    Who?

9   A    All the Defendants.

10  Q    All right.  And what did they do?

11  A    Well, specifically, there are items laid

12  out in the April 9th addendum to the Board of

13  Governors and then also this formed the basis for

14  the -- or, at least, part of basis -- for the

15  Performance Improvement Plan or the Performance

16  Improvement Program and later on for the suspension

17  and the removal of other cases.  I mean, a lot of

18  actions.

19  Q    Turn to Defendant's 45.

20       Who is Mr. Ebbesen?

21  A    He's a friend.

22  Q    Defendant's 45 is Bates 9519, an e-mail

23  from Mr. Konig to Mr. Ebbesen on March 22nd, 2004,

24  and it's a chain.

25       And why did you send this internal e-mail

523

ALAN KONIG, VOLUME II

03:00    1  to him?

         2       A    Because I was showing him how ridiculous it

         3  was.

         4       Q    Did you agree with him that your response

         5  to Mr. Blumenthal was bitchy?

         6       A    No.  I don't use that word.

         7       Q    Did you think it was funny?

         8       A    Did I think it was funny?

         9       Q    Yes.

        10       A    No.  Well, did I think what was funny?

        11       Q    Do you think that Mr. Blumenthal's e-mail

        12  to you or yours to him was funny?

        13       A    No.  As a matter of fact, I say "This is

        14  what it has deteriorated to at this point."

03:30   15       Q    You would agree with me, would you not,

        16  that some of the matters set forth in the e-mail

        17  that you forwarded represented your work product?

        18       A    Where?

        19       Q    In Exhibit 45.

        20       A    If you can point to me a portion where

        21  there is work product--

        22       Q    Let's me ask you this:  Would you agree

        23  with me that it would be inappropriate to share work

        24  product by an e-mail with a friend because you would

        25  risk the waiver of the work product protection?

                                524

                     ALAN KONIG, VOLUME II

1    Q    Well, do you recall writing an e-mail in

2    which you said, "If we applied this standard,

3    rapists and other criminals would be on the

11:30    4    street"?

5         Do you recall writing that?

6    A    I don't think that is the quote.  No, I

7    think you've taken a portion of a quote, maybe.

8    Q    What do you recall saying?

9    A    I don't recall specifically word for word,

10   but I know that it wasn't what you just said.

11   Q    All right.  Let's go to Exhibit 49,

12   Bates 10146 through 10152.

12:00   13        You were asked to make revision to an ENEC

14   statement in Lowenstein; right?

15   A    Yes.

16   Q    And as a result of this e-mail chain did

17   you--

18   A    Actually, it was to the notice and the ENEC

19   statement.

20   Q    Yes.  Thank you.

21        And did you share these e-mails with anyone

22   other than the recipients?

23   A    I believe this was also included in this

12:30   24   second addendum to the Board of Governors and,

25   again, union representatives may have had this.

BARKLEY
Court Reporters

14:00    1    attorney/paralegal meeting."

         2              That's what you wanted to communicate;

         3    right?

         4        A    That's not correct.

         5        Q    And you wanted to communicate to

         6    Mr. Blumenthal that as a DTC you are not required to

         7    be neutral, unbiased or soft in your statements;

         8    right?

         9        A    That's a portion of what was communicated

        10    to him, yes.

        11        Q    Let's go to Exhibit 50, Bates 1955 through

14:30   12    1963.

        13              What is this, sir?

        14        A    This is the second addendum to the

        15    complaint to the Board of Governors and the

15:00   16    Legislature, although just provided to

        17    Mr. Van de Kamp and not the Legislature.

        18        Q    We are getting used to our run here.

        19              Who did you give it to besides those

        20    recipients, if anyone?

        21        A    I believe the union representatives have a

        22    copy of this as well.

        23        Q    Anybody else?

        24        A    I don't remember anybody else having it or

        25    giving this to anybody else.

                              533

                     ALAN KONIG, VOLUME II

BARKLEY
Court Reporters

1        I have not and shall not offer or provide

2    any services or products to any party's attorney or

3    third party who is financing all or part of the action

4    without first offering same to all parties or their

5    attorneys attending the deposition and making same

6    available at the same time to all parties or their

7    attorneys.  (Civ. Proc. § 2025(k)(2).)

8        I shall not provide any service or product

9    consisting of the deposition officer's notations or

10    comments regarding the demeanor of any witness,

11    attorney, or party present at the deposition to any

12    party or any party's attorney or third party who is

13    financing all or part of the action, nor shall I collect

14    any personal identifying information about the witness

15    as a service or product to be provided to any party or

16    third party who is financing all or part of the action.

17    (Civ. Proc. § 2025(k)(3).)

18

19    Dated: _____11/03_____, 2004

20

21

22

23

24

25

1    STATE OF CALIFORNIA        )
                                ) ss.
2    COUNTY OF LOS ANGELES      )

3

4         I, _Rafael Herrera_____ hereby certify:

5     .  I am an employee of Barkley Court Reporters,

6    duly authorized agent for the deposition officer that

7    stenographicaly recorded the testimony in the foregoing

8    proceeding and authorized to execute this copy

9    certificate.

10         The foregoing is true and correct copy of

11    the original transcript of the stated proceeding.

12

13    Dated _11/22/04_____

14

15

16

17

18

19

20

21

22

23

24

25

BARKLEY
Court Reporters

**EXHIBIT B**

/O=KERRWAGSTAFFE/OU=KERRWAGSTAFFE01/CN=RECIPIENTS/CN=TEMP

**From:** Henderson, Robert
**Sent:** Friday, January 16, 2004 2:47 PM
**To:** Konig, Alan
**Subject:** RE: Decision on Grievance

Yep. Here you go. solidarity535@earthlink.net

Good luck.

Rob

-----Original Message-----
**From:** Konig, Alan
**Sent:** Friday, January 16, 2004 2:45 PM
**To:** Henderson, Robert
**Subject:** RE: Decision on Grievance

No prob. Do you by any chance have an e-mail address for Debra (Deborah?) Glasser? I want to e-mail her and see if she can forward my questions to legal counsel for SEIU for an opinion on which course to follow. Don't know if SEIU would even do it but I see no harm in asking. Thanks.

-----Original Message-----
**From:** Henderson, Robert
**Sent:** Friday, January 16, 2004 3:57 PM
**To:** Konig, Alan
**Subject:** RE: Decision on Grievance

Alan:

Sorry it has taken me so long to get back to you. I don't know how to advise you on which course of action to take. From where I stand it seems unlikely that management will move on the written warning, but I don't know what happens if you abandon the grievance process. Since I'm not knowledgeable about employment law I don't know what weight to give the case you pointed out.

I wish I could be more helpful.

Rob

-----Original Message-----
**From:** Konig, Alan
**Sent:** Tuesday, January 13, 2004 3:01 PM
**To:** Haffner, Robin; Henderson, Robert
**Subject:** Decision on Grievance

Hey kids.

I'm sure you've received the response to my grievance by now. If not, let me know and I'll shoot a copy to you. Here are my thoughts at this point and I wanted to get your input before making a final determination.

It is clear from the response that the performance evaluation will never be addressed through the grievance procedure or any other available internal procedure. That's really ludicrous and permits a supervisor to place any false information in an evaluation without fear of having to justify it or be held accountable for intentional false statements. Second, it is obvious to me that the culture in the State Bar continues to be that HR and management cover for one another regardless of the merits of any grievance. That HR sides with management every time is appalling given its function is to assist employees and not hinder them or side with management. I note in the response that many of the issues I raised in my written grievance, including blatant violation of the MOU by Jeff, are not even addressed. A step three result is a forgone conclusion in this thing and I see nothing to indicate any member of management will ever find fault in anything Don or Jeff did.

At this point I believe my most prudent course of action is to abandon the grievance process and step III for

1

DEP. EXHIBIT 8
Date: 10/28/04 Konig
CSR: C. Harper - Russell

DEF: 09413
CONFIDENTIAL

the grievance already heard and step 1 through 3 of the grievance yet to be heard (related to the 2nd warning letter). In addition to being a waste of my time, energy, and resources, there appears to be a significant legal reason for abandoning the grievance process. If you have the time, please take a look at *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1090, wherein the Supreme Court states there is no need to exhaust internal grievance procedures prior to proceeding with a claim under the California Fair Employment and Housing Act (FEHA) (Gov. Code section 12900, et seq.) with the Department of Fair Employment and Housing. However, if an employee chooses to fully utilize the internal grievance procedures of an employer, the employer's findings are binding on any subsequent FEHA claim. This means that any subsequent review by a court would be under a "substantial evidence" standard of review under which factual determinations are not subject to reexamination in a trial de novo but are to be upheld by a reviewing court if they are supported by substantial evidence.

On the other hand, by not permitting the State Bar to make its own findings and by pursuing the matter under FEHA, the grievance is heard by the Fair Employment and Housing Commission. This has significant substantive and procedural advantages because the Commission is an independent agency not subject to the pressures and internal incestuous relationships that exist here at the Bar, the Commission will represent me at a hearing if it determines a hearing should be held, all costs of investigating, conciliating, and prosecuting a valid claim is borne by the Commission, and if the Commission decides in my favor, it will conduct a compliance review to ensure the Bar is fully obeying the Commission's order. Additionally, if the Commission determines not to prosecute or reaches a decision adverse to me after prosecution, it issues a right to sue letter and any determination made by it is not binding on any court and any reviewing court would review the matter de novo, with no deference given to the Commission's decision, instead of under the "substantial evidence" standard.

I see nothing but disadvantages to pursuing the incestuous internal grievance procedure here and nothing but advantages to pursuing my matter through FEHA. Any thoughts? Thanks.

--Alan

2

DEF: 09414
CONFIDENTIAL

**EXHIBIT C**

/O=KERRWAGSTAFFE/OU=KERRWAGSTAFFE01/CN=RECIPIENTS/CN=TEMP

| | |
|---|---|
| **From:** | Ebbesen, Brian [BEbbesen@cme.com] |
| **Sent:** | Monday, March 22, 2004 7:52 AM |
| **To:** | Konig, Alan |
| **Subject:** | RE: Review Brief in Medeiros |

Wow!  That is quite an email!! Did you ever hear any more from him? That is ridiculous!
But it was funny reading your bitchy response!  :-)

B

-----Original Message-----
From: Konig, Alan [mailto:Alan.Konig@calbar.ca.gov]
Sent: Wednesday, March 17, 2004 11:08 AM
To: Ebbesen, Brian
Subject: FW: Review Brief in Medeiros


This is what is has deteriorated to at this point. You have to start with the e-mail at
the end of the chain of e-mails so it's chronological. The "conversation" I refer to is a
whole story in itself.

> -----Original Message-----
> From:      Konig, Alan
> Sent:      Wednesday, March 17, 2004 8:58 AM
> To: Blumenthal, Allen
> Subject:  RE: Review Brief in Medeiros
>
> I'm not sure what prompted this e-mail from you but suspect it's a
> reaction to the "conversation" I had with you and Jeff following the senior attorney's
> meeting. If you look at your original e-mail, it simply asked when the brief was due. My
> responding e-mail stated when I calculated the date it was due. Nothing more, nothing
> less. It also stated I hoped to have it completed by the end of the week which is well
> within your stated desire in your original e-mail to have it by Monday, March 22.
> Thus, I fail to understand the need for the unnecessarily provocative
> and antagonistic e-mail at the end of the day Tuesday. There was nothing in my e-mail
> response that warranted such an e-mail from you. I was never advised of your personal
> policy to have something 5 working days before its submission and if your intent was to so
> advise me of the policy there were certainly more appropriate and courteous ways of doing
> so. The fact the e-mail was not sent until well after the senior attorney meeting, when
> other e-mail from you was sent throughout the day, leads me to believe it is the result of
> a calculated decision to create yet another issue that is actually a non-issue.
> This is exactly the type of action I was referring to after the senior
> attorney meeting when I stated the only thing affecting my "effectiveness" in this office,
> if it is affected at all, is the constant need to defend myself and my actions.
> If every step I take wasn't continually and unnecessarily being watched, criticized, scrutinized, and second-guessed, then I could probably have had the
> brief done by now.
> If I could spend less time defending myself against the baseless
> attacks, baseless criticism, baseless micro-management, false accusations, and
> backstabbing from my own office, then I could probably have had the brief done by now.
> If I didn't constantly have to request approval again and again for
> proactive action to be taken in matters only to receive no response, then I could probably
> have had the brief done by now.
> If management and supervisors would treat me with the respect,
> courtesy and consideration I'm owed, not as an attorney but as a human being, then I could
> probably have had the brief done by now.
> If management and supervisors would cease the hostility and stop
> making this an undesirable place to work, then I could probably have had the brief done by
> now.
> If management and supervisors would begin to act as a supportive
> employer and not as an adversary or friend of the court, then I could probably have had
> the brief done by now.

12

DEF: 09519
CONFIDENTIAL

> If I could spend less time countering third party hearsay statements
> that I'm never told about or given an opportunity to address but which are considered by
> management and supervisors to form the basis for opinions and beliefs about my work,
> conduct, or behavior, then I could probably have had the brief done by now.
> If I could spend less time distrusting management and supervisors,
> their motives, and their actions, then I could probably have had the brief done by now.
> If I could spend less time documenting misconduct in this office that
> affects the overall mission of this office, then I could probably have had the brief done
> by now.
> If I could spend less time ensuring the goals of protecting clients,
> protecting the public, and maintaining the high standards of the profession were not being
> sabotaged or undermined in my matters by my own office, then I could probably have had the
> brief done by now.>
>
> -----Original Message-----
> From:    Blumenthal, Allen
> Sent:    Tuesday, March 16, 2004 5:18 PM
> To: Konig, Alan
> Subject:  RE: Review Brief in Medeiros
>
> As to the Meirodos brief, it may be due the 26th but I have to approve
> it first; and I need time to review it and you need time if I want some changes.  It has
> always been my policy regarding review briefs that they are due for my review 5 working
> days before they are due.  I understand there are other matters you are working on, but if
> you were going to have a problem regarding time you needed to advise me of that so that we
> could decide if we needed someone else to do it. In any case, I want this to be a priority
> and I want the draft by the end of Monday March 22, 2004.  Again, the brief is not to be
> filed until I approve it.
>
> Thank you for your cooperation in this.
>
> -----Original Message-----
> From:      Konig, Alan
> Sent: Tuesday, March 16, 2004 9:28 AM
> To:  Blumenthal, Allen
> Subject:    RE: Review Brief in Meiberos
>
> According to my calculations, it's due 3/26. I haven't been able
> to devote significant time to it as of yet because of other matters that keep popping up
> requiring immediate attention. I've done the necessary research and have the cases upon
> which I will rely so it's just a matter of putting it all into the brief at this point.
> Hopefully that will be done by weeks end.
>
> I also have a settlement conference at 10:00 today in Robert
> Beasley's matter. Not sure if I previously calendared it with you. It's not a complicated
> matter because it's a 955 violation. He never filed the affidavit and is now claiming that
> he both mailed it and faxed it to the State Bar Court. He's obviously lying about the
> submission and he has yet to produce any evidence, such as a fax confirmation, that he did
> the submission as he claims. I submitted the settlement conference statement to Judge
> McElroy last week but haven't seen anything from respondent.
>
> -----Original Message-----
> From:      Blumenthal, Allen
> Sent: Tuesday, March 16, 2004 8:32 AM
> To:  Konig, Alan
> Subject:    Review Brief in Meideros
>
>
> Alan: Is the review brief due????  I need the draft no
> later than Monday, March 22, 2004. Thanks
> Allen Blumenthal
> Supervising Attorney
>
> Please note that my e-mail address has changed to
> Allen.Blumenthal@calbar.ca.gov
>

13

DEF: 09520
CONFIDENTIAL