1   JAMES M. WAGSTAFFE (95535)
    MICHAEL VON LOEWENFELDT (178665)
2   EMILIA MAYORGA (203688)
    **KERR & WAGSTAFFE LLP**
3   100 Spear St., Suite 1800
    San Francisco, CA 94105–1528
4   Tel: (415) 371-8500
    Fax: (415) 371-0500
5
    LAWRENCE C. YEE (84208)
6   HEATHER A. IRWIN (203203)
    **OFFICE OF GENERAL COUNSEL**
7   **THE STATE BAR OF CALIFORNIA**
    180 Howard Street
8   San Francisco, CA 94105-1639
    Tel: (415) 538-2000
9   Fax: (415) 538-2321

10  Attorneys for Defendants
    LAWRENCE J. DAL CERRO; RUSSELL WEINER;
11  ALLEN BLUMENTHAL; and ROBERT HAWLEY

12

13

14                **UNITED STATES DISTRICT COURT**

15             **NORTHERN DISTRICT OF CALIFORNIA**

16   ALAN KONIG,                          Case No. C 04-02210 MJJ

17              Plaintiff,                 **DECLARATION OF LAWRENCE J.
                                           ("JEFF") DAL CERRO IN SUPPORT
18       v.                               OF DEFENDANTS' MOTION FOR
                                           PARTIAL SUMMARY JUDGMENT ON
19   LAWRENCE J. DAL CERRO; RUSSELL        PLAINTIFF'S FIRST AMENDMENT
     WEINER; ALLEN BLUMENTHAL; and         CLAIM**
20   ROBERT HAWLEY,
                                           DATE:   April 26, 2005
21              Defendants.                TIME:   9:30 a.m.
                                           DEPT:   11
22
                                           Hon. Martin J. Jenkins
23

24

25                          <u>**REDACTED**</u>

26                    **RE-FILED PURSUANT TO**

27                     **MARCH 3, 2009 ORDER**

28

KERR
&
WAGSTAFFE
LLP

I, Lawrence J. ("Jeff") Dal Cerro, hereby declare:

1.     I have been employed by the State Bar of California ("the State Bar") since March 13, 1989. Since November 6, 2000, I have been the Assistant Chief Trial Counsel in the San Francisco office of the Office of the Chief Trial Counsel ("OCTC"). In the course of the performance of my job at the State Bar, I have obtained personal knowledge concerning the facts stated herein and, if called as a witness, could and would competently testify to them under oath.

2.     I am the only Assistant Chief Trial Counsel ("ACTC") in the San Francisco office of OCTC. As ACTC, I supervise the only two current Supervising or Senior Trial Counsel ("STC") in the San Francisco office, Allen Blumenthal and Donald Steedman.

3.     For most of the relevant period for this case, the San Francisco office of OCTC was divided into two teams under STC Allen Blumenthal ("Blumenthal") and STC Donald Steedman ("Steedman"). Blumenthal replaced STC Andrea Wachter, who retired in the summer of 2003. Each San Francisco STC works with Deputy Trial Counsel ("DTC"), investigators, and paralegals. The DTCs, in turn, perform a number of prosecutorial tasks including but not limited to providing advice and overseeing investigations of misconduct, negotiating case settlements, attending Early Neutral Evaluation Conferences ("ENECs"), drafting Notices of Disciplinary Charges ("NDC") and stipulations to resolve cases where warranted, trying cases against Respondents who do not settle or resolve those charges, and handling appeals to the State Bar Court's Review Department.

4.     On September 5, 2002, Plaintiff Alan Konig ("Konig") sent me an email regarding "ex parte communications" in the *Murphy* matter. Attached hereto as Exhibit A is a true and correct copy of Konig's September 5, 2002, email to me.

5.     On or about September 17, 2002, Konig prepared a memorandum regarding the *Wells* ENEC, a true and correct copy of which is attached hereto as Exhibit B. A copy of this memorandum is maintained in our office case file.

6.     In July 2003, Judge McElroy issued a decision disbarring Respondent Murphy. Attached hereto as Exhibit C is a true and correct copy of a July 24, 2003 email from Konig to me regarding, in part, Judge McElroy's disbarment decision in the *Murphy* matter.

1    7.    On May 7, 2003, Konig wrote emails to Andrea Wachter and I regarding Judge

2  Remke's denial of the State Bar's motion to continue the trial in the *Bajaj* matter.  Attached

3  hereto as Exhibit D are Konig's May 7, 2003 emails.

4    8.    Attached hereto as Exhibit E is a true and correct copy of pages III-35 to III-219

5  of the trial transcript in the matter of *Bajaj*.

6    9.    Attached hereto as Exhibit F is a true and correct copy pages II-156 to II-173 of

7  the trial transcript in the matter of *Wells*.

8    10.    On June 25, 2003, I received a call from Scott Drexel, Chief Court Counsel for

9  the State Bar Court at that time.  Mr. Drexel informed me that Judge Remke wanted me to come

10  down to the State Bar Court.  Preliminarily, I met privately with Konig and asked why he had

11  refused to follow the Judge's instruction to bring me to court.  Konig told me that Judge Remke

12  did not have the authority to demand that he summon me to court.  He also told me that there

13  was no need for me to be there because the *Wells* matter was *his* case.  I told him that he was

14  there as a deputy of the Chief Trial Counsel, and that the case was not his personally.  I also told

15  him that whenever the Court requested a superior it was my expectation that a superior would be

16  called.  Subsequently, I appeared before Judge Remke as requested.  I offered to stay in the

17  courtroom to monitor the rest of the trial or have a STC present, but Judge Remke told me that it

18  was not necessary.

19    11.    On September 11, 2003, Konig delivered to me a memorandum entitled "State of

20  Office Working Environment."  Attached hereto as Exhibit G is a true and correct copy of

21  Konig's September 11, 2003 memorandum to me.

22    12.    On September 23, 2003, I met with Steedman, Konig and Robert Henderson,

23  Konig's union representative.  I attempted to counsel Konig about his anger, the statement in his

24  September 11, 2003 memorandum about refusing to comply with office policy regarding

25  ENECs, and his need to be less confrontational and accusatory and more collegial.

26    13.    On October 31, 2003, I delivered a memorandum to Konig responding to his

27  "State of Office Working Environment" memorandum.  Attached hereto as Exhibit H is a true

28  and correct copy of my October 31, 2003 memorandum to Konig.

14.    On November 18, 2003, Konig responded to my October 31, 2003 memorandum with another memorandum entitled "Completing the Record." Attached hereto as Exhibit I is a true and correct copy of Konig's November 18, 2003 memorandum to me.

15.    Sometime before June 25, 2003, Judge Remke informed me that she had some concerns regarding Konig. In particular, she stated that in the course of ENECs and settlement conferences respondents' counsel had suggested that Konig could not always be trusted. She also said that he was often overzealous and disrespectful of opposing counsels' or respondents' views.

16.    Attached hereto as Exhibit J is a true and correct copy of a September 23, 2003 letter from Konig to Judge Anello. A copy of this letter is maintained in the OCTC's *Kay/Dalton* case file in the normal course of business.

17.    In late 2003, I became concerned that Konig was too personally involved in the *Kay/Dalton* matter, especially with respect to his relationship with Judge Anello, the complaining witness in that case. I was also concerned that Konig had lost objectivity in the case.

18.    I also wanted to ensure that the theories pled and the facts alleged in the NDC that Konig had drafted in the *Kay/Dalton* matter were accurate. Therefore, the decision was made to withhold filing of the NDC until an STC could review it. I informed Konig of this decision via email and also instructed him to cease communicating with Judge Anello for a short time because his communication to Judge Anello of the State Bar's strategies and work product could jeopardize the success of Judge Anello as a witness. Attached hereto as Exhibit K is a true and correct copy of my October 21, 2003 email communication to Konig.

19.    On October 21, 2003, Konig sent me an email objecting to my instruction not to contact Judge Anello, a true and correct copy of which is attached hereto as Exhibit L.

20.    On October 24, 2003, Konig asked that the *Kay/Dalton* matter be assigned to another DTC. A true and correct copy of Konig's October 24, 2003 email to me is attached hereto as Exhibit M.

21.    The *Kay/Dalton* matter was reassigned to Blumenthal in late October 2003.

22. On, November 10, 2003, Konig sent me an email regarding the reassignment of the *Kay/Dalton* matter to Blumenthal, a copy of which is attached hereto as Exhibit N.

23. Attached hereto as Exhibit O is a true and correct copy of a November 14, 2003 memorandum I received from Konig regarding Judge Remke's decision in the matter of *Bajaj*.

24. On November 18, 2003, I received an email from Steedman in which he informed me that Konig had filed an NDC in the *Mendez* matter without first incorporating Steedman's changes. Attached hereto as Exhibit P is a true and correct copy of that email.

25. On November 18, 2003, I telephoned Konig and asked him whether he had made Steedman's changes to the *Mendez* NDC. He said that he had not and that Steedman had not specifically instructed him not to file the NDC without his changes.

26. On November 20, 2003, I met with Konig, Steedman, and union representative Rob Henderson and presented Konig with a "Disciplinary Notice (Written Warning)". A true and correct copy of that Written Warning is attached hereto as Exhibit Q.

27. Konig refused to sign the Written Warning. Attached hereto as Exhibit R is a true and correct copy of a memorandum I wrote that day regarding my meeting with Konig.

28. At the November 20, 2003 meeting, I also gave Konig his written review for the July 2002 through July 2003 period. A true and correct copy of that review is attached hereto as Exhibit S.

29. I did not draft the original version of Konig's 2002-2003 review. Steedman provided me with a draft of that review. I made minor edits to the review but did not change the category or overall ratings.

30. Konig objected to several portions of the review, including the statement concerning "his supervisors." When I turned the review in to Human Resources I crossed out the words "his supervisors." A true and correct copy of the "revised" review is attached hereto as Exhibit T.

31. On August 12, 2003, I informed Konig via email that Steedman was his supervisor. A copy of my August 12, 2003 email to Konig is attached hereto as Exhibit U.

1    32.    On January 6, 2004 I provided Konig with a "Supplemental Disciplinary Notice

2    (Written Warning)." A true and correct copy of that second Written Warning is attached hereto

3    as Exhibit V.

4    33.    On January 6, 2004, I met with Konig, union representatives Robert Henderson

5    and Robin Haffner, Steedman, and Iola Lee LaMark of Human Resources to conduct the Step I

6    and Step II grievance proceedings concerning the grievance Konig filed about his performance

7    evaluation and Written Warning.

8    34.    It was previously agreed with the union representatives that Step I and Step II of

9    the grievance would take place simultaneously. Attached hereto as Exhibit W is a true and

10   correct copy of an email exchange between myself, Robin Haffner, and others concerning the

11   scope of the January 6, 2004 meeting.

12   35.    On January 9, 2004, Steedman, Ms. Lee-LaMark and I wrote to Konig rejecting

13   his grievance. Attached hereto as Exhibit X is our January 9, 2004 letter to Konig. Konig did

14   not request a Step III meeting.

15   36.    Konig did not file a grievance concerning the second written warning which I

16   delivered to him on January 6, 2004.

17   37.    Effective January 5, 2004, the San Francisco office of the OCTC was reorganized

18   into two teams, each of which contained two legal advice/notice drafters and three trial attorneys.

19   Konig was assigned to be a notice drafter/legal advisor, with Blumenthal as his supervisor. The

20   purpose of the reassignment was two-fold: (1) to get Konig out of contested courtroom

21   proceedings, where he had been clashing with the only two State Bar Court judges before whom

22   he appeared and (2) to allow him to use his skills for the benefit of reducing case backlog and to

23   help move cases forward toward resolution more expeditiously. The other three DTCs

24   performing notice drafting/legal advice duties at that time were Erica Dennings, Esther Rogers,

25   and Mark Hartman, who had been employed at the OCTC since September 1992, February 1997,

26   and February 2002, respectively.

27

28

1    38.    On January 2, 2004, Konig sent me an email requesting to keep nine trial matters

2   that were assigned to him prior to the reorganization. A copy of Konig's January 2, 2004 email

3   to me is attached hereto as Exhibit Y.

4    39.    On January 7, 2004, Konig sent me another email objecting to his assignment to

5   notice drafting once again. A true and correct copy of Konig's January 7, 2004 email to me is

6   attached hereto as Exhibit Z.

7    40.    Prior to the February 24, 2004 Senior Attorneys meeting in which a potential

8   appeal of the *Mendez* matter was to be discussed, I asked Konig whether he had anything further

9   to add that was not in his memorandum about the case. He told me that he did not.

10    41.    Attached hereto as Exhibit AA is a true and correct copy of the State Bar Court's

11   March 12, 2004 decision in the matter of *Wells*.

12    42.    Attached hereto as Exhibit BB is a true and correct copy of the March 15, 2004

13   memorandum I received from Konig regarding Judge Remke's decision in the matter of *Wells*.

14    43.    Attached hereto as Exhibit CC is a true and correct copy of a March 16, 2004

15   memorandum from Konig to the *Beaseley* file. The OCTC maintains a copy of this

16   memorandum in the *Beaseley* case file in its normal course of business.

17    44.    On April 2 and April 5, 2004, I had various email exchanges with Konig

18   regarding changes that Blumenthal had instructed him to make to a draft NDC in the *Lowenstein*

19   matter. Attached hereto as Exhibit DD is a true and correct copy of my April 2 and April 5, 2004

20   email exchanges with Konig.

21    45.    On April 13, 2004, I informed Konig via email that the office had decided to

22   appeal the *Wells* decision and that the appeal had been assigned to Alan Gordon from the Los

23   Angeles office. Konig objected to that decision, but I chose not to engage him in a debate

24   regarding the reassignment to Alan Gordon. Attached hereto as Exhibit EE is a true and correct

25   copy of my April 13, 2004 email exchanges with Konig regarding the *Wells* appeal.

26    46.    In November 24, 2003, the Senior Attorneys of the OCTC voted to recommend

27   that the *Bajaj* matter to be taken up on appeal, and senior management determined to seek

28   appeal. Blumenthal was assigned to handle the appeal of the *Bajaj* matter. On December 2,

1  2003, Konig sent me an email stating that he had been "prevented" from attending the November

2  24 meeting. Konig informed me that he believed he should be assigned to the appeal because he

3  had tried the case. I explained to him that the trial lawyer does not always get to do their own

4  appeals. I believed this was especially important in *Bajaj* because Konig and Judge Remke had

5  been at odds throughout the trial, and because I believe Konig lacked objectivity in the matter. A

6  true and correct copy of my December 2, 2003 email exchange with Konig is attached hereto as

7  Exhibit FF.

8        47.    On April 13, 2004, I provided Konig with a written memorandum, a true and

9  correct copy of which is attached hereto as Exhibit GG, instructing him to follow the charging

10  standard set in the Uniform Charging Manual.

11        48.    By the Spring of 2004, I believed that Konig was unable or unwilling to

12  satisfactorily fulfill the requirements of his position as a DTC. Therefore, I, in consultation with

13  Mike Nisperos, Russell Weiner, and Human Resources, decided to put Konig on a non-

14  disciplinary "Performance Improvement Plan" ("PIP"). On May 19, 2004, I provided Konig

15  with written notice of the PIP, a true and correct copy of which (not including its exhibits) is

16  attached hereto as Exhibit HH.

17        49.    Attached hereto as Exhibit II is a true and correct copy (not including its exhibits)

18  of Konig's May 25, 2004 memorandum to me in response to the PIP.

19        50.    On August 18, 2004, I held an abbreviated PIP meeting with Konig to discuss the

20  status of the *Stevens* trial preparation. Despite an August 25 deadline, Konig had not finalized

21  the pretrial statement. I told him he had until August 20 to finalize the statement. Attached

22  hereto as Exhibit JJ is a true and correct copy of my memorandum regarding the August 18, 2004

23  PIP meeting.

24        51.    As a result of Konig's failure to adhere to the requirements of the PIP and in

25  particular, his failure to adequately and timely prepare for the *Stevens* matter and failure to

26  conduct himself in professional manner and adhere to standard office procedures, on August 24,

27  2004, I provided Konig with a memorandum and notice of disciplinary action, a true and correct

28  copy of which is attached hereto as Exhibit KK.

52.     On October 27, 2004, Konig sent me the email attached hereto as Exhibit LL.  In the email, he resigns.

53.     I did not take any adverse or disciplinary action against Konig as a result of his September 11, 2003 "State of the Office Working Environment" memorandum.  My only response to the memorandum was to counsel him about the insubordination and poor attitude expressed therein.  I so counseled him in person on September 23, 2003 and in writing on October 31, 2003.  My counseling was directed at the hostile tone displayed in the September 11, 2003 memorandum, his refusal to improve his attitude, and his asserted refusal to comply with office ENEC standards.  I did not consider Konig's September 11, 2003 memorandum to be complaining about anything other than Konig feeling unsupported.

54.     I did not take any action against Konig as a result of his grievance, his complaints to RAD, the legislature, the State Personnel Board ("SPB"), or the Commission on Judicial Performance ("CJP").   Indeed, I was not even aware of his complaints to the SPB or the CJP until this lawsuit was filed and I have never read Konig's complaints to RAD, the legislature, the SPB or the CJP.

55.     None of my conduct toward Konig was intended to punish or retaliate against him for any of his complaints about the State Bar Court, me, or any other person.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on March 17, 2005, at San Francisco, California.

_Lawrence J. Dal Cerro_

Lawrence J. Dal Cerro

**EXHIBIT A**

## /O=KERRWAGSTAFFE/OU=KERRWAGSTAFFE01/CN=RECIPIENTS/CN=TEMP

| | |
|---|---|
| **From:** | Konig, Alan |
| **Sent:** | Wednesday, October 23, 2002 11:18 AM |
| **To:** | Steedman, Donald |
| **Subject:** | FW: Murphy 6007(c)(2) hearing |

Don,

Here's a copy of the email I sent to Jeff about McElroy's ex parte communications in the Murphy 6007.

--Alan

-----Original Message-----
| | |
|---|---|
| **From:** | Konig, Alan |
| **Sent:** | Thursday, September 05, 2002 12:33 PM |
| **To:** | DalCerro, Jeff |
| **Subject:** | Murphy 6007(c)(2) hearing |

Jeff,

I hate to be the bad guy and be perceived by the State Bar Court as a trouble maker, but things occurred in this hearing this morning that should be addressed by someone. At the beginning of the hearing Judge McElroy went through the procedural history of the matter. She stated several things that were new to me and the result of ex parte communications between the court and Mr. Murphy. The list of ex parte communications is as follows:

--On August 28, 2002, Mr. Murphy called the court and informed the court he had just received the State Bar's application. The court gave him until September 3, 2002 to file his response. The response was due on August 28, 2002. I was never consulted by Mr. Murphy or the court about the extension to September 3 or even notified of it after it was provided.

--On September 3, 2002, Mr. Murphy sent his response to the court via facsimile. The court accepted the response despite the inadequacy of the service. Mr. Murphy sent it to me also via facsimile.

--On September 3, 2002, Mr. Murphy contacted the court and stated he could not attend the hearing because of transportation problems. The court told him it would continue the hearing to September 9, 2002 if Mr. Murphy could find transportation by then. I was never advised of the court's accommodation or asked if I consented to the proposed continuance. The court also stated Mr. Murphy informed it that he was leaving for Indiana on Monday and could not therefore attend the September 9 hearing.

--On September 3, 2002, the court informed Mr. Murphy his response was not verified and that it would give him until the time of the hearing to submit a verification. Again, my input on this was never sought nor was I ever told the accommodation had been made.

--Today at the hearing the court extended Mr. Murphy's opportunity to file a verification to September 9, 2002 over my objections. The court stated the reason for doing so was because Mr. Murphy claimed to have received the application on August 28, 2002 and the court wanted to give him a reasonable opportunity to respond. There are several problems with this, the most evident being the hearing was held anyway. How can he submit a verified response to a hearing after the fact? Second, the alleged receipt of the application on August 28, 2002 was never stated in a declaration or other means other than his own oath. Third, the receipt of the application on August 28, 2002 was due to his own negligence and failure to retrieve it from the post office. He admitted in his unverified response that the post office tried for several days to get him the certified mail but no one was ever in his office. He then didn't bother to go to the post office to pick it up after they left him notices.

--Because the court gave him until September 9, 2002 to file a verification, it also made the submission date September 9 thus moving the due date for the decision to September 23.

I noted the State Bar's objection to the above ex parte communications. Judge McElroy's response was "well, it wasn't actually me speaking with Mr. Murphy. It was the clerk." Does she not get it? Obviously the clerk is not the one making the decision and granting the extensions.

Again, I don't want to be labeled as the trouble maker but the ex parte communications going on here are the worst I've ever seen. It probably won't make a difference in the long run in my matter but it's frightening to think that if she is willing to do this in a case as significant as a 6007(c) proceeding then she'll do even worse in a routine discipline matter.

DEF: 06370
CONFIDENTIAL

—Alan

DEF: 06371
CONFIDENTIAL

**EXHIBIT B**



**THE STATE BAR**
**OF CALIFORNIA**

INTER-OFFICE
COMMUNICATION

<u>PRIVILEGED AND CONFIDENTIAL</u>

DATE:   September 17, 2002

TO:   Wells File

FROM:   Alan Konig

SUBJECT:   ENEC on September 17, 2002

The ENEC in this matter was held with Judge McElroy and did not result in any resolution. In fact, the entire 90 minutes that it took was a waste of time and effort as indicated herein.

Ms. Wells engaged in the unauthorized practice of law in South Carolina in at least two client matters. She ultimately settled the matters and then failed to deposit the funds in a trust account and misappropriated at least one of the client's funds. When asked about her representation of one of the clients, Ms. Wells lied to the State Bar investigator and stated she never represented the client. Ms. Wells also misrepresented her status in South Carolina to at least one of the clients. There is also other misconduct in the matters I chose not to charge such as failing to communicate with the clients and failing to provide accountings to them.

The ENEC began with Judge McElroy criticizing my decision to charge UPL to begin with. It steadily progressed downhill from there. There was no basis for attacking the UPL charge as it is well founded in the evidence. Judge McElroy persistently attempted to have me drop the UPL matters and, at various times, attempted to have me drop or lessen some of the other misconduct despite my repeated reminders that there already is substantial uncharged misconduct.

Judge McElroy also attempted to pressure me into reducing any discipline to no actual suspension or 30 days maximum. I repeatedly reminded her my offer of 6 months actual was the low end of the reported discipline for similar offenses and there is authority to support disbarment. She did not care. She called me unreasonable. She also gave respondent the benefit of the doubt on every issue and even accepted every unsupported representation made by respondent despite the questionable credibility of respondent and lack of documentation or other evidence produced by respondent. As if calling me unreasonable were not sufficient, Judge McElroy then proceeded to call me "unfair" and "unjust."

Judge McElroy's personal attacks were unprofessional, unnecessary and counter-productive. I explained to her that I did not appreciate the attack and my NDC was supported by the evidence and my offer was clearly supported by the case law and standards. I asked either her or respondent's counsel to provide me with case law or anything to support her belief I was being unreasonable. Neither could do it. I told Judge McElroy there was no point in continuing the ENEC given every position I take is labeled unreasonable without support or foundation. I told her that her comments were contrary to the stated

DEF 00155
CONFIDENTIAL

Wells File
September 17, 2002
Page 2

purpose of the ENEC of objectively evaluating each party's case and making an objective recommendation.

I would have no problem with Judge McElroy stating my offer is not realistic if it was done without the necessity of personal attack and was also done with some support. To do so in the manner she did and without any case law, standards, or other authority to justify her position is inappropriate. This might not bother me if it was the first time it has occurred. However, this is the third time in as many ENECs/settlement conferences it has happened.

In the Tehin/Stevens 6007(c)(2) proceeding, Judge Remke requested we participate in a settlement conference with Judge McElroy midway through the hearing. When the settlement conference was held, Judge McElroy repeatedly told me I did not have the evidence for Stevens' involuntary inactive enrollment and I should agree to interim remedies for her. When I told her I believed there was sufficient evidence, pointed out the evidence to her, and cited her the case law to support Ms. Stevens' inactive enrollment, I was called unreasonable by her. Again, she failed to cite to a single authority to support her assertion I was unreasonable but instead utilized her "personal judgment."

In a settlement conference for Bruce Burge, Mr. Burge had a matter in investigation stage that involved the misappropriation of $20,000.00 from a client in addition to two other investigation matters and three matters in HRG OPN status. Again, I provided sufficient case law to Judge McElroy to support my resignation or disbarment offer (Mr. Burge was recently admitted and began his misconduct only two years after being admitted). Nevertheless, Judge McElroy accepted Mr. Burge's representation that the $20,000.00 was still in trust and stated I was unreasonable for not accepting the same representation. I agreed to allow Mr. Burge to provide me the trust records within a week. Needless to say, the records never were sent and the money was misappropriated.

Again, I have no problem with Judge McElroy criticizing my positions but expect that when she does so it is done with a reasonable basis and without accepting the uncorroborated word of a respondent. Settlement procedures with her have become nothing more than an opportunity for the respondent to obtain a third party attack on the State Bar's position.

**EXHIBIT C**

**/O=KERRWAGSTAFFE/OU=KERRWAGSTAFFE01/CN=RECIPIENTS/CN=TEMP**

| | |
|---|---|
| **From:** | DalCerro, Jeff |
| **Sent:** | Thursday, July 24, 2003 11:49 AM |
| **To:** | Konig, Alan |
| **Subject:** | RE: ████████████████████ |

well, I don't know the record as well as you. if you think we need to correct things, we should. I'm so overjoyed to read a decision that disbars someone and contains no overt criticism of our office that I am pleased as punch, but it doesn't take much to make me happy. Do the calculations on time for recon -- I think we can still staff it at the Sr. Atty Mtg a week from Tuesday, right? J

—————Original Message—————
| | |
|---|---|
| **From:** | Konig, Alan |
| **Sent:** | Thursday, July 24, 2003 11:40 AM |
| **To:** | DalCerro, Jeff |
| **Subject:** | RE: ████████████████ |

You didn't say the Murphy decision was a good decision did you? It is so fraught with factual errors and erroneous legal conclusions that I wonder if Judge McElroy heard or read all the evidence or read my brief on culpability and discipline. While the result it fine, this is almost a reverse case of the end does not justify the means. There will be no review of her findings absent a request by Murphy or us, right? I really think the errors need to be corrected because as the decision reads now, I'm embarrased to send it to any of the CWs, including two Superior Court judges and a Federal District Court Judge. The state and federal judiciary's opinion of the State Bar can only be diminished if this current version of the decision is sent to it.

—Alan

—————Original Message—————
| | |
|---|---|
| **From:** | DalCerro, Jeff |
| **Sent:** | Thursday, July 24, 2003 1:14 PM |
| **To:** | Konig, Alan; Matney, John |
| **Subject:** | RE: ██████████████ |

Cathy Booth may be able to help you. Jeff

—————Original Message—————
| | |
|---|---|
| **From:** | Konig, Alan |
| **Sent:** | Thursday, July 24, 2003 11:10 AM |
| **To:** | Matney, John |
| **Cc:** | DalCerro, Jeff |
| **Subject:** | ████████████████████ |

John,

I have the ████ file and am in the process of putting together a 20-day letter on it. However, this morning I received an interesting phone call and "tip" from Jenifer Becker at Long & Leavitt (she represented Legal Aid in its battle with Tehin). According to Jenifer's legal secretary, when she calls ████████████ phone number, she gets a recording stating something to the effect of "you've reached the offices of ████████ ██████ and NTP....for Nikolai Tehin press 13, for Pamela Stevens press 20." This is obviously a huge problem. I don't know what's going on at the office but it's obvious they are sharing offices, resources, and probably still engaging in the unauthorized practice of law. I want to be certain of the content of the telephone message before I make this known to Brian Weber over at the FBI.

I don't know what type of recording equipment we have to record someone's outgoing message, but if we do, can you call the number and record the message you receive? And you'll probably have to do it twice; once and press the number for Tehin and the second time pressing the option for Stevens. If you get a live person you'll have to say wrong number or something because we can't record telephone conversations without the other party's consent. You'll then just have to try after hours or sometime when you can get the actual message.

If we don't have recording equipment, can you have another individual sit with you while you dial the number and have that person simultaneously listen and take notes of what the recording and its options state? I figure

1

that way you should be able to accurately write the major parts of the message.

The number is 956-6906.

Let me know if you have any questions. Thanks.

—Alan

2

DEF: 09803
CONFIDENTIAL

**EXHIBIT D**

/O=KERRWAGSTAFFE/OU=KERRWAGSTAFFE01/CN=RECIPIENTS/CN=TEMP

| | |
|---|---|
| **From:** | Konig, Alan |
| **Sent:** | Wednesday, May 07, 2003 3:41 PM |
| **To:** | DalCerro, Jeff; Wachter, Andrea |
| **Subject:** | RE: More Judge Remke |

Jeff,

Only one concern. The hearing is scheduled to start Tuesday. Should I, in an overabudance of caution, begin working on a request for review and a request for a stay to seek review for Remke in case its something the senior attorneys decide should be reviewed? Otherwise, I don't know that the required documentation could be done on Monday prior to the scheduled beginning of the hearing. Also, there is a pretrial conference on Friday. Should I say anything about the possibility review might be sought? Thanks.

—Alan

-----Original Message-----
| | |
|---|---|
| **From:** | DalCerro, Jeff |
| **Sent:** | Wednesday, May 07, 2003 5:26 PM |
| **To:** | Wachter, Andrea |
| **Cc:** | Konig, Alan |
| **Subject:** | RE: More Judge Remke |

Alan, would you be so kind as to attend the sr atty meeting on Monday to discuss this with the group.  Thanks, Jeff

-----Original Message-----
| | |
|---|---|
| **From:** | Wachter, Andrea |
| **Sent:** | Wednesday, May 07, 2003 3:20 PM |
| **To:** | DalCerro, Jeff |
| **Cc:** | Konig, Alan |
| **Subject:** | FW: More Judge Remke |

Jeff - I thought you should see this and consider it for Sr. Attorney's meeting.  Please let me know what you think.
Andrea

-----Original Message-----
| | |
|---|---|
| **From:** | Konig, Alan |
| **Sent:** | Wednesday, May 07, 2003 2:45 PM |
| **To:** | Wachter, Andrea |
| **Subject:** | More Judge Remke |

Andrea,

I think I've reached my breaking point with Judge Remke. Yesterday, the clerk called and stated Judge Remke wanted a status conference in Bajaj (of course no status conference at my request in Mendez). It was done at 2:00 today. There were two issues Remke wanted to address in Bajaj. First, my motion to continue which was filed on April 9, 2003 to which Fishkin filed an opposition on April 18. Second, my motion for an order to compel petitioner to answer questions related to his disclosure or non-disclosure of the sale of his home to the IRS.

Bajaj is a petition for reinstatement. He resigned in 1994 after being convicted of filing false applications with the INS. In a nutshell, the motion to continue was necessitated by the late discovery that petitioner sold his home in 1995. We had no reason to know this information until his deposition on March 28, 2003. He disclosed this in response to my questions about his residence history and what happened to the home he owned in 1993 that he used as collateral for his criminal bond. Upon further questioning, he disclosed that he allowed his co-defendant in the criminal matter, Steve Lyons, to sell the home under a power of attorney. He also disclosed that he allowed Lyons to keep the full amount of the proceeds from the sale – about $60,000.00. He received no consideration in return and did it because "he felt badly for putting Lyons through the criminal matter." He denied having any documentation of the sale or anything related to it and claimed it was all thrown away.

When I got back to SF at the beginning of April from NYC where the depo was, I immediately wrote to Fishkin and told him the circumstances of the sale and allowing Lyons to keep the proceeds concerned me and that I thought it was an attempt to make petitioner judgment proof and hide assets. Given that the hearing was to begin on May

141

DEF: 07738
CONFIDENTIAL

13, 2003, I told him I was going to request a continuance so that the matter could be looked into and documentation obtained. In response, Fishkin provided about 1/3 of the documentation related to the sale. In addition, petitioner "corrected" his deposition testimony to state that he had documentation. I was very clear in my questioning in his depo about whether he had documentation or not and gave him every opportunity to state "I don't know or I don't remember." Instead, he categorically denied having any. After receiving the documentation from Fishkin, I immediately wrote back to him and requested he provide the remaining documentation that was missing. He refused. I then was forced to file the motion to continue.

Today Remke denied the motion to continue for failing to state good cause. She seemed to find some fault in the fact I didn't learn of the sale of the home before March 28, 2003 and therefore my request was somehow not timely. I'm completely at a loss to try and understand this reasoning. Under her standard, I should have anticipated that he sold the home and asked about it much earlier. I should either be Ms. Cleo or Nostrodamous. The fact is, as soon as I learned of it, I immediately took steps to find out more information and when my requests were refused, I immeditatey filed the motion to continue. I find her entire reasoning for denial of the motion to be hypocritical actually. It took her almost a month to rule on the motion even though Fishkin filed his opposition on April 18. She has no ground to point fingers related to timeliness.

The circumstances in which the home was sold are apparently lost on her and how significant they are to petitioner's moral character. He sold the home in 1995. In 1996, he filed for bankruptcy. In the bankruptcy, he discharged $87,000.00 in credit card debt which was incurred prior to the sale of the home. He knew of the debt but took not a penny from the sale and gave it to the creditors. Instead, he engaged in this sham transaction to frustrate the creditors and to hide the asset from the bankruptcy court. Why I am not entitled to a continuance to investigate and explore into this area is beyond me. She also failed to cite any prejudice she thinks would occur to petitioner if the motion to continue were granted.

She effectively has eliminated from my case an entire significant area bearing upon petitioner's moral character. How good cause has not been shown is something I cannot understand. This is the first time in my 4 years here that I have ever asked for a continuance in a matter and I know it is not something our office regularly does. So it is not like the requests are being abused as the respondents continually abuse them and have them granted. I am outraged that she does not extend the same consideration to our office when legitimate reasons for the request is made.

I broach this with you because I feel strongly that her denial of the continuance is something the Review Dept. should take a look at. How can there be a fair determination to the issues and a search for the truth with this serious blight on petitioner's character being left unresolved? It serves justice in no way.

Thanks.

—Alan

142

DEF: 07739
CONFIDENTIAL