RICHARD M. ROGERS, #045843
MAYO & ROGERS
114 Sansome Street, #1310
San Francisco, CA 94104
Telephone:    415/397-1515
Facsimile:    415/397-1540
Email:        RogersRMR@aol.com

Attorneys for Plaintiff
ALAN KONIG

E-FILED 01/19/05

SUBMITTED UNDER SEAL

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN KONIG,<br><br>          Plaintiff,<br><br>     v.<br><br>LAWRENCE J. DAL CERRO, RUSSELL WEINER, ALLEN BLUMENTHAL, and ROBERT HAWLEY,<br><br>          Defendants. | **CASE NO. C04-2210 MJJ [ECF]**<br><br>Case filed:    06/04/04<br>Trial date:    11/07/05<br><br>**DECLARATION OF ALAN KONIG IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:        02/08/05<br>Time:        9:30 a.m.<br>Location:    Courtroom 11 |

**REDACTED**

**RE-FILED PURSUANT TO**

**MARCH 3, 2009 ORDER**

KONIG/
DM4SUMJ.AK-RDCT.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial Summary Judgment

I, Alan Konig, hereby declare and state:

1. I am over eighteen years of age and am the Plaintiff in this matter. I have personal knowledge of the facts stated herein and in those situations where I do not have personal knowledge I have knowledge based on information and belief. The statements made herein are true and correct and if called as a witness, I could and would competently testify thereto.

2. In May 1999, I was hired as a deputy trial counsel with the State Bar of California. Before deciding to accept employment with the State Bar, I was employed, from December 1997 through May 1999, as a deputy district attorney with the Sonoma County District Attorney's Office.

3. I began my legal career with the Judge Advocate General's Corps (JAGC) of the U.S. Navy in June 1994 and was honorably discharged in December 1997 after serving tours of duty as a criminal defense attorney at courts-martial and administrative boards, a prosecutor at courts-martial and administrative boards, a claims officer overseeing adjudication of federal tort claims and other claims brought on behalf of and against the U.S. Navy, and as a command services attorney offering legal advice and opinion to commanding officers and commands. While a judge advocate, I was twice awarded the Navy-Marine Corps Achievement Medal (NAM), twice selected as officer of the quarter, and received numerous letters of commendation and appreciation.

4. Contrary to the representations contained in Defendants' Motion for Partial Summary Judgment on Plaintiff's Due Process Claim ("motion"), I was highly effective and uniformly successful in my employment with the State Bar. I routinely litigated some of the more difficult matters at the State Bar and, beginning in 2002, I successfully litigated and resolved some of the most difficult, complex, and serious matters within the State Bar.

5. Included in the State Bar matters for which I was responsible in 2002 and 2003 was the matter of Nikolai Tehin and his law partner and wife, Pamela Stevens, which involved the largest misappropriation of client funds in recent State Bar history. I successfully litigated and resolved three separate court matters related to their misconduct including an expedited proceeding to have them placed on involuntary inactive enrollment, a proceeding for the assumption of jurisdiction over their law practice by the San Francisco County Superior Court, and their underlying disciplinary proceeding.

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial
Summary Judgment

1

6. With my work on the Tehin and Stevens matter came significant and favorable stories and reports from print and television news media. Because of my work, the State Bar was the subject of no less than 10 favorable articles written by various news organizations including a lengthy front page story that appeared in the August 3, 2003 Sunday edition of the *San Francisco Chronicle*.[1] Additionally, the State Bar benefitted from no less than 10 positive television news reports on every local network affiliate including a 5-minute segment by KTVU, Fox Channel 2, that aired on a Saturday night prime time newscast.[2]

7. My dedication and work were favorably recognized not only by the media but also by countless third parties and the State Bar itself. I received several letters of appreciation from others I assisted including members of the judiciary and other attorneys. In September 2002, I received a performance evaluation from the State Bar that covered the period of July 24, 2001 to July 24, 2002. I was rated as "exceeds standards" in 5 individual categories, "meets standards" in 4 individual categories, "needs improvement" in no individual category, and received an overall rating of "exceeds standards." In December 2002, I was recognized by the Chief Trial Counsel as the "most valuable attorney" at an office-wide gathering and presented with a token game ball. The accolades and recognition continued into 2003.

8. Prior to November 2003, I had never been subjected to disciplinary action of any kind and, prior to the end of September 2003, I had never received counseling of any kind from any supervisor at the State Bar related to my performance, work, or any other issue.

9. During the Spring and Summer of 2003, several serious errors, rulings, and orders were made by the State Bar Court in matters which I was litigating that violated the constitutional right to medical privacy of one witness testifying at a hearing, that violated the State Bar's right to due

---

[1]   I was also the subject of an extremely complimentary and favorable article that appeared in the January/February 2004 edition of *Legal Affairs* magazine, a publication associated with Yale Law School. To my knowledge, in my 5.5 years at the State Bar, I was the first deputy trial counsel at the State Bar to ever have had a feature article written about him in such a publication solely because of work done on a specific matter.

[2]   To my knowledge, the favorable television media stories about the State Bar were the most positive network news coverage the State Bar has received in the Bay Area in recent memory due to its regulatory function and work.

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial Summary Judgment

2

KONIG/
DM4SUMJ.AK.wpd

1    process, that disregarded binding Supreme Court precedent and other law, and that displayed a lack

2    of judicial temperament and decorum. Additionally, the court had several *ex parte* communications

3    with opposing parties or counsel.

4        10. I reported each of the transgressions by the court to one or more supervisors or members

5    of management at the time they occurred or shortly thereafter. The court's transgressions were

6    directly impacting the rights of third party witnesses, were contrary to law and the Code of Judicial

7    Ethics, and were affecting my ability to fulfill the mission of the State Bar – protection of the public,

8    the high standards of the profession, and the administration of justice.

9        11. Except in the rarest of situations, the reports to supervisors and management, and my

10   requests that action be taken to address the court's transgressions, were dismissed with no action

11   being taken at all. The unwillingness of supervisors and management to address the misconduct of

12   the court led me to eventually report the misconduct myself to the Commission on Judicial

13   Performance (CJP). Prior to making the actual report, I informed supervisors and management that

14   I would be doing so.

15       12. On September 11, 2003, I sent to Defendant Dal Cerro a memorandum in which I again

16   detailed some of the misconduct committed by the court. The memorandum also detailed numerous

17   issues of malfeasance within the office that were directly preventing me from effectively performing

18   my job, that were having a detrimental effect on former clients or others who had complained to, and

19   sought assistance from, the State Bar, that were contradictory to the stated mission of the State Bar,

20   and that could be potentially harmful to members of the public. Attached as Exhibit 1 is a true and

21   correct copy of the September 11 memorandum.

22       13. Subsequent to my September 11 memorandum, a coordinated campaign was begun by

23   Defendants to retaliate against me, harass me, intimidate me, and sabotage my work, among other

24   things. As indicated herein, the involvement of all Defendants, and others who have not been named

25   as parties in this matter, provided every necessary means to ensure they could take whatever action

26   they desired against me, disregard fundamental due process, and believe they would not be held

27   accountable in any way. Their concerted activity literally poisoned every step of the grievance

28   procedure established in the Memorandum of Understanding ("MOU").

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial
Summary Judgment                                                                                    3

14. On September 23 and 24, 2003, Defendant Dal Cerro required me to attend a meeting in his office at which he made several false accusations and allegations against me related to my performance, conduct, and other issues. In response to my union steward's question about the purpose of the meeting, Defendant Dal Cerro expressly stated it was not discipline nor likely to lead to discipline. At each meeting I stated to Defendant Dal Cerro that I viewed his false accusations and allegations as retaliation and I insisted he provide them to me in writing along with the supporting facts and evidence. Although Defendant Dal Cerro agreed he would do so, he never did.

15. On October 31, 2003, Defendant Dal Cerro sent to me a memorandum entitled "Performance Expectations" in which he expressly acknowledged it was in response to my September 11 memorandum. In his memorandum, Defendant Dal Cerro, for the first time ever, stated there were "mutual dissatisfactions" between me and the State Bar. The memorandum contained no specifics or facts in support of the general and vague statements that were in it. Defendant Dal Cerro closed the memorandum with what I construed as a veiled threat that I either accept the way things are done and stop raising issues of wrongdoing and malfeasance or I would no longer have a job. Attached as Exhibit 2 is a true and correct copy of Defendant Dal Cerro's October 31 memorandum.

16. Defendant Dal Cerro did not actually author the October 31 memorandum by himself. For reasons unknown to me, Defendant Hawley also was instrumental in writing the October 31 memorandum and presenting a draft to Defendant Dal Cerro. Defendant Hawley has never been a member, in any capacity, of the office in which I worked and he has no need or justification for becoming personally involved in an internal office matter. At no time was I ever informed that Defendant Hawley was actively participating in every action taken against me from the beginning to the end. Attached as Exhibit 3 is a true and correct copy of the draft from Defendant Hawley that was provided in Defendants' initial disclosures.[3] I recognize the handwriting on the top of the document as that of Defendant Dal Cerro.

//

//

---

3      Unless otherwise indicated, all documents which are marked "DEF ######
CONFIDENTIAL" were provided by Defendants in discovery.

Case No. C04-2210 MJJ [ECF] — Declaration of Alan Konig in Opposition to Defendants' Motion for Partial Summary Judgment

KONIG/
DM4SUM/.AK.wpd

4

17.   For unknown reasons, Defendant Dal Cerro provided a copy of his October 31 memorandum to Iola Lee-LaMark, a representative of human resources, Mike Nisperos, the Chief Trial Counsel, and Defendant Weiner.

18.   Because Defendant Dal Cerro provided his memorandum to others when my September 11 memorandum was addressed strictly to him, I prepared a responsive memorandum and, on November 18, 2003, sent a copy to the individuals to whom he sent his memorandum. Attached as Exhibit 4 is a true and correct copy of my November 18 memorandum.

19.   On November 3, 2003, I sent a formal complaint to the CJP regarding the actions of the State Bar Court.

20.   On November 19, 2003, Defendant Dal Cerro sent to me an e-mail requesting that I arrange to have myself and a union representative meet with him and Donald Steedman, another attorney in the office, on November 21, 2003. Despite repeated requests from me to Defendant Dal Cerro for the specifics and details of the meeting, he provided nothing more specific or detailed than what he stated in his e-mails. Attached as Exhibit 5 is a true and correct copy of the e-mails related to the requests.

21.   Within the same e-mails requesting specific and detailed facts, was a request from me to Defendant Dal Cerro to continue the meeting in order for me to obtain counsel. Defendant Dal Cerro refused. I am not aware of any emergency or urgency that required the meeting to be held within two days of my notification and without the benefit of counsel of my choice.

22.   At the meeting on November 21, Defendant Dal Cerro presented to me a written warning (reprimand) which alleged I had filed a Notice of Disciplinary Charges (NDC) in the matter of Mendez contrary to Mr. Steedman's directive not to file it until all of his suggested changes were made. At the same meeting, Defendant Dal Cerro presented to me a performance evaluation which was due on July 24, 2003 and covered the period of July 24, 2002 to July 24, 2003. During the evaluation period I was supervised by a senior trial counsel who retired in July 2003. Therefore, I asked Defendant Dal Cerro to inform me who prepared the evaluation and whether my former supervisor had input into it. He refused to answer or have any discussion about the evaluation and instead walked out of the room. In the reprimand, Defendant Dal Cerro specifically references the

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial Summary Judgment

5

1    September 23 meeting as prior counseling despite his express assurances to me and my union
2    steward that the meeting was not discipline nor likely to lead to discipline. Attached as Exhibit 6 is
3    a true and correct copy of the reprimand and as Exhibit 7 a true and correct copy of the evaluation.

4        23.  Contained within the reprimand is Defendant Dal Cerro's version of a telephone call he
5    made to me on November 18, 2003 during which he questioned me regarding the false statements
6    made by Mr. Steedman that formed the basis of the false reprimand. At no time prior to, during, or
7    after the call did Defendant Dal Cerro state he was conducting a disciplinary investigation nor did
8    he provide me with an opportunity to have union representation during the questioning. The
9    conversation lasted less than approximately one minute and Defendant Dal Cerro simply asked if I
10   had filed the Mendez NDC and if I did so contrary to Mr. Steedman's instructions. When I responded
11   that I did file the Mendez NDC and it was not contrary to any instruction from Mr. Steedman,
12   Defendant Dal Cerro never asked me what was stated to me by Mr. Steedman, if anything, and what
13   my understanding of Mr. Steedman's statements were, if any. The call clearly was designed to do
14   nothing more than attempt to obtain incriminating evidence since no regard was shown for obtaining
15   exculpatory evidence, my account of events, or a full and complete statement of facts.

16       24.  Section 17(D)(2) of the MOU under which I was working mandated that any grievance
17   I wished to pursue for the reprimand would begin at "Step 1" which required that the grievance be
18   "submitted to the first level manager involved;" in other words, to Mr. Steedman. A meeting would
19   then be held between Mr. Steedman, myself, and a union steward. The section requires the first level
20   manager to submit a response to the grievance within seven working days. This process seemed
21   fundamentally unfair to me given the same person who made the accusations would determine
22   whether he was telling the truth.

23       25.  Pursuant to section 17(D)(3) of the MOU, "Step II" of the grievance procedure required
24   submission of the grievance to the "Office Director;" in other words, to Defendant Dal Cerro. A
25   meeting would then be held between Defendant Dal Cerro, myself, and a union steward or field
26   representative. The section requires the Office Director to provide a response to the grievance within
27   seven working days. This process seemed fundamentally unfair to me given the same person who
28   issued the reprimand would determine whether what he did was right or wrong.

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial
Summary Judgment

6

26. As with the October 31 memorandum, Defendant Dal Cerro was not the sole author of the reprimand. Attached as Exhibit 8 is a true and correct copy of an e-mail that evidences Ms. Lee-LaMark's assistance in the preparation of the reprimand.

27. Additionally, Defendant Hawley remained active in providing assistance and guidance to Defendant Dal Cerro. At no time was I informed of Ms. Lee-LaMark's involvement in, and rewriting of, the reprimand that was presented to me nor of Defendant Hawley's continuing involvement in my matters.

28. On December 4, 2003, I submitted a grievance pursuant to section 17(P) and 22(I) of the Memorandum of Understanding (MOU) for the reprimand and evaluation. Attached as Exhibit 9 is a true and correct copy of the grievance (without exhibits).

29. On January 6, 2004, "Step I" and "Step II" of my grievance proceeding were combined and the grievance proceeded. Present at the proceeding were Mr. Steedman, Defendant Dal Cerro, myself, and my union stewards. Surprisingly, Ms. Lee-LaMark was also present and actually presided over the proceeding.

30. Nowhere in section 17(D)(2) or 17(D)(3) of the MOU is there a requirement or authorization for a member of Human Resources to participate in "Step I" or "Step II" of the grievance proceeding or to participate in the response to the grievance. Nevertheless, Ms. Lee-LaMark actively participated in both steps and, according to the "From" line of the response I received, at least partially authored the response to my grievance. At no time did I consent to or authorize Ms. Lee-LaMark's participation in my grievance proceeding.

31. The involvement of Defendant Hawley in every matter related to me, as well as Ms. Lee-LaMark's involvement in certain of the matters, should have been disclosed to me as it presents an actual conflict of interest in them both since Ms. Lee-LaMark assisted in writing the reprimand that was the subject of the grievance. Given Defendant Dal Cerro investigated and issued the reprimand and Mr. Steedman was the accuser, that left not a single impartial or unbiased member on my grievance panel. Instead of following accepted standards and disclosing the conflict to me, the three proceeded under a ruse of impartiality.

//

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial Summary Judgment

7

32. The bias and lack of impartiality of the three became readily apparent once the grievance proceeding began. It was over a full month after I submitted my grievance that the grievance proceeding was held and I had previously indicated to all involved that I was not waiving the provisions of section 17(D)(2) of the MOU that require a grievance to be heard within seven working days of the submission of the grievance. At the grievance proceeding I again stated the failure to comply with the requirements of the MOU and my objection to the grievance proceeding. My objection was denied without any stated reasons why the employer felt it was not bound by the terms of the MOU.

33. Next, Defendant Dal Cerro and Ms. Lee-LaMark refused to proceed first and carry the burden of proof as required by section 17(J) of the MOU despite at least two objections from me about the requirement that I proceed first. I was therefore required to make a presentation without first having the benefit of hearing the presentation of my accuser. Additionally, by so doing, they impermissibly shifted the burden of proof to me to prove my innocence.

34. Before, during, and after the grievance proceeding, Defendant Dal Cerro and Ms. Lee-LaMark had several *ex parte* communications including one during the grievance proceeding itself that was in a private conference room that was easily visible to me and the union representatives in attendance. Attached as Exhibit 10 is a copy of a page from Defendant Dal Cerro's calendar which shows that on December 19, 2003, at 10:45 a.m., he had another *ex parte* communication with "Iola-DRS [Donald Steedman]." To this day, I still have no idea what was discussed in the *ex parte* communications.

35. The reprimand and evaluation are both false and based on completely fabricated facts or events. Prior to the untrue allegation, I had never been required to have a NDC reviewed by anyone prior to filing it and had never been instructed by anyone at any time not to file a NDC. My discretion in filing a NDC was absolute and I filed dozens of them during my employment without any interference or hindrance. There was no policy or rule in effect at any time that prevented me from performing the routine discretionary act of initiating a matter by filing a charging document – a task undertaken by attorneys daily and assumed to be within their discretion unless told otherwise.

//

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial Summary Judgment

8

36. Additionally, Mr. Steedman's assertion that he directed me not to file the first NDC unless I made all his suggested changes is false and refuted by substantial evidence including his own e-mails to Defendant Dal Cerro. Attached as Exhibit 11 and Exhibit 12 is true and correct copy of e-mail from Mr. Steedman to Defendant Dal Cerro. Both e-mails are Mr. Steedman's rendition of the substance of the meeting at which he alleges he directed me not to file the Mendez NDC unless I made his suggested changes. Nowhere in either e-mail does he state he directed me not to file the Mendez NDC.

37. Attached as Exhibit 13 is a true and correct copy of handwritten notes of Defendant Dal Cerro. Nowhere in the notes does Defendant Dal Cerro make any mention of an alleged directive from Mr. Steedman to me.

38. Attached as Exhibit 14 is a true and correct copy of a declaration by Tammy Albertsen-Murray, another attorney in the office, which also refutes Mr. Steedman's allegation.

39. At no time prior to the initial disclosures in this matter was I provided with a copy of Exhibit 11, Exhibit 12, or Exhibit 13 despite the exculpatory nature of them and the significant value they could have provided in any grievance proceeding.

40. Despite informing Defendant Dal Cerro that there was at least one witness who would refute Mr. Steedman's allegation, Defendant Dal Cerro never once asked who the witness was or made any attempt to speak with the witness (Ms. Albertsen-Murray).

41. On January 12, 2004, I received a response, dated January 9, 2004, to my grievance from Defendant Dal Cerro, Mr. Steedman, and Ms. Lee-LaMark. The response in no way addressed the issues I raised in my grievance, contained inaccurate information, and asserted further misrepresentations. Attached as Exhibit 15 is a true and correct copy of the response.

42. Based on the manner in which the grievance proceeding occurred, the refusal of the grievance participants to address violations of the MOU, the biased and unfair inclusion of the three members of the grievance proceeding, the unfair manner in which the grievance proceeding was held, and the lack of a fair and unbiased response to my grievance, I determined to abandon the grievance process as it was clear to me that it was fundamentally unfair and would afford no relief whatsoever regardless of the merits of my grievance. I additionally considered that proceeding to

KONIG/
DM4SUMLAK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial Summary Judgment

9

1    "Step III" of the grievance proceeding would be futile and unfair for the same reasons given that,

2    pursuant to section 17(D)(4) of the MOU, it would be composed of Defendant Hawley and Mr.

3    Nisperos. The bias the two would have brought to the Step III proceeding is displayed by the events

4    detailed further herein. Because of the unfairness that existed in the grievance process I also

5    determined not to initiate any grievance for the second reprimand provided to me and the suspension

6    that was given to me.

7         43. On November 26, 2003, pursuant to California Government Code §9149.21, I submitted

8    to the Senate and Assembly Judiciary Committees and the State Bar Board of Governors, a report

9    of the improper and unlawful actions occurring at the State Bar and the actions being taken against

10    me in retaliation for my previous reports of misconduct. It was my intent to have the unlawful

11    activity properly addressed and to have voided and rescinded the adverse personnel actions taken

12    against me.

13         44. On November 25, 2003, a day before I had even placed my report to the Legislature and

14    Board of Governors in the mail, Defendant Hawley sent an e-mail to John K. Van de Kamp, the

15    Chair of the Regulation, Admissions, and Discipline Oversight Committee (RAD) of the Board of

16    Governors, in which he warned Mr. Van de Kamp that I was attempting to communicate with him.

17    Defendant Hawley then immediately began making prejudicial statements about me while defending

18    the actions of himself and Defendant Dal Cerro. Nowhere in the e-mail does Defendant Hawley

19    inform Mr. Van de Kamp of his personal involvement in the matters about which I was complaining

20    or otherwise inform Mr. Van de Kamp of his conflict of interest. Attached as Exhibit 16 is a true and

21    correct copy of the e-mail.

22         45. On November 26, 2003, Defendant Hawley sent another e-mail to Mr. Van de Kamp

23    stating he had a copy of my report to the Legislature and the Board of Governors. In the e-mail,

24    Defendant Hawley misrepresents to Mr. Van de Kamp the nature of my report and he then assumes

25    control over the proper manner in which to respond to it. Defendant Hawley also represents that my

26    report "is best handled in the manner we have done in the past" and then sets out a scheme to

27    discredit and minimize my report. Nowhere in the e-mail does Defendant Hawley inform Mr. Van

28    //

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] — Declaration of Alan Konig in Opposition to Defendants' Motion for Partial
Summary Judgment

10

1  de Kamp of his conflict of interest or his involvement in the matters about which I was complaining.

2  Attached as Exhibit 17 is a true and correct copy of the e-mail.

3      46. On December 2, 2003, Defendant Hawley wrote to the Legislative committees to which

4  I had sent my report and misrepresented to them the nature of my report, misrepresented that Mr.

5  Van de Kamp is directing an appropriate investigation, and misrepresented that my "issues are being

6  appropriately examined and will be appropriately addressed." Nowhere in the letter does Defendant

7  Hawley inform the committees of his involvement in the matters about which I reported or disclose

8  his conflict of interest. At no time was I provided a copy of the letter. Attached as Exhibit 18 is a true

9  and correct copy of the letter.

10     47. The legislative committees determined to defer their investigation of the matters

11  contained in my report to the State Bar Board of Governors. I am informed and believe that the

12  decision to defer was based on the [mis]representations made by Defendant Hawley to the legislative

13  committees.

14     48. At no time was I informed that Defendant Hawley was in any way involved with my

15  report, the investigation of the matters stated in my report, or the ultimate disposition of my report.

16     49. On December 8, 2003, I received in inter-office mail a manilla envelope from Defendant

17  Hawley's office. Inside the manilla envelope was a State Bar mailing envelope addressed to me but

18  without postage. Inside the State Bar envelope was a December 5, 2004 [sic] letter signed by Mr.

19  Van de Kamp acknowledging receipt of my complaint and "assuring the Chairs and members of [the

20  California State Senate and Assembly Judiciary Committees] that I will oversee an appropriate

21  inquiry into your concerns beginning with an outside independent investigation of your allegations."

22  For unknown reasons, copies of the letter were also sent to members of management of the very

23  institution about which I was complaining. Attached as Exhibit 19 is a true and correct copy of the

24  manilla envelope, as Exhibit 20 a true and correct copy of the State Bar envelope, and as Exhibit 21

25  a true and correct copy of the letter.

26     50. The letter I received on December 8, 2003 was the one and only communication I ever

27  had with any member of the Legislature or Board of Governors until April 2004 when I finally sent

28  //

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial
Summary Judgment

11

1   another letter expressing my disillusionment with the fact no one had contacted me or informed me

2   of any action having been taken on my report.

3       51.  On December 8, 2003, Defendant Hawley telephoned Charlotte Addington, a partner at

4   Kauff, McClain & McGuire, L.L.P., a law firm devoted strictly to defending employers against the

5   claims of employees, for purposes of hiring her as the "independent investigator" of my report. I am

6   informed and believe that Defendant Hawley and Ms. Addington had worked together for several

7   years in the field of employer defense at the same law corporation before he began working at the

8   State Bar, that they maintain a friendship, and that Ms. Addington has represented both him and the

9   State Bar in several previous matters involving employee claims of various labor law and civil rights

10  violations. In the public records of the San Francisco County Superior Court and the Federal District

11  Court for the Northern District of California, I have located three civil actions in which Ms.

12  Addington previously personally represented Defendant Hawley and the State Bar with the most

13  recent occurrence being in 2002. I am also aware of Ms. Addington's current representation of the

14  State Bar in a labor dispute with another attorney from the same office in which I worked. At no

15  time, including as of the date of this declaration, have I ever been informed of the extent of Ms.

16  Addington's present and past personal and professional relationships with Defendant Hawley and

17  the State Bar. All communications to me and others from Defendant Hawley or other agents of the

18  State Bar have always misrepresented Ms. Addington as an "independent" or neutral investigator.

19      52.  Ms. Addington's notes from Defendant Hawley's call of December 8 indicated that

20  Defendant Hawley stated he had another "fun-filled opportunity" for her that was a "similar project"

21  but "another trial counsel." Her notes also indicated that Defendant Hawley stated that "HR + Bob

22  handling – agree cost-effective for me to handle since I know all the players" and that she was to use

23  a "retainer letter similar to Lisa Vorgias letter."

24      53.  In a follow-up call on December 10, 2003, Ms. Addington's notes indicated that "Bob

25  [is] contact" and that "Konig will question my role --" The notes indicated that Defendant Hawley

26  once again created bias in the investigation from the start by stating that I "over responded" to the

27  written warning. He then provided a "psychology" of me that included his assertion that I am

28  "obsessed," "overly zealous," and have "0 else in life." The last page of her notes indicated the

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial
Summary Judgment

12

facade of who is "official[ly]" in control of the investigation of my report. Attached as Exhibit 22 is a true and correct copy of Ms. Addington's notes from December 8 and December 10.

54.   On December 11, 2003, Defendant Hawley wrote to Mr. Van de Kamp to provide a status report of the investigation into my report and misrepresented to Mr. Van de Kamp that Charlotte Addington would conduct an "independent investigation." Defendant Hawley failed to state in his letter, or at any time to me, Ms. Addington's past and present personal and professional relationships with him, other employees of the State Bar, and the State Bar itself. Additionally, at no time did Ms. Addington disclose her present and past social and professional relationships to me. Attached as Exhibit 23 is a true and correct copy of the December 11 letter.

55.   Defendant Hawley remained in control of the investigation through its entirety and on numerous occasions actually gave directives to Ms. Addington on how to proceed or what to place in her final report. Attached as Exhibit 24 is a true and correct copy of some of the notes, letters, and other documents maintained by Ms. Addington that serve as a representative sample of the significant involvement of Defendant Hawley in overseeing the investigation of his own misconduct.

56.   Within Exhibit 24 are several entries in Ms. Addington's notes that clearly display her investigation was a charade and her real purpose was not to investigate the misconduct I disclosed in my report but rather to investigate and discredit me. For instance, the page numbered "DEF 12935," was prepared after she finally interviewed me as the reporting party – 5 months after I submitted my report (although it would be more appropriate to classify her interview as an interrogation complete with trick questions and attempts to have me adopt her words and statements as my own). It was clear she could not have cared less about actual facts and wrongdoing since she resisted and refused every attempt I made to provide information that corroborated anything I stated or was at all favorable to me.[4] Near the bottom right hand side of the page numbered "DEF 12935,"

---

4      The most disturbing evidence that she had no intent of being objective and fair came at the conclusion of our meeting when she asked me if there were any people that I thought she should speak with. When I offered to provide her with the contact information for former supervisors when I was a deputy district attorney, of judges, of former commanding officers from the Navy, and a virtual laundry list of former clients of attorneys who committed misconduct in their cases, she flatly refused stating she did not want "those" kind of people. Notably, her notes of her interviews with other witnesses clearly indicate that she jumped at the opportunity to interview as many people as

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial Summary Judgment

13

1  which appear to be notes of a conversation she had with Defendant Hawley, she wrote about me: "if

2  a trial – keep him on the stand a long time!" How anyone who is an independent, neutral, and

3  unbiased investigator makes a statement of that nature defies logic.

4      57.  On the page marked "DEF 12937," she displayed a rather cavalier and arrogant

5  demeanor since she apparently concluded the MOU ("CBA") preempted any legal claim I could file

6  with this Court based on the Defendants' unlawful acts. The documents marked "DEF 12940 -

7  12941" show that Defendant Hawley actually resorted to writing Ms. Addington's letters for her. The

8  letter I eventually received from her was substantially similar to Defendant Hawley's draft. In the

9  letter that was sent to me, Ms. Addington made the same misrepresentation to me as Defendant

10  Hawley did to the Legislature – that RAD retained her. It could not be anymore crystal clear from

11  the retainer agreement, Defendant Hawley's supervision of her and the investigation, and Mr. Van

12  de Kamp's lack of involvement in the investigation and abdication of his responsibilities and

13  obligations to Defendant Hawley, that Ms. Addington was retained by Defendant Hawley who has

14  no membership in RAD or the Board of Governors. Additionally, at the beginning of my meeting

15  with her, she expressly stated it was Defendant Hawley who retained her and to whom she would

16  provide her report. Attached as Exhibit 25 is a true and correct copy of the letter sent to me by Ms.

17  Addington and as Exhibit 26 a true and correct copy of my letter to Ms. Addington that precipitated

18  her mostly unresponsive letter.

19      58.  Ms. Addington, despite knowing of the confidential nature of the investigation, had no

20  difficulty discussing me and my personnel matters with third parties who had no authorization from

21  me to receive such information. The contents of her investigation file reveal that she discussed the

22  entire contents of my personnel file with Ms. Lee-LaMark and discussed private and confidential

23  matters about me with at least three attorneys in the community and both State Bar Court judges in

24  San Francisco. The personnel file contains the two reprimands, the false performance evaluation

25  (without my response which I requested be placed in the file), and the suspension. At the time of her

26  meeting with the judges, there were pending before them active litigation matters, either at the trial

27

28  _____

           possible who she believed would impugn my character.

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial
Summary Judgment                                                                                    14

1   or appellate level, for which I was responsible.[5] Additionally, I had two contested trials scheduled

2   before one judge and several Early Neutral Evaluation Conferences and settlement conferences

3   scheduled before the other judge. I have never at any time authorized anyone to disclose the contents

4   of my personnel file, discuss personnel issues related to me, and spread malicious and defamatory

5   statements about me. Nor have I ever waived my privacy rights in such information.

6         59.  In her report, Ms. Addington expressed surprise that some of the other attorneys in the

7   office knew she was working on a report/complaint from me and she could not imagine how they

8   knew. A true and correct copy of an e-mail chain is attached as Exhibit 27. The subject line of the

9   e-mail chain and the content of the bodies of several of the e-mails more than evidences a serious

10   breach of confidentiality and should resolve any doubt about how others knew of my

11   report/complaint.

12         60. Attached as Exhibit 28 is a true and correct copy of the retainer agreement signed by Ms.

13   Addington and Defendant Hawley. The retainer itself is troubling given it is a retainer for an

14   **advocate** and not someone who is neutral and impartial. For instance, the very beginning of the

15   retainer confirms the extensive usage of Ms. Addington and her law corporation by the State Bar in

16   the past and on the second page Ms. Addington states she will "seek to obtain favorable results for

17   and further the legal interests of our clients. . . ." There is no concern for obtaining favorable results

18   for me or any regard for my legal interests. The purpose of Ms. Addington's employment was stated

19   to be "to assist [the State Bar] with a specific legal matter, that is, to conduct a factual investigation

20   pertaining to an employee disciplinary action." There is no mention anywhere in the retainer

21   agreement about investigating issues of wrongdoing within the State Bar or issues of retaliation

22   against me by the Defendants which was the nature of my report to the Legislature.

23         61. A review of several documents associated with Defendant Hawley, Ms. Addington, and

24   her investigation of my report to the Legislature shows that facts and truth were entirely dependent

25   upon the audience intended to receive the information. In addition to the retainer agreement itself,

26

27   5     The propriety of the judges discussing an attorney who has active matters pending before
           them and would appear before them in the future raises serious issues involving
28         questions of bias and violation of the Code of Judicial Ethics. However, the propriety of
           their actions is a subject best left to the proper agency.

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial
Summary Judgment                                                                                        15

Defendant Hawley, on December 11, 2003, sent to Mr. Van de Kamp a letter informing Mr. Van de Kamp that Ms. Addington had been retained by Defendant Hawley and advising Mr. Van de Kamp that Defendant Hawley would provide regular status updates. Yet, in his December 5, 2003 letter to me and the legislative committees, Mr. Van de Kamp affirmatively stated, and led me to believe, that he personally would oversee the investigation. On April 9, 2004, I sent a letter to Mr. Van de Kamp and the legislative committees expressing my exasperation with the investigation and the failure of anyone to communicate with me in any way about its progress and status. On April 14, 2004, I received a response from Mr. Van de Kamp that again misled me into believing he was overseeing the investigation and that Ms. Addington was "neutral." On May 3, 2004, Defendant Hawley sent to the legislative committees a letter addressing my April 9 letter in which he misrepresented that it was RAD who retained Ms. Addington and not himself. A true and correct copy of the December 11 letter was previously attached as Exhibit 23, a true and correct copy of the April 9 letter is attached as Exhibit 29, a true and correct copy of the April 14 letter is attached as Exhibit 30, and a true and correct copy of the May 3 letter is attached as Exhibit 31.

62. On April 30, 2004, a letter was sent to Defendant Hawley by the union local president which expressed concerns related to actions taken against me and the general treatment of me. On May 7, 2004, Defendant Hawley responded to the April 30 letter with a memorandum that was extremely critical of me, stated false assertions about me, and expressed several of his personal opinions of me. Defendant Hawley's memorandum was adversarial to me and my interests and provided information to which he never should have been privy (perhaps this is why he chose not to provide a copy of it to me despite providing copies to four other persons). Additionally, Defendant Hawley misrepresents that RAD is conducting the investigation of my report and, in order to deny a copy of the investigation documents to the union, states that my "complaints" to the Legislature "have not been treated as a personnel matter" and the resulting investigation has not focused on "individual personnel issues." Yet, in his November 26, 2003 e-mail to Mr. Van de Kamp, Defendant Hawley stated in three different sentences that my "complaint" was a "personnel matter." In his December 2, 2003 letter to the legislative committees, Defendant Hawley stated my "complaint raises issues which are largely, if not exclusively, matters of personnel administration.

1   . . ." A true and correct copy of the April 30 letter is attached as Exhibit 32 and a true and correct

2   copy of the May 7 memorandum is attached as Exhibit 33.

3       63.  I have reviewed the investigation file of Ms. Addington that has been provided by

4   Defendants. All Defendants were interviewed by Ms. Addington and all provided untrue derogatory

5   information about me to Ms. Addington.

6       64.  Defendant Hawley's insistence on inappropriately involving himself in every action

7   taken by me or against me did not end with the improper assumption of control over the investigation

8   of my report to the Legislature but extended to every single issue involving me – even to the point

9   of finding a way to harass me while I was on medical leave in order to get away from the harassment

10  that was occurring in the work place. Attached as Exhibit 34 is a true and correct copy of only a

11  small portion of various documents exhibiting the extent of Defendant Hawley's personal vendetta

12  against, and harassment of, me. The documents evidence that Defendant Hawley, among other

13  things: actively interfered with my complaint to the State Personnel Board (DEF 02616); was

14  actively involved in my reassignment (DEF 04321); participated in the second reprimand that was

15  given to me; participated in, wrote, or revised the "PIP" that was given to me (DEF 6680 - 6684;

16  03983 - 03987; 04175 - 04178); participated in determining whether to grant my request for part-

17  time work status (which was approved, then rescinded, then approved again); participated in the

18  writing or review of reports of "PIP" meetings that eventually were signed by either Defendant

19  Blumenthal or Defendant Dal Cerro; coordinated the adverse actions taken against me while at the

20  same time theoretically overseeing a neutral and unbiased investigation into my report (DEF 05270);

21  wrote the letter that falsely accused me of some nefarious act by simply going to my office to retrieve

22  personal property (DEF 11290); and directed that I be locked out of my office and the State Bar

23  building, while I was on medical leave, without any notice that it was being done, justification, or

24  notice after it had been done and while I still had significant personal property in my office (DEF

25  11290).[6]

26

27  6   What the documents do not show is that while on medical leave, my ability to remotely
        access my e-mail account was also terminated without any notice or warning or
28      justification.

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial Summary Judgment

KONIG/
DM4SUMJ.AK.wpd

17

65. On or about September 19, 2004, I received the letter Defendant Hawley wrote for Ms. Lee-LaMark to sign that accused me of improper activity while in my office. On September 19, 2004 I responded to the letter and corrected the false assertions contained within it. When Defendants produced a copy of my personnel file in discovery in this matter, Ms. Lee-LaMark's letter was in my personnel file for some unknown reason. However, my response to her letter was not in my personnel file. Attached as Exhibit 35 is a true and correct copy of the letter I received and as Exhibit 36 a true and correct copy of my response to the letter.

66. Attached as Exhibit 37 is a true and correct copy of various documents spanning the period of November 2003 through April 2004 that show the involvement and lack of impartiality from all Defendants and Mr. Nisperos who were making decisions, or could make decisions, regarding employment actions taken against me and who would have been participants in any grievance proceeding I desired to pursue.

67. On December 11, 2003, while I was on vacation, Defendant Dal Cerro submitted a corrected performance evaluation in which he deleted reference to alleged antagonistic encounters with supervisors. His deletion of the reference was in response to my assertion that I never had a single antagonistic encounter with my supervisor and is an acknowledgment of the false nature of the evaluation. The submission of the corrected performance evaluation was addressed by me in my addendum to my grievance which was previously attached as Exhibit 9.

68. Despite my entitlement under section 11(A) of the MOU to submit a response to the evaluation, and my actual submission of a response to the evaluation, the response was never placed in my personnel file. Notwithstanding the untrue content of the evaluation, the evaluation was overdue by approximately four months. Defendants' delay in providing the evaluation deprived me of a step increase in salary that automatically triggered with the evaluation and was due to me in July 2003 but not provided until December 2003.

69. On December 18, 2003, a "reorganization" memorandum and chart was distributed throughout the office which indicated that as of January 5, 2004, I was being reassigned to the position of "notice drafter," a position that prohibits me from making any court appearances or engaging in any litigation. The reassignment was done without any consultation with me and against

1   my desire. Additionally, I was never informed of my reassignment by any of the Defendants and

2   learned of it from other employees and from the reorganization memorandum. I considered the

3   reassignment to be punitive in nature as I had on several occasions, including my employment

4   interview, made it known that I had no desire to leave my previous employment with the district

5   attorney's office if it meant I would have to cease litigation. Prior to the reassignment I was assured

6   I would be involved in litigation and there never was a position in the San Francisco office for an

7   attorney that did not involve litigation (prior to the creation of the "notice drafter" position).[7]

8   Attached as Exhibit 38 is a true and correct copy of the reorganization memorandum.

9       70.   The reassignment of me to a non-litigation position was in fact done in response to my

10  complaints about the improprieties occurring with the State Bar Court. Attached as Exhibit 39 is a

11  true and correct copy of Ms. Addington's notes of her interview of Defendant Weiner and a one-page

12  excerpt from her final investigation report that describes the reassignment. As indicated on the first

13  page of her notes, Defendant Weiner stated that the reassignment was not "**solely to punish Alan**

14  **K**" and when asked the reasons for my reassignment Defendant Weiner stated "**his known**

15  **antagonism to SBC J [State Bar Court Judge]**." On the second page of Ms. Addington's notes she

16  attributes to Defendant Weiner the following statement: "Jeff's concerns: Alan's battles w/ Judges -

17  part. Remke." Ms. Addington, however, intentionally failed to include Defendant Weiner's

18  statements in her investigation report and instead, as exhibited on the one-page excerpt from her

19  report, she misrepresented that "[t]he reorganization certainly was not directed at Mr. Konig, nor do

20  I understand him to say that was the case. Moreover, other experienced litigators in the San

21  Francisco office who also prefer litigation were assigned to notice drafting, negating any suggestion

22  that the reorganization was intended to be retaliatory toward Mr. Konig." Not only does Ms.

23  Addington intentionally exclude incriminating statements by Defendant Weiner but she absolutely

24  misrepresented the nature of the reorganization – it is indisputable that I was the only attorney in the

25  San Francisco office who was reassigned and given completely different and unwanted job functions.

26

27  7    In July 2000, I volunteered to work in a position not involving litigation for four months
          in the Los Angeles office in order to accept a transfer to the Los Angeles office.
28        However, the decision to accept that position was solely my determination.

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial
Summary Judgment                                                                                      19

71. Attached as Exhibit 40 is a true and correct copy of a July 2003 reorganization that occurred in my office. When comparing the July 2003 reorganization to the January 2004 reorganization, it is readily obvious that I was the only attorney in the entire office who was reassigned to new duties and responsibilities.

72. On May 21, 2004, Defendant Dal Cerro and Defendant Blumenthal presented to me a "Performance Improvement Program" ("PIP") which was dated May 19, 2004.[8] The "PIP" was provided to me and implemented without any notice or opportunity to respond. The "PIP" was extremely critical and judgmental, imposed further restrictions on me, and removed additional responsibilities and privileges from me. The "PIP" removed all the rights and privileges of being an attorney including litigation, exercising my own independent legal judgment, prohibiting or discounting my independent legal thinking and analysis, and removing any ability to use my own discretion in matters. The "PIP" essentially reduced my job responsibilities and functions to the equivalent of a paralegal. Attached as Exhibit 41 is a true and correct copy of the "PIP."

73. The contents of the "PIP" and the alleged bases for it were false or based on misrepresentations and misstatements. Additionally, one of the alleged bases, lack of productivity, could not be an actual basis for the "PIP." Notwithstanding the untrue assertion of lack of productivity, productivity could not be a basis because no written or verbal productivity standards had ever been provided to me. Thus, Defendants never provided notice of any kind that there was a minimal level of productivity expected of me at any time. On May 25, 2004, I provided a response to the "PIP" to Defendant Dal Cerro which he summarily dismissed on May 28, 2004. Attached as Exhibit 42 is a true and correct copy of my response and as Exhibit 43 a true and correct copy of Defendant Dal Cerro's reply to my response.

74. The alleged bases and need for the "PIP" were clearly pretextual as Defendants had determined all the way back in March 2004 that they would impose a "PIP" on me. See Exhibit 37. However, all the alleged bases for the "PIP" that were contained within it post-date the March 2004 determination to issue a "PIP" to me.

---

8   Defendants erroneously assert in their motion that the "PIP" was provided to me on May 19, 2004.

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial Summary Judgment

KONIG/
DM4SUMJ.AK.wpd

20

75. On August 24, 2004, Defendant Dal Cerro and Defendant Blumenthal presented to me a "Notice of Disciplinary Action" which imposed a three day suspension without pay, placed additional restrictions on me, and removed me as counsel for a serious matter, the Stevens matter, on which I had worked for over two years. The disciplinary action was imposed on me without any notice or opportunity to be heard. Attached as Exhibit 44 is a true and correct copy of the disciplinary action.

76. The alleged bases in the disciplinary action were false, half-truths, and misrepresentations and misstatements. Additionally, the documentation attached to the notice was incomplete and reflected a determination by Defendants to selectively choose documentation to attach while refusing to attach other documentation that was relevant and would have provided a complete and truthful presentation of the documentation. Each and every assertion and allegation contained in the notice can be refuted by me.

77. At no time did any Defendant or any other person state the suspension was just a "notice of suspension" and all parties involved with it acted in conformity with it being imposed at the time the documentation was presented to me. For instance, Defendant Blumenthal, within 15 minutes of the conclusion of the meeting at which the suspension was given to me, began an incessant badgering of me for all the files, documents, exhibits, pretrial statement, witness list, and everything else associated with the Stevens matter. The document imposing the suspension was consistent with the other documents imposing the reprimands and Defendants have not asserted the reprimands were not effective when presented. Their assertion is also contradicted by their own document. The suspension document stated the reason for not imposing the suspension immediately was because there was too much work in the office. It did not state the reason was to provide me with an opportunity to respond. In my view, the suspended imposition of the suspension was no different than suspending imposition of a criminal sentence. The sentence is still imposed but then suspended.

78. Any grievance proceeding provided to me for the suspension would have been pure symbolism over substance given any determinations about the validity of my grievance would have been made by the very parties who were already biased against me, had imposed the suspension, and

//

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial Summary Judgment                    21

1  were predetermined to get rid of me – Defendant Blumenthal, Defendant Dal Cerro, Defendant

2  Weiner, Mr. Nisperos, Ms. Lee-LaMark, and Defendant Hawley.

3       79. There has been substantial public disclosure of the charges that have been made against

4  me. On June 28, 2004, an article appeared in *The Recorder* which quoted verbatim false and negative

5  criticisms of me from Defendant Dal Cerro (Defendant Hawley also provided commentary for the

6  article). The article also disclosed the existence of the unwarranted "PIP" and its terms and

7  conditions. Additional comments were made in an article that appeared in the September 20, 2004

8  edition of *The Recorder*. Following the issuance of the suspension to me, Defendants disclosed the

9  untrue information about the suspension and me to other attorneys within the State Bar including two

10  attorneys from the State Bar's Los Angeles office. As with the outside investigator, I never

11  authorized the release of my employment information to other employees. On different occasions,

12  I have encountered job applications that require me to disclose the false information whenever it is

13  requested.

14       80. On August 25, 2004, pursuant to my treating physician's directive, I began a medical

15  leave of absence from the State Bar because of Defendants' actions against me.

16       81. On or about September 14, 2004, I attempted to remotely access my work e-mail from

17  home, a practice which I had done on countless occasions for at least two years while at home sick,

18  on vacation, at night, and on weekends. My access was denied.

19       82. In October 2004, I attempted to enter the State Bar building and my office therein in

20  order to retrieve personal property from my office. My access to the building and my office was

21  denied.

22       83. While I was on medical leave, Defendants produced their initial disclosures in this

23  matter. Included in their initial disclosures was an e-mail from Mr. Nisperos, dated June 14, 2004,

24  that stated it was his intent to terminate my employment regardless of the results of the investigation

25  into my report to the Legislature and regardless of whether good cause existed. Attached as Exhibit

26  45 is a true and correct copy of the e-mail.

27       84. The alleged bases and need to impose the disciplinary suspension and remove me from

28  the Stevens matter were obviously pretextual. Also included with the initial disclosures was an e-

KONIG/
DM4SUM.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial
Summary Judgment

22

1   mail dated August 19, 2004 between Defendant Dal Cerro and Defendant Weiner, with a copy to Mr.

2   Nisperos, that evidences their predetermined plan to remove me from the Stevens matter and replace

3   me with two attorneys from the Los Angeles office. The e-mail predates the removal of me from the

4   Stevens matter and the alleged bases for the removal by five days. However, the decision to remove

5   me must have obviously been made long before the actual e-mail since the e-mail simply confirms

6   the pre-existing plan to replace me and that they had found attorneys to assume the case. Attached

7   as Exhibit 46 is a true and correct copy of the August 19 e-mail.

8       85.   When I began my medical leave of absence, I signed and submitted to Defendant Dal

9   Cerro my time card for the period August 16, 2004 through August 29, 2004 that reflected 55.4 hours

10  of work and 8 hours of sick leave. At the conclusion of the pay period ending August 29, 2004, I had

11  103.98 hours of vacation leave accumulated pursuant to section 26 of the MOU. The "advice of

12  deposit" subsequently provided to me confirmed I had 103.98 hours of vacation leave. Attached as

13  Exhibit 47 is a true and correct copy of the time card I completed and signed and attached as Exhibit

14  48 is a true and correct copy of my advice of deposit.

15      86.   On October 7, 2004, I received in the mail a letter from the State Bar which informed

16  me that I only had 90.56 hours of vacation leave. I took no vacation leave between August 25, 2004

17  and October 7, 2004. The deduction of 13.42 hours of vacation leave from my vacation leave was

18  done without any notice, without any explanation, and without any opportunity to be heard or notice

19  that the improper deduction could be challenged. Attached as Exhibit 49 is a true and correct copy

20  of the October 7 letter.

21      87.   Subsequent to the notification that my vacation leave had been improperly reduced, I

22  discovered that Defendant Dal Cerro signed and submitted to payroll a time card which stated I had

23  only worked 40 hours for the pay period August 16, 2004 through August 29, 2004. The time card

24  signed and submitted by Defendant Dal Cerro was fraudulent and was done without my knowledge

25  or consent. I am informed and believe that the time card was the cause of payroll's improper

26  deprivation of my vacation leave. Attached as Exhibit 50 is a true and correct copy of the fraudulent

27  time card signed and submitted to payroll by Defendant Dal Cerro.

28  //

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial
Summary Judgment                                                                                      23

88. When I grieved my performance evaluation, Defendants, in bad faith, refused to consider the grievance based on an obviously baseless interpretation of the MOU. Defendants contended that an overall performance rating of "Meets Requirements" or better precluded any grievance on the remainder of the evaluation regardless of the content of the remainder. The language of section 17(K)(1) of the MOU is clear and unambiguous. Section 17(K)(1) states performance **ratings** of "Meets Requirements" or better are not subject to the grievance proceeding. It does not state "**an overall performance rating** of 'Meets Requirements' is not subject to the grievance proceeding." If the intent of the MOU was to preclude grievances for an overall performance rating of "Meets Requirements" or better then section 17(K)(1) would state "overall" and "rating" in the singular instead of using "rating" in the plural which logically means the individual ratings in each category of the evaluation. The parties to the MOU obviously knew the difference as in section 10(B) of the MOU the term "overall performance rating" was specifically used. The inconsistency is again reflected in section 22(I)(1) of the MOU where in the same paragraph the terms are used interchangeably. Preceding section 22(I)(1), in section 22(I), is again no reference to "overall performance rating" as well as in section 22(I)(2), 22(I)(2)(a), 22(I)(2)(c), the paragraph that follows 22(I)(2)(e), section 22(I)(3), 22(I)(4), 22(I)(5), 22(I)(6), 22(I)(7), and 22(I)(8). I was not a party to the contract negotiations and was not a signatory to the MOU. However, Defendant Hawley was and any ambiguity in the MOU should be construed against him and Defendants. Notwithstanding the improper denial of my attempt to grieve the evaluation based on an incorrect interpretation of the MOU, section 22(I)(1) unequivocally gave me the right to an "informal" grievance for my evaluation since I disagreed with the overall performance rating. However, to me the provision is meaningless since any "informal" grievance would be with the exact same person who wrote the evaluation – in this case Defendant Dal Cerro.

89. Based on the history of Defendants' actions against me during the preceding year, the lack of fairness, impartiality, and due process that had been exhibited in the previous year, and the predetermined intent to terminate my employment which could not have been anymore clearly displayed than by Mr. Nisperos' e-mail, it was obvious to me that Defendants were dedicated to continuous harassment of me,  removing me from the office, and terminating my employment

KONIG/
DM4SUMJ.AK.wpd

Case No. C04-2210 MJJ [ECF] – Declaration of Alan Konig in Opposition to Defendants' Motion for Partial Summary Judgment

24

1  regardless of whether justification existed and in blatant disregard of my legal rights. Because of this,

2  I determined it would be unhealthy and unwise to return to the office, subject myself to further

3  harassment and violation of my legal rights, and to sit and wait for a predetermined decision to

4  terminate me to occur. Thus, I resigned from my employment on October 27, 2004.

5      90.  Since my resignation, none of the Defendants nor any employee or representative of the

6  State Bar has in any way attempted to suggest that I should return to work or that I have an incorrect

7  perception of the various employment actions taken against me, the denial of remote access to my

8  e-mail account, the lock out of me from the building and my office, Mr. Nisperos' June 14 e-mail,

9  Defendant Weiner and Defendant Dal Cerro's August 19 e-mail, the unauthorized deduction of my

10  vacation leave[9], the improper involvement of Defendant Hawley in every action taken by me or

11  against me, the biased nature of Ms. Addington's investigation and report, or any other action, event,

12  or statement that has negatively impacted me.

13      I declare under penalty of perjury under the laws of the United States of America that the

14  foregoing is true and accurate. Executed this 1_0th day of January, 2005 at San Francisco, California.

15                                             Alan Konig

16

17
_____

9      In addition to the unauthorized deduction of vacation leave, Ms. Lee-LaMark attempted
18     to obtain funds from me to which the State Bar was never entitled. Attached as Exhibit
       51 is a true and correct copy of my November 2, 2004 e-mail response to an October 29,
19     2004 e-mail from Ms. Lee-LaMark wherein she asserted I owed benefit payments to the
       State Bar which I had already previously paid. On or about November 10, 2004, I
20     received a letter from Ms. Lee-LaMark which, consistent with all other documentation
       from the State Bar that attempts to justify wrongful conduct by it, contains
21     misrepresentations and attempts to revise history. Attached as Exhibit 52 is a true and
       correct copy of the letter. The entirety of the second paragraph is pure fiction. Never was
22     it stated to me that the amounts Ms. Lee-LaMark stated in her October 29 e-mail were
       estimates and the e-mail itself gave no such indication. The only discussion that occurred
23     on November 2, 2004 with Ms. Lee-LaMark was her request that I provide a check to her
       in the amounts stated in her October 29 e-mail. Obviously, there would be no need for
24     my November 2 e-mail which was sent at 6:18 p.m., after the meeting with Ms. Lee-
       LaMark, if she had corrected the improper amounts and not requested of me payment of
25     the incorrect amount. Ms. Lee-LaMark's attempted explanation in her November 8 letter
       for the improper deduction from my vacation leave ignored the fact the hours were
26     improperly deducted and it was me who challenged the improper deduction. Her letter
       attempted to assert that no deduction ever occurred and unbelievably attempted to claim
27     that I was actually overpaid. Ms. Lee-LaMark's letter completely ignored previously
       identified Exhibit 49 and 50. The personal time pay was made on October 22, 2004 while
28     I was clearly in a medical leave status. Thus, her assertion that it was a "cash-out"
       payment was false. The facts simply contradict the fantasy created in Ms. Lee-LaMark's
       letter.

EXHIBIT 1



**THE STATE BAR
OF CALIFORNIA**

**INTER-OFFICE
COMMUNICATION**

<u>PRIVILEGED AND CONFIDENTIAL</u>

DATE:        September 11, 2003

TO:          Jeff Dal Cerro, Assistant Chief Trial Counsel

FROM:        Alan Konig, Deputy Trial Counsel

SUBJECT:     State of Office Working Environment

Jeff,

This office is on the verge of a state of crisis in my opinion because of the low morale among the line deputy trial counsel who are doing the bulk of the work but receiving nothing but aggravation, second-guessing, and criticism in return for the long and hard hours being dedicated to the job. I believe individuals in positions to address this problem are aware of it but instead are treating it like the "dirty little family secret." When the line deputy trial counsel lose their enthusiasm, or even desire, for the job, it is the public and the clients who have been hurt by their former attorneys' actions who will eventually suffer the consequences of the low morale in the office.

I can only speak for myself but I know for a fact that I am not the only one who has had these negative experiences in this office over the past few months. We do talk to one another about what is going on and what is being said. I think that is what is more unbelievable about the current situation than anything else – we all know there are common issues negatively affecting our ability to carry out the mission of this agency but they are not being addressed in a common fashion. Instead, each is being treated individually as if the others don't exist and the others don't know about each other. Continuing to deal with work environment issues on an individual basis when they affect us all only fosters an environment of distrust and animosity. It also insults our intelligence.

Because I do not want to implicate others in this memo, I will limit my examples of the intolerable working conditions to my experiences only. This has been festering for a while now and yesterday turned out to be the straw that broke the camel's back. I'll address my experiences in a chronological order.

The frustration and lack of support began with the hearings in Bajaj and Wells. I am still speechless when I look back at these hearings and still appalled at the lack of support and lack of backing I received from this office while enduring the erroneous rulings, inappropriate comments, unlawful orders, disregard of due process, and outright bias of Judge Remke. The examples are far too numerous to delineate but when a State Bar Court judge knowingly disregards Supreme Court and Review Department authority and provides no basis for doing so, I cannot believe this office rolls over and allows it to happen. I cannot believe this office refuses to support its trial counsel and defend their integrity when inappropriately attacked by a judge without basis. I cannot understand why so much deference is given to a judge here merely because there is a fear of conflict between this office and a judge despite the judge's behavior and actions lacking in judicial temperament and the judge's

EXHIBIT  /

Jeff Dal Cerro, Assistant Chief Trial Counsel
September 11, 2003
Page 2

rulings disregarding and contradicting Supreme Court authority and Review Department authority. This office's refusal to do anything about it only encourages the continued disregard of the law and judicial decorum by the judges.

In no other organization that I have worked have I ever seen senior attorneys or management refuse to back their trial attorneys when inappropriately disparaged or attacked by the judiciary. I don't have to remind you that in the District Attorney's office a blanket recusal would be made of any judge who acted inappropriately with one of the deputy district attorneys. Any district attorney would do this for his deputies and any deputy could rely on the district attorney to fight his cause before the offending judge. My commanding officers in the Navy would routinely make special appearances in matters, thankfully none of mine, whenever ANY military judge acted inappropriately toward one of his or her officers and trial counsel. These special appearances weren't for show. They in no uncertain terms would tell the judge the comments, behavior, rulings, etc. were wrong, uncalled for, unprofessional, unlawful, etc. and would not be tolerated on his/her command. Each commanding officer I had made it very clear to every officer in his/her command that he/she wanted to immediately know if any military judge treated one of us with disrespect, made an inappropriate comment, ignored the law, or showed bias in any way. Each commanding officer ensured us that the judge's action would be dealt with personally and the action would be swift and direct. Each kept his/her word and I saw it done on many occasions.

The effect of seeing your commanding officer standing up for you without fear of a judge cannot be adequately expressed in words. Suffice it to say the respect and loyalty earned as a result was a respect and loyalty that never diminished. I have more respect for my last commanding officer than any boss or supervisor I have ever had because of his willingness to stand up for his officers even if it meant risking his own advancement in the JAG Corps. I am forever grateful to him for instilling an unwavering sense of justice in me and creating a working environment where no officer ever doubted themselves, their dedication, their mission, or the integrity of their office.

With that as background I will tell you what I have found entirely frustrating, aggravating, and outright unprofessional and inappropriate in this office over the past several months in my experiences. I never expected that someone should assist me in any way with Judge Remke's behavior in Bajaj and Wells nor did I particularly want any assistance. However, I never in my wildest dreams could have predicted the complete lack of support and backstabbing that I endured from you when Judge Remke had Scott Drexel call you and have you come to court.

To begin with, her order and his phone call were so inappropriate that I should not even have to mention it. Can you imagine a Superior Court judge telling an associate at Latham & Watkins to go get a name partner now and bring him to the courtroom and then storming off the bench? It would never happen. And if it did happen and the associate told the judge that was not a valid order the judge would not then have someone on his staff call over to Latham & Watkins and order a partner to come to the court immediately. I would be interested to see the authority under which such a purported order can be made. In fact, my guess is the actions of Judge Remke would actually be considered misconduct by a judge since it either is designed or has the potential to chill the advocacy of a party's attorney mid-way through trial. There are methods of dealing with an attorney's

Jeff Dal Cerro, Assistant Chief Trial Counsel
September 11, 2003
Page 3

conduct if you find it inappropriate and the one thing all the methods have in common is **due process**. A judge is not entitled to disregard due process merely because of her position. Yet that is exactly what Judge Remke did. Her behavior was so child-like that the most appropriate response to her would have been "I'll go get Mr. Dal Cerro if you go get Judge Stovitz."

What is more aggravating to me is your allowing Judge Remke to "dress me down" in front of you and David Carr for absolutely no reason and without any factual basis being stated. Her conclusory statements were without factual basis and you said not a word in my defense despite my telling you everything that had occurred preceding her temper tantrum and order to bring you to court. Instead, you essentially concurred with her statements, assured her there would be no further inappropriate behavior (still trying to figure out what the initial inappropriate behavior was that would preclude further inappropriate behavior), and volunteered to stay in the courtroom to "monitor" my behavior. At the very least I would have expected a neutral statement from a boss that merely stated he didn't want to comment until he had an opportunity to review the record and speak with the involved parties. That only seems fair to everyone. What an employee should really expect though is a statement defending the integrity of the employee until the employer has an opportunity to reach a conclusion without prejudging. No employee, anywhere at anytime, should ever have to feel betrayed by his employer when attacked by a third party and the employer does not even remotely have all the facts before commenting on the third party's attack, much less concurring with it.

This incident has impacted my confidence in this office more than any and every incident combined over the 4 years I have been here. I truly and sincerely now question the mission of this office and its commitment to its obligation to protect the public, the administration of justice, and former clients. And I say this not solely based on the lack of support I received but also because of the way this office permitted the discourteous, rude, inappropriate, and humiliating treatment of two witnesses by Judge Remke. The manner in which Judge Remke treated the INS Judge in Bajaj, Judge Abrams, is appalling. Not only did her unprofessional and discourteous treatment affect him but it affected the INS, the Immigration Court, the Executive Office for Immigration Review, and the U.S. Attorney's Office. I believe I provided you the e-mail sent to me by Judge Abrams wherein he voiced his disgust with Judge Remke and said he has never seen another judge as disrespectful or rude as she has been toward him. Adding insult to injury was her refusal to ever once show him the respect to which he is entitled and refer to him by his appropriate title as Judge Abrams instead of Mr. Abrams. I seriously doubt Judge Remke would let it slide if anyone referred to her as Ms. Remke while speaking of her in her capacity as a judge.

The disrespect shown me and Judge Abrams pales in comparison to the humiliation of my complaining witness that she permitted in the Wells matter. I have never felt so badly for a witness as I did for this man. Mr. Amyotte is a simple man by his own admission. He is humbled by his own lack of education and skills and growing up and living in South Carolina. He has a ninth grade education which he courageously self-confessed without necessity to do so. He has a heart of gold and has never said one disparaging word about Wells despite the fact she ripped him off over $11,000.00, which in South Carolina is the equivalent of about $100,000.00 here. Despite my repeated objections and citations to rules of evidence, the constitutional right to privacy, the attorney-client privilege, etc. she permitted David Carr to ask Mr. Amyotte about all medications he was taking when Wells represented him, what his medical and psychological conditions were, etc. Judge Remke did not

Jeff Dal Cerro, Assistant Chief Trial Counsel
September 11, 2003
Page 4

even require an offer of proof as to the relevance or that the information was obtained from a non-privileged source (i.e. the attorney-client relationship). Mr. Amyotte eventually ended up having to disclose he was bi-polar and had in the past taken various prescription drugs. This is now a matter of public record for anyone who might care in the future. Before completing the questions and answers, Mr. Amyotte had to stop and tell Judge Remke that this was really difficult for him and truly embarrassing and was it really necessary. Judge Remke's response was so uncaring and inhumane that it tells volumes about her as a person. In her usual rude, hostile, and raised voice she told him to just answer the questions. Is not this woman's role as a judge to ensure that no witness is treated improperly or asked inappropriate personal information? Instead, she added to his humiliation by her response. Suffice it to say by the end of his testimony on the topic Mr. Amyotte was near tears. This was one of the incidents that preceded her order to have me bring you to court. And I freely admit that her allowing that questioning and her treatment of Mr. Amyotte made me madder than anything else she has ever done or that any judge anywhere has ever done that I have seen. Despite this, I never once said an inappropriate word to her or acted inappropriately in any way. I simply stated my objections for the record and she found fault in that.

I then wanted to establish for the record that Mr. Amyotte provided his private medical history to Wells in confidence and never authorized her to disclose it nor did he ever expect she would disclose it. As soon as I began this line of questioning on redirect, Carr objected and she sustained the objection without even providing me an opportunity to respond to the objection (this is repeatedly done by her and when its pointed out that there is a right to respond to the objection before the court rules, she becomes angry and does her typical "Mr. Konig the court has ruled, move on.") This issue was too important to leave without preserving the record. What followed was a back-and-forth between myself and Judge Remke about why the questioning was permissible or impermissible. She was hung up on two erroneous beliefs: (1) that because she had already overruled my objections the line of questioning was not proper; and (2) that Mr. Amyotte waived the attorney-client privilege when he complained to the State Bar. I still don't think she understands the concept of limited waiver only to that privileged information necessary to defend against the accusations and not a general waiver of all privileged information. She finally understood that just because she made her ruling it wasn't necessarily the correct one and I had a right to establish the record for appellate review of the ruling. I have researched the area of inquiring of private medical information of a witness and it seems to indicate that an entire separate hearing needs to be held on the issue before any evidence can be presented about a witnesses' medical history (unless of course relevant such as a medical malpractice case). At the next break, I immediately telephoned Mr. Amyotte and profusely apologized for what occurred. It was obvious to me while talking to him that he was still shaken by the whole event.

The next witness following Mr. Amyotte was a co-counsel with Wells in Hana Odeh's matter, Melvin Wall. Anticipating his testimony, I called the North Carolina Bar where he is admitted and they were gracious enough to fax me his record of discipline which included misconduct involving honesty, deception and moral turpitude. Needless to say, Judge Remke prohibited me from asking him any questions about his record of discipline despite the fact it strikes directly at his credibility and credibility of a witness is ALWAYS an issue. My attempts to educate her on the issue is what led to her outburst and request to have you come to court. And yes, I told her that was not a valid order and she could not compel me to bring anyone to the court. I believed

Jeff Dal Cerro, Assistant Chief Trial Counsel
September 11, 2003
Page 5

in the correctness of my statement then and I believe in it even more firmly today. I again challenge anyone to find authority that permits such an order to be made by a judge to an attorney.

Despite my telling you of her treatment of Mr. Amyotte, you insisted that I apologize to her. You had no clue what I should even apologize for, if anything. I cannot believe you even made the request of me knowing what had occurred. If I or this office cannot vehemently protect the complaining witnesses against harassment and improper questioning in court designed solely to embarrass them, then this office truly needs to close its doors for it has become pure symbolism over substance. I, for one, refuse to take part in such a disservice to the former clients and the public. For Judge Remke to permit the cross-examination of Mr. Amyotte by covering his private medical history but refuse to allow me to cross-examine an attorney about his public record of discipline that includes acts of dishonesty, is the height of disregard of the law and abuse of discretion. For me to have gone into the courtroom and apologized for nothing I did wrong but for something she did wrong would have been the greatest disservice to this office's purpose and would have been a slap in the face of Mr. Amyotte. But that seems to be a minor or secondary consideration that is subordinate to maintaining a good relationship with a bad judge.

Since the Bajaj and Wells trials, things have become no better. As examples, I have for weeks now been requesting the authorization to initiate a 6007 on ███████████████. I have yet to receive a response and new allegations of misconduct and client abandonment are appearing almost every day. I'll also remind you that I initially requested the authorization to do the 6007 on ██████ all the way back in October 2002 when it was obvious he was interfering with the Tehin/Stevens 6180. My decision then wasn't arrived at on a whim but also had the backing and support of Martin Dean, the receiver who helped with some of the 6180 files. Had it been done then, some of these clients now would never have been harmed.

While on the topic of ███████████ I find it upsetting that this office permits him to file a completely false and baseless complaint against me, provide the complaint to numerous third parties including Judge Robertson during the pendency of the 6180 proceeding, and then does nothing about it despite it being a crime to make a false complaint to the State Bar against an attorney. Had he just left it as nothing more than a complaint I wouldn't be so upset. But the fact he distributed it to others and stated the facts in it were true, he has wrongly impugned my integrity with a Superior Court judge and several attorneys/law firms in the area. There should be repercussions for an attorney when he does something like this. The legislature obviously enacted the criminal statute to prevent this exact situation.

Judge Remke has been sitting on a rule 219 motion in the Mendez case now for over three months – since May 2, 2003. This is so improper and probably again misconduct by her. She has seriously prejudiced my case and provided Mendez an additional 3 months to put together his case after hearing my case. I can't imagine something like this would ever be allowed to occur in a superior court anywhere. Yet this office doesn't care and won't care. She has sat on my unopposed motion to terminate the abatement in Tehin/Stevens since the end of July and wants to have a status conference in October without ruling on it. Again, it has been my experience that in the "real world" if a motion goes unopposed it is granted by the court. The court doesn't provide another opportunity, 3 months after an opposition was due, to the opposing party to respond. What an incredible injustice to the victims of Tehin/Stevens, especially the McCoys. Again, I don't think this office cares

Jeff Dal Cerro, Assistant Chief Trial Counsel
September 11, 2003
Page 6

and I've done all I can do as a deputy trial counsel. If there were ever a time for this office to grow a backbone and challenge the SBC, the Tehin/Stevens matter is the perfect case for it. Who on earth would ever criticize us for protecting the interests and the rights of the client victims to a prompt, full, and fair adjudication of their complaints? What is particularly troubling about Judge Remke's actions or inactions and the lack of response from this office is that it's hypocritical. She is constantly permitted to harass this office for our lack of "due diligence" but apparently such a concept does not apply to her. The "do as I say not as I do" mentality is completely inappropriate for a court.

For over 5 months I have requested an investigation number in the Mendez matter that was reopened in March 2003. I lost count how many times I have requested it. It has now become an impediment to resolution of his matters because there is no investigation number and no investigation. I again must look at this from the perspective of the CW who has a legitimate complaint with provable misconduct. Her initial complaint was closed despite there being evidence of the misconduct on the face of her complaint. She then requested reconsideration in very strong terms only to be hit with the macro letter saying it will remain closed. Now she's being treated inappropriately again by having to wait so long for a simple number to be given to her complaint. How does one explain this in a rational and logical way to her? If you know please tell me since I'm the one who will end up bearing the brunt of her criticism and harsh words.

On August 8 and August 15, 2003, I submitted two memoranda regarding why we permit attorneys to keep attorney's fees in cases of serious misappropriation. I spent considerable time and effort doing the research indicated in the memoranda but have received absolutely no response to it. Again, I did this because I believe the client victims in Tehin/Stevens deserve such a commitment from this office and one that appears to be entirely supported by authority.

Finally, I refuse to conduct another ENEC or settlement conference under the current policy. I bit my tongue at the first one under the new policy where things were said that completely undercut me and my ability to prosecute the matter. But now it has happened in 100% of the conferences. At the Mendez ENEC, Mendez was given another month to make some decisions before we file the notice. This decision was made by Don which is entirely hypocritical given management's repeated edicts that ENECs are not to be continued and any continuance should be short in duration.

At the Kay/Dalton ENEC yesterday, Don agreed to give them an additional two weeks to provide more information despite the fact they were given every opportunity in the world to provide the information during the investigation. Additionally, as you may recall, I provided Paul Vapnek continuance after continuance to provide additional information. None ever came. Furthermore, Kay didn't even bother to show up at the ENEC and just sent his attorneys. At the 20-day meeting, I made an extremely generous offer to Mr. Kay to resolve all of his matters for stayed suspension with no actual. I don't even think such a resolution is supported by the case law. I have done extensive research now in the area of contemptuous behavior and other unprofessional behavior by an attorney during trial and cannot find a single reported case in the history of California that comes even remotely close to the extent of misconduct committed by Kay. The extent of his misconduct is reflected in the CW's complaint (Judge Anello of San Diego) when he says Kay should never be allowed to step foot into

Jeff Dal Cerro, Assistant Chief Trial Counsel
September 11, 2003
Page 7

a courtroom again. At the 20-day, I also provided Kay/Dalton an additional two weeks to provide me additional documentation and agreed to a continued 20-day once the information was received.

Instead of recognizing and appreciating my courtesy, I got a letter from Kay's counsel at the end of the two weeks refusing to provide more information and declining a continued 20-day (keep in mind this was their request and not mine). They then had the audacity at the ENEC to lie to the judge and claim I haven't provided them everything. Additionally, at the ENEC, Don stated to counsel for Kay/Dalton that HE was the one they needed to impress. From that point on, everything was addressed to Don and Don made all the decisions and did all the talking. To this I take personal offense. I have had extensive correspondence with Judge Anello and have kept him abreast of every development in the matter. As part of my communications with him, I promised him that if resolution was not reached at the 20-day I would immediately file the NDC. Don has now affected my personal credibility with the judge. Additionally, he has completely undercut my authority, caused me to feel entirely meaningless in the case, reduced my role to that of an "associate," and obviously impacted my ability to deal with counsel for Kay/Dalton since they now are addressing everything to him. If I want this type of treatment, I'll gladly move over to a law firm and get paid twice as much to be treated like a second class attorney who knows nothing and can't have any responsibility. Plus, at least there I'll know my role and it won't ever be sprung on me out of the blue for no reason. I had more autonomy my first year of law practice in the JAG Corp then I do now. This office has an unbelievable way of showing its appreciation and gratitude. It seems we are more concerned about ensuring we make respondents and SBC judges happy then we are about making CWS happy, ensuring their interests are protected, or caring about the people that work here.

This is the thanks I get for busting my ass to get this complaint/investigation done quickly? Just to let you know, I worked on the NDC nonstop for 2 days in order to get it done in time for the ENEC. One of those days was my birthday and I stayed at the office until 5:30 just so Judge McElroy could have the stupid ENEC materials that afternoon as she requested. It was obvious at the ENEC that she hadn't even read them. To make matters worse, Kay/Dalton provided a statement to her but refused to provide a copy to us. Don then rewards this behavior with a grant of more time for them. That both Don and Judge McElroy are unfamiliar with the facts of the case is abundantly obvious by their questions to me about why can't Kay call Judge Anello "intellectually dishonest." Had either bothered to read my ENEC statement and the cases I cited (that's another several hours of research I did) they both would have know that the Supreme Court has already determined that calling a judge intellectually dishonest is contemptuous on its face. Even after I pointed out that the Supreme Court has already made this determination for us, the response was "well, it seems to be an opinion which he's entitled to state." The focus then shifted to how Judge Anello might actually be biased against Kay/Dalton and why is he making us do this when he should've just found them in contempt? I would like to issue the invitation to either or both Judge McElroy and Don to go ahead and call Judge Anello and ask him the question themselves. Is it not enough that we piss off the membership on a daily basis? Now we must begin to question the motives and intent of a judge and begin to isolate the judiciary as well? Are we trying to become the most unpopular kids on the block?

I am tired, defeated, and have no passion for this job any longer. I put together quality work product not for you, not for the office, and not for the court. I do it because its my own pride that requires it and because I owe it to the complaining witnesses and the public since that is my job. I try to place myself in the shoes of the

Jeff Dal Cerro, Assistant Chief Trial Counsel
September 11, 2003
Page 8

complaining witnesses and say I would expect nothing less than what I do if I was the complaining witness. I cannot begin to tell you the feeling of anger, resentment, and animosity that continues to develop every time my work product or opinion is disregarded by someone who knows nothing about the facts of the case, the history of it, or the working relationship already developed between me and the CW. If Don is the one who Kay/Dalton need to impress then I suggest the case be reassigned to him. I have no problem with that and have no problem notifying Judge Anello of what has transpired and the reasons for the reassignment. Since he seems to know it all and has an answer for everything, he should have no problem resolving the case to the satisfaction of both Judge Anello and Kay/Dalton.

I am having a hard enough time dealing with respondents, doing further investigation in matters where the investigator did a incomplete job, being my own secretary, dealing with respondents' counsel, dealing with CW's, and dealing with the court that I don't need additional frustration and interference from my own office. But it now seems to be the rule rather than the exception. My back is broken and I cannot continue to endure the hurdles that are thrown in my path in this office. One person can only take so much. The next time I feel betrayed by this office, instead of a memo asking for something to be done, there will instead be a letter of resignation.

Just to let you know so you don't think this is simply whining. In order to put together the 25 page NDC (with about 50% of it being single spaced because of quotes from transcripts) and provide the required ENEC statement and authority to support the charges in Kay/Dalton, I have had to work from home at night every day this week on the Wells' closing brief which is due on Friday. Had I known there would be so little regard for my work and my opinions in Kay/Dalton, I would have simply prepared a piece of crap notice and statement as the respondents always do anyway, if they do one at all. Oh, and I have obviously accepted that I won't see a dime in overtime pay for the work being done at home at night but am sure I would receive something in return if I was unable to file the brief in Wells by Friday. I've come to accept this method of operation long ago. I have no idea why I continue to abide by it but I do.



**THE STATE BAR**
**OF CALIFORNIA**

**INTER-OFFICE**
**COMMUNICATION**

**PRIVILEGED AND CONFIDENTIAL**

DATE:  September 11, 2003

TO:  Jeff Dal Cerro, Assistant Chief Trial Counsel

FROM:  Alan Konig, Deputy Trial Counsel

SUBJECT:  State of Office Working Environment

Jeff,

This office is on the verge of a state of crisis in my opinion because of the low morale among the line deputy trial counsel who are doing the bulk of the work but receiving nothing but aggravation, second-guessing, and criticism in return for the long and hard hours being dedicated to the job. I believe individuals in positions to address this problem are aware of it but instead are treating it like the "dirty little family secret." When the line deputy trial counsel lose their enthusiasm, or even desire, for the job, it is the public and the clients who have been hurt by their former attorneys' actions who will eventually suffer the consequences of the low morale in the office.

I can only speak for myself but I know for a fact that I am not the only one who has had these negative experiences in this office over the past few months. We do talk to one another about what is going on and what is being said. I think that is what is more unbelievable about the current situation than anything else – we all know there are common issues negatively affecting our ability to carry out the mission of this agency but they are not being addressed in a common fashion. Instead, each is being treated individually as if the others don't exist and the others don't know about each other. Continuing to deal with work environment issues on an individual basis when they affect us all only fosters an environment of distrust and animosity. It also insults our intelligence.

Because I do not want to implicate others in this memo, I will limit my examples of the intolerable working conditions to my experiences only. This has been festering for a while now and yesterday turned out to be the straw that broke the camel's back. I'll address my experiences in a chronological order.

The frustration and lack of support began with the hearings in Bajaj and Wells. I am still speechless when I look back at these hearings and still appalled at the lack of support and lack of backing I received from this office while enduring the erroneous rulings, inappropriate comments, unlawful orders, disregard of due process, and outright bias of Judge Remke. The examples are far too numerous to delineate but when a State Bar Court judge knowingly disregards Supreme Court and Review Department authority and provides no basis for doing so, I cannot believe this office rolls over and allows it to happen. I cannot believe this office refuses to support its trial counsel and defend their integrity when inappropriately attacked by a judge without basis. I cannot understand why so much deference is given to a judge here merely because there is a fear of conflict between this office and a judge despite the judge's behavior and actions lacking in judicial temperament and the judge's

Jeff Dal Cerro, Assistant Chief Trial Counsel
September 11, 2003
Page 2

rulings disregarding and contradicting Supreme Court authority and Review Department authority. This office's refusal to do anything about it only encourages the continued disregard of the law and judicial decorum by the judges.

In no other organization that I have worked have I ever seen senior attorneys or management refuse to back their trial attorneys when inappropriately disparaged or attacked by the judiciary. I don't have to remind you that in the District Attorney's office a blanket recusal would be made of any judge who acted inappropriately with one of the deputy district attorneys. Any district attorney would do this for his deputies and any deputy could rely on the district attorney to fight his cause before the offending judge. My commanding officers in the Navy would routinely make special appearances in matters, thankfully none of mine, whenever ANY military judge acted inappropriately toward one of his or her officers and trial counsel. These special appearances weren't for show. They in no uncertain terms would tell the judge the comments, behavior, rulings, etc. were wrong, uncalled for, unprofessional, unlawful, etc. and would not be tolerated on his/her command. Each commanding officer I had made it very clear to every officer in his/her command that he/she wanted to immediately know if any military judge treated one of us with disrespect, made an inappropriate comment, ignored the law, or showed bias in any way. Each commanding officer ensured us that the judge's action would be dealt with personally and the action would be swift and direct. Each kept his/her word and I saw it done on many occasions.

The effect of seeing your commanding officer standing up for you without fear of a judge cannot be adequately expressed in words. Suffice it to say the respect and loyalty earned as a result was a respect and loyalty that never diminished. I have more respect for my last commanding officer than any boss or supervisor I have ever had because of his willingness to stand up for his officers even if it meant risking his own advancement in the JAG Corps. I am forever grateful to him for instilling an unwavering sense of justice in me and creating a working environment where no officer ever doubted themselves, their dedication, their mission, or the integrity of their office.

With that as background I will tell you what I have found entirely frustrating, aggravating, and outright unprofessional and inappropriate in this office over the past several months in my experiences. I never expected that someone should assist me in any way with Judge Remke's behavior in Bajaj and Wells nor did I particularly want any assistance. However, I never in my wildest dreams could have predicted the complete lack of support and backstabbing that I endured from you when Judge Remke had Scott Drexel call you and have you come to court.

To begin with, her order and his phone call were so inappropriate that I should not even have to mention it. Can you imagine a Superior Court judge telling an associate at Latham & Watkins to go get a name partner now and bring him to the courtroom and then storming off the bench? It would never happen. And if it did happen and the associate told the judge that was not a valid order the judge would not then have someone on his staff call over to Latham & Watkins and order a partner to come to the court immediately. I would be interested to see the authority under which such a purported order can be made. In fact, my guess is the actions of Judge Remke would actually be considered misconduct by a judge since it either is designed or has the potential to chill the advocacy of a party's attorney mid-way through trial. There are methods of dealing with an attorney's

Jeff Dal Cerro, Assistant Chief Trial Counsel
September 11, 2003
Page 3

conduct if you find it inappropriate and the one thing all the methods have in common is **due process**. A judge is not entitled to disregard due process merely because of her position. Yet that is exactly what Judge Remke did. Her behavior was so child-like that the most appropriate response to her would have been "I'll go get Mr. Dal Cerro if you go get Judge Stovitz."

What is more aggravating to me is your allowing Judge Remke to "dress me down" in front of you and David Carr for absolutely no reason and without any factual basis being stated. Her conclusory statements were without factual basis and you said not a word in my defense despite my telling you everything that had occurred preceding her temper tantrum and order to bring you to court. Instead, you essentially concurred with her statements, assured her there would be no further inappropriate behavior (still trying to figure out what the initial inappropriate behavior was that would preclude further inappropriate behavior), and volunteered to stay in the courtroom to "monitor" my behavior. At the very least I would have expected a neutral statement from a boss that merely stated he didn't want to comment until he had an opportunity to review the record and speak with the involved parties. That only seems fair to everyone. What an employee should really expect though is a statement defending the integrity of the employee until the employer has an opportunity to reach a conclusion without prejudging. No employee, anywhere at anytime, should ever have to feel betrayed by his employer when attacked by a third party and the employer does not even remotely have all the facts before commenting on the third party's attack, much less concurring with it.

This incident has impacted my confidence in this office more than any and every incident combined over the 4 years I have been here. I truly and sincerely now question the mission of this office and its commitment to its obligation to protect the public, the administration of justice, and former clients. And I say this not solely based on the lack of support I received but also because of the way this office permitted the discourteous, rude, inappropriate, and humiliating treatment of two witnesses by Judge Remke. The manner in which Judge Remke treated the INS Judge in Bajaj, Judge Abrams, is appalling. Not only did her unprofessional and discourteous treatment affect him but it affected the INS, the Immigration Court, the Executive Office for Immigration Review, and the U.S. Attorney's Office. I believe I provided you the e-mail sent to me by Judge Abrams wherein he voiced his disgust with Judge Remke and said he has never seen another judge as disrespectful or rude as she has been toward him. Adding insult to injury was her refusal to ever once show him the respect to which he is entitled and refer to him by his appropriate title as Judge Abrams instead of Mr. Abrams. I seriously doubt Judge Remke would let it slide if anyone referred to her as Ms. Remke while speaking of her in her capacity as a judge.

The disrespect shown me and Judge Abrams pales in comparison to the humiliation of my complaining witness that she permitted in the Wells matter. I have never felt so badly for a witness as I did for this man. Mr. Amyotte is a simple man by his own admission. He is humbled by his own lack of education and skills and growing up and living in South Carolina. He has a ninth grade education which he courageously self-confessed without necessity to do so. He has a heart of gold and has never said one disparaging word about Wells despite the fact she ripped him off over $11,000.00, which in South Carolina is the equivalent of about $100,000.00 here. Despite my repeated objections and citations to rules of evidence, the constitutional right to privacy, the attorney-client privilege, etc. she permitted David Carr to ask Mr. Amyotte about all medications he was taking when Wells represented him, what his medical and psychological conditions were, etc. Judge Remke did not

Jeff Dal Cerro, Assistant Chief Trial Counsel
September 11, 2003
Page 4

even require an offer of proof as to the relevance or that the information was obtained from a non-privileged source (i.e. the attorney-client relationship). Mr. Amyotte eventually ended up having to disclose he was bi-polar and had in the past taken various prescription drugs. This is now a matter of public record for anyone who might care in the future. Before completing the questions and answers, Mr. Amyotte had to stop and tell Judge Remke that this was really difficult for him and truly embarrassing and was it really necessary. Judge Remke's response was so uncaring and inhumane that it tells volumes about her as a person. In her usual rude, hostile, and raised voice she told him to just answer the questions. Is not this woman's role as a judge to ensure that no witness is treated improperly or asked inappropriate personal information? Instead, she added to his humiliation by her response. Suffice it to say by the end of his testimony on the topic Mr. Amyotte was near tears. This was one of the incidents that preceded her order to have me bring you to court. And I freely admit that her allowing that questioning and her treatment of Mr. Amyotte made me madder than anything else she has ever done or that any judge anywhere has ever done that I have seen. Despite this, I never once said an inappropriate word to her or acted inappropriately in any way. I simply stated my objections for the record and she found fault in that.

I then wanted to establish for the record that Mr. Amyotte provided his private medical history to Wells in confidence and never authorized her to disclose it nor did he ever expect she would disclose it. As soon as I began this line of questioning on redirect, Carr objected and she sustained the objection without even providing me an opportunity to respond to the objection (this is repeatedly done by her and when its pointed out that there is a right to respond to the objection before the court rules, she becomes angry and does her typical "Mr. Konig the court has ruled, move on.") This issue was too important to leave without preserving the record. What followed was a back-and-forth between myself and Judge Remke about why the questioning was permissible or impermissible. She was hung up on two erroneous beliefs: (1) that because she had already overruled my objections the line of questioning was not proper; and (2) that Mr. Amyotte waived the attorney-client privilege when he complained to the State Bar. I still don't think she understands the concept of limited waiver only to that privileged information necessary to defend against the accusations and not a general waiver of all privileged information. She finally understood that just because she made her ruling it wasn't necessarily the correct one and I had a right to establish the record for appellate review of the ruling. I have researched the area of inquiring of private medical information of a witness and it seems to indicate that an entire separate hearing needs to be held on the issue before any evidence can be presented about a witnesses' medical history (unless of course relevant such as a medical malpractice case). At the next break, I immediately telephoned Mr. Amyotte and profusely apologized for what occurred. It was obvious to me while talking to him that he was still shaken by the whole event.

The next witness following Mr. Amyotte was a co-counsel with Wells in Hana Odeh's matter, Melvin Wall. Anticipating his testimony, I called the North Carolina Bar where he is admitted and they were gracious enough to fax me his record of discipline which included misconduct involving honesty, deception and moral turpitude. Needless to say, Judge Remke prohibited me from asking him any questions about his record of discipline despite the fact it strikes directly at his credibility and credibility of a witness is ALWAYS an issue. My attempts to educate her on the issue is what led to her outburst and request to have you come to court. And yes, I told her that was not a valid order and she could not compel me to bring anyone to the court. I believed

Jeff Dal Cerro, Assistant Chief Trial Counsel
September 11, 2003
Page 5

in the correctness of my statement then and I believe in it even more firmly today. I again challenge anyone to find authority that permits such an order to be made by a judge to an attorney.

Despite my telling you of her treatment of Mr. Amyotte, you insisted that I apologize to her. You had no clue what I should even apologize for, if anything. I cannot believe you even made the request of me knowing what had occurred. If I or this office cannot vehemently protect the complaining witnesses against harassment and improper questioning in court designed solely to embarrass them, then this office truly needs to close its doors for it has become pure symbolism over substance. I, for one, refuse to take part in such a disservice to the former clients and the public. For Judge Remke to permit the cross-examination of Mr. Amyotte by covering his private medical history but refuse to allow me to cross-examine an attorney about his public record of discipline that includes acts of dishonesty, is the height of disregard of the law and abuse of discretion. For me to have gone into the courtroom and apologized for nothing I did wrong but for something she did wrong would have been the greatest disservice to this office's purpose and would have been a slap in the face of Mr. Amyotte. But that seems to be a minor or secondary consideration that is subordinate to maintaining a good relationship with a bad judge.

Since the Bajaj and Wells trials, things have become no better. As examples, I have for weeks now been requesting the authorization to initiate a 6007 on ███████████ I have yet to receive a response and new allegations of misconduct and client abandonment are appearing almost every day. I'll also remind you that I initially requested the authorization to do the 6007 on ████ all the way back in October 2002 when it was obvious he was interfering with the Tehin/Stevens 6180. My decision then wasn't arrived at on a whim but also had the backing and support of Martin Dean, the receiver who helped with some of the 6180 files. Had it been done then, some of these clients now would never have been harmed.

While on the topic of ████████, I find it upsetting that this office permits him to file a completely false and baseless complaint against me, provide the complaint to numerous third parties including Judge Robertson during the pendency of the 6180 proceeding, and then does nothing about it despite it being a crime to make a false complaint to the State Bar against an attorney. Had he just left it as nothing more than a complaint I wouldn't be so upset. But the fact he distributed it to others and stated the facts in it were true, he has wrongly impugned my integrity with a Superior Court judge and several attorneys/law firms in the area. There should be repercussions for an attorney when he does something like this. The legislature obviously enacted the criminal statute to prevent this exact situation.

Judge Remke has been sitting on a rule 219 motion in the Mendez case now for over three months – since May 2, 2003. This is so improper and probably again misconduct by her. She has seriously prejudiced my case and provided Mendez an additional 3 months to put together his case after hearing my case. I can't imagine something like this would ever be allowed to occur in a superior court anywhere. Yet this office doesn't care and won't care. She has sat on my unopposed motion to terminate the abatement in Tehin/Stevens since the end of July and wants to have a status conference in October without ruling on it. Again, it has been my experience that in the "real world" if a motion goes unopposed it is granted by the court. The court doesn't provide another opportunity, 3 months after an opposition was due, to the opposing party to respond. What an incredible injustice to the victims of Tehin/Stevens, especially the McCoys. Again, I don't think this office cares

Jeff Dal Cerro, Assistant Chief Trial Counsel
September 11, 2003
Page 6

and I've done all I can do as a deputy trial counsel. If there were ever a time for this office to grow a backbone and challenge the SBC, the Tehin/Stevens matter is the perfect case for it. Who on earth would ever criticize us for protecting the interests and the rights of the client victims to a prompt, full, and fair adjudication of their complaints? What is particularly troubling about Judge Remke's actions or inactions and the lack of response from this office is that it's hypocritical. She is constantly permitted to harass this office for our lack of "due diligence" but apparently such a concept does not apply to her. The "do as I say not as I do" mentality is completely inappropriate for a court.

For over 5 months I have requested an investigation number in the Mendez matter that was reopened in March 2003. I lost count how many times I have requested it. It has now become an impediment to resolution of his matters because there is no investigation number and no investigation. I again must look at this from the perspective of the CW who has a legitimate complaint with provable misconduct. Her initial complaint was closed despite there being evidence of the misconduct on the face of her complaint. She then requested reconsideration in very strong terms only to be hit with the macro letter saying it will remain closed. Now she's being treated inappropriately again by having to wait so long for a simple number to be given to her complaint. How does one explain this in a rational and logical way to her? If you know please tell me since I'm the one who will end up bearing the brunt of her criticism and harsh words.

On August 8 and August 15, 2003, I submitted two memoranda regarding why we permit attorneys to keep attorney's fees in cases of serious misappropriation. I spent considerable time and effort doing the research indicated in the memoranda but have received absolutely no response to it. Again, I did this because I believe the client victims in Tehin/Stevens deserve such a commitment from this office and one that appears to be entirely supported by authority.

Finally, I refuse to conduct another ENEC or settlement conference under the current policy. I bit my tongue at the first one under the new policy where things were said that completely undercut me and my ability to prosecute the matter. But now it has happened in 100% of the conferences. At the Mendez ENEC, Mendez was given another month to make some decisions before we file the notice. This decision was made by Don which is entirely hypocritical given management's repeated edicts that ENECs are not to be continued and any continuance should be short in duration.

At the Kay/Dalton ENEC yesterday, Don agreed to give them an additional two weeks to provide more information despite the fact they were given every opportunity in the world to provide the information during the investigation. Additionally, as you may recall, I provided Paul Vapnek continuance after continuance to provide additional information. None ever came. Furthermore, Kay didn't even bother to show up at the ENEC and just sent his attorneys. At the 20-day meeting, I made an extremely generous offer to Mr. Kay to resolve all of his matters for stayed suspension with no actual. I don't even think such a resolution is supported by the case law. I have done extensive research now in the area of contemptuous behavior and other unprofessional behavior by an attorney during trial and cannot find a single reported case in the history of California that comes even remotely close to the extent of misconduct committed by Kay. The extent of his misconduct is reflected in the CW's complaint (Judge Anello of San Diego) when he says Kay should never be allowed to step foot into

Jeff Dal Cerro, Assistant Chief Trial Counsel
September 11, 2003
Page 7

a courtroom again. At the 20-day, I also provided Kay/Dalton an additional two weeks to provide me additional documentation and agreed to a continued 20-day once the information was received.

Instead of recognizing and appreciating my courtesy, I got a letter from Kay's counsel at the end of the two weeks refusing to provide more information and declining a continued 20-day (keep in mind this was their request and not mine). They then had the audacity at the ENEC to lie to the judge and claim I haven't provided them everything. Additionally, at the ENEC, Don stated to counsel for Kay/Dalton that HE was the one they needed to impress. From that point on, everything was addressed to Don and Don made all the decisions and did all the talking. To this I take personal offense. I have had extensive correspondence with Judge Anello and have kept him abreast of every development in the matter. As part of my communications with him, I promised him that if resolution was not reached at the 20-day I would immediately file the NDC. Don has now affected my personal credibility with the judge. Additionally, he has completely undercut my authority, caused me to feel entirely meaningless in the case, reduced my role to that of an "associate," and obviously impacted my ability to deal with counsel for Kay/Dalton since they now are addressing everything to him. If I want this type of treatment, I'll gladly move over to a law firm and get paid twice as much to be treated like a second class attorney who knows nothing and can't have any responsibility. Plus, at least there I'll know my role and it won't ever be sprung on me out of the blue for no reason. I had more autonomy my first year of law practice in the JAG Corp then I do now. This office has an unbelievable way of showing its appreciation and gratitude. It seems we are more concerned about ensuring we make respondents and SBC judges happy then we are about making CWS happy, ensuring their interests are protected, or caring about the people that work here.

This is the thanks I get for busting my ass to get this complaint/investigation done quickly? Just to let you know, I worked on the NDC nonstop for 2 days in order to get it done in time for the ENEC. One of those days was my birthday and I stayed at the office until 5:30 just so Judge McElroy could have the stupid ENEC materials that afternoon as she requested. It was obvious at the ENEC that she hadn't even read them. To make matters worse, Kay/Dalton provided a statement to her but refused to provide a copy to us. Don then rewards this behavior with a grant of more time for them. That both Don and Judge McElroy are unfamiliar with the facts of the case is abundantly obvious by their questions to me about why can't Kay call Judge Anello "intellectually dishonest." Had either bothered to read my ENEC statement and the cases I cited (that's another several hours of research I did) they both would have known that the Supreme Court has already determined that calling a judge intellectually dishonest is contemptuous on its face. Even after I pointed out that the Supreme Court has already made this determination for us, the response was "well, it seems to be an opinion which he's entitled to state." The focus then shifted to how Judge Anello might actually be biased against Kay/Dalton and why is he making us do this when he should've just found them in contempt? I would like to issue the invitation to either or both Judge McElroy and Don to go ahead and call Judge Anello and ask him the question themselves. Is it not enough that we piss off the membership on a daily basis? Now we must begin to question the motives and intent of a judge and begin to isolate the judiciary as well? Are we trying to become the most unpopular kids on the block?

I am tired, defeated, and have no passion for this job any longer. I put together quality work product not for you, not for the office, and not for the court. I do it because its my own pride that requires it and because I owe it to the complaining witnesses and the public since that is my job. I try to place myself in the shoes of the

Jeff Dal Cerro, Assistant Chief Trial Counsel
September 11, 2003
Page 8

complaining witnesses and say I would expect nothing less than what I do if I was the complaining witness. I cannot begin to tell you the feeling of anger, resentment, and animosity that continues to develop every time my work product or opinion is disregarded by someone who knows nothing about the facts of the case, the history of it, or the working relationship already developed between me and the CW. If Don is the one who Kay/Dalton need to impress then I suggest the case be reassigned to him. I have no problem with that and have no problem notifying Judge Anello of what has transpired and the reasons for the reassignment. Since he seems to know it all and has an answer for everything, he should have no problem resolving the case to the satisfaction of both Judge Anello and Kay/Dalton.

I am having a hard enough time dealing with respondents, doing further investigation in matters where the investigator did a incomplete job, being my own secretary, dealing with respondents' counsel, dealing with CW's, and dealing with the court that I don't need additional frustration and interference from my own office. But it now seems to be the rule rather than the exception. My back is broken and I cannot continue to endure the hurdles that are thrown in my path in this office. One person can only take so much. The next time I feel betrayed by this office, instead of a memo asking for something to be done, there will instead be a letter of resignation.

Just to let you know so you don't think this is simply whining. In order to put together the 25 page NDC (with about 50% of it being single spaced because of quotes from transcripts) and provide the required ENEC statement and authority to support the charges in Kay/Dalton, I have had to work from home at night every day this week on the Wells' closing brief which is due on Friday. Had I known there would be so little regard for my work and my opinions in Kay/Dalton, I would have simply prepared a piece of crap notice and statement as the respondents always do anyway, if they do one at all. Oh, and I have obviously accepted that I won't see a dime in overtime pay for the work being done at home at night but am sure I would receive something in return if I was unable to file the brief in Wells by Friday. I've come to accept this method of operation long ago. I have no idea why I continue to abide by it but I do.

EXHIBIT 2



**THE STATE BAR
OF CALIFORNIA**

**INTER-OFFICE
COMMUNICATION**

<u>**PRIVILEGED AND CONFIDENTIAL**</u>

DATE:        October 31, 2003

TO:          Alan Konig, Deputy Trial Counsel

FROM:        Jeff Dal Cerro, Assistant Chief Trial Counsel

SUBJECT:     Performance Expectations

This follows discussions (primarily on September 23, 2003) we have had since you provided me with your memorandum of September 11, 2003 outlining dissatisfactions you have in your employment relationship with the State Bar of California. As I have expressed to you, you are a talented attorney with much to offer the State Bar. You are a serious advocate of the public interest. You work hard. However, there are issues, some of which are reflected in your memorandum, and others which are reflected in your conduct as a representative of the Office of the Chief Trial Counsel ("OCTC"), which must be addressed.

It is not productive to belabor the details of the mutual dissatisfactions between you and the State Bar. I intend here to generally address the guiding principles that are necessary to maintain the relationship between you and the State Bar.

You serve OCTC which serves the public interest in the name of the State Bar of California. You are not a free agent to determine how you will represent the interests of our office's client, the State Bar of California, in particular cases. The manner in which the public interest is served through OCTC is determined by the Chief Trial Counsel's exercise of prosecutorial discretion which is articulated through OCTC's management.

As a former member of the military, I am sure you appreciate the importance of the chain of command and the importance of taking instructions from those in command. While this is not a military environment, and we do not adhere to the rigors I suspect you encountered there, we do have a chain of command here as well. OCTC is not a democracy. OCTC respects open debate and discussion about case strategy and you have benefitted from these exchanges as much as anyone else in the office. However, the decision as to how the interests of the public will be represented in the name of the State Bar is the responsibility of OCTC management. It is critical that the members of this office understand this principle and conform their behavior to the standards of the office.

I welcome your in-house debate and good-spirited dissent on issues. I personally have learned things from this debate. When all is said and done, we require that you conform yourself to the standards of this office and the prosecutorial discretion that is reposed ultimately in the Chief Trial Counsel and his management staff. The Chief Trial Counsel has delegated to individual attorneys within the office the power to act on his behalf in many situations, but when that power is limited in particular instances,



**EXHIBIT   2**

Alan Konig
October 24, 2003
Page 2

either directly through orders or indirectly by the offered advice and counsel of managers and supervisors, it is the obligation of individual deputies to accept the limitations willingly and conduct themselves accordingly

Additionally, it is important to recognize that the workplace is a place for work. Personal preferences must yield to the work of the office. It is inevitable that individuals will encounter others in the workplace whom they like and whom they dislike. Whether you like an individual or not is irrelevant. You need to get along with your supervisors, managers and co-workers and they need to get along with you. This is a condition of employment. As noted above, debate and discussion is more than tolerated in this office. However, disrespect for authority and disregard of the standards that apply to you as a representative of this office is not tolerable. As mentioned above, you are not a free agent and you are confined by the directions that are given to you by your supervisors and the management of this office.

As I am also sure you appreciate, it is inevitable that attorneys, particularly dedicated attorneys like yourself, will find themselves at odds with judges who are making the final decisions regarding cases upon which we as advocates may feel passionately. As an attorney, you are an officer of the court and have a duty to respond to the judges before whom you appear as an officer. You have a duty to maintain appropriate respect due those judges, regardless of your opinion of their abilities or whether or not you agree with their rulings. You have a duty to answer their questions directly. It is detrimental to you as an attorney, to the office as a whole, to the cases assigned to you, and to the public interest, for you to personalize disputes that arise in "the heat of battle." Being professional under fire is part of the job of the litigator.

You have at times called rulings and decisions of judges with which you disagree to the attention of management with the request that they be appealed. It is, of course, appropriate that you do so. However, the decision to appeal a judge's ruling is a management decision. Once that decision is made, it is your responsibility to accept it without slight, expressed resentment or second-guessing, even if the decision is contrary to your recommendation.

I provide this to you in writing because you requested a writing from me. I hope that this gives you some guidance as to those areas where you need to conform your conduct to the standards of the office of which you are part. While conversation can be constructive, there is a point when you must accept the principle that you are either a part of the Office of the Chief Trial Counsel or you are not. If you are, you will yield to the standards of the office. If you choose not to yield to those standards, you will not continue to be a part of the office. Again, I want to stress that I firmly believe that you have much to offer this office and the public through your hard work, but your contribution will be accepted on the terms of the office as I have expressed them to you.

In conclusion, I appreciate that this discussion as well as the surrounding circumstances might be stressful to you. I remind you that should you choose to seek it, information regarding the Employee Assistance Plan ("EAP") can be obtained from Human Resources.

cc:    Iola Lee-LaMark
       Mike A. Nisperos, Jr.
       Russell Weiner

EXHIBIT 3



## THE STATE BAR
## OF CALIFORNIA

**INTER-OFFICE
COMMUNICATION**

**DATE:**     October 22, 2003

*Draft received from Bob Hawley*

**TO:**     Alan Konig

**FROM:**     Jeff Dal Cerro, Assistant Chief Trial Counsel

**SUBJECT:**   Performance

This follows several discussions that we have had since you provided to me your _____ memorandum outlining dissatisfactions that you have in your employment relationship with the State Bar of California. As I have expressed to you in our conversations, you are a talented attorney who has much potential to offer the State Bar of California. You are a serious advocate of the public interest. However, there are issues, some of which are reflected in your memorandum, and others which are reflected in your conduct as a representative of the State Bar's Office of the Chief Trial Counsel (OCTC), which must be addressed.

It is not productive to belabor the details of the mutual dissatisfactions between you and the State Bar. I intend here to generally address the guiding principles that are necessary to maintain the relationship between you and the State Bar.

You serve OCTC which serves the public interest in the name of the State Bar of California. You are not a free agent to determine how you will represent the interests of your client, the State Bar of California, in particular cases. The manner in which the public interest is served through OCTC is determined by the Chief Trial Counsel's (CTC) exercise of prosecutorial discretion which is articulated through OCTC's managing agents.

As a former member of the military, I am sure you appreciate the importance of the chain of command and the importance of taking instructions from those in command. This is not a military environment and we do not adhere to the rigors encountered there. Nor is OCTC a democracy. OCTC respects open debate and discussion about case strategy and you have benefitted from these exchanges as much as anyone else in the office. However, the decision as to how the interests of the public will be represented in the name of the State Bar is the responsibility of the CTC's management structure. It is critical that the members of this office understand this principle and conform their behavior to the standards of the office. I welcome your debate and dissent on any issue. But ultimately, we require that you conform yourself to the State Bar's standards and the prosecutorial discretion that is reposed, not in you, but in the CTC and his management staff.

Additionally, it is important to recognize that the workplace is a place for work. Personal preferences must yield to the work of the office. It is inevitable that individuals will

EXHIBIT __3__

DEF 04180
CONFIDENTIAL

encounter others in the workplace whom they like and whom they dislike. Whether you like an individual or not is irrelevant. You need to get along with your supervisors, managers and co-workers and they need to get along with you. This is a condition of employment. As noted above, debate and discussion is more than tolerated in the office. However, disrespect for authority and disregard of the standards that apply to you as a representative of the office is not tolerable. As mentioned above, you are not a free agent and you are confined by the directions that are given to you by your supervisors and OCTC Management. You should feel free to openly discuss these issues within the office. But once the office has made its determination regarding how you will represent it, you are to adhere to those standards. As a professional, no less can be expected of you.

As I am also sure you appreciate, it is inevitable that attorneys, particularly dedicated attorneys like yourself, will find themselves at odds with judges who are making the final decisions regarding cases upon which we as advocates may feel passionately. As an attorney, you are an officer of the court and have a duty to respond to the judges before whom you appear as an officer. You have a duty to maintain appropriate respect due those judges whether you like them, agree with them or not. It is detrimental to yourself as an attorney and to the office as a whole for you to personalize disputes that arise in "the heat of battle" and which involve State Bar Court judges, respondents or their counsel. We all "sting" at times from the wounds we suffer in the name of advocacy. However, attorneys cannot be "thin-skinned" and we must put the interests of the State Bar ahead of our own.

I provide this to you in writing because you requested that I do so. I hope that this gives you some guidance as to those areas where you need to conform your conduct to the standards of the office of which you are a part. I remain open to questions and concerns that you may have. However, there is a point when you must accept the principle that you are either a part of the Office of the Chief Trial Counsel or you are not. If you are, you will yield to the standards of the office. If you choose not to yield to those standards, you will not continue to be a part of the office. I remain open and available to discuss any of your concerns with you on an ongoing basis.

cc:  Russell Weiner
     Iola Lee-LaMark

DEF 04181
CONFIDENTIAL